UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

DOWNEAST VENTURES, LTD.,     )
                           )
          Plaintiff,       )
                           )
      v.                )         Civil No. 05-87-B-W
                           )
WASHINGTON COUNTY *et al.*,     )
                           )
         Defendants.    )

**RECOMMENDED DECISION**

Downeast Ventures, Ltd., filed suit against Key Bank National Association, SN
Commercial, LLC, Jasper Wyman & Son, Washington County, the Washington County Sheriff's
Department, James Ebbert and his employer, the McShane Group, Inc. (the state-appointed
receiver of property in a foreclosure action commenced by KeyBank and presently being
maintained by SN Commercial against third parties), and Harry Bailey, a private investigator
hired by the receiver to assist in the location and acquisition of the bank defendants' collateral.
The gravamen of the complaint is that the defendants conspired to violate Downeast Ventures's
federal rights and various state law duties owed to Downeast Ventures, by wrongfully seizing
under color of state law and refusing to return certain assets allegedly owned by Downeast
Ventures and not reasonably subject to a possessory interest in the receiver. Now pending are
several preliminary motions filed by the defendants that seek the dismissal of the case or, in the
alternative, "abstention" in the exercise of this Court's jurisdiction. I recommend that the Court
deny the motions, in the main, but grant them all, in part, to the limited extent they request an
entry of judgment against Downeast Ventures's due process claim, and that it also grant, in part,

the motion submitted by the Washington County defendants for judgment in their favor against Downeast Ventures's state law tort claims.

## Rule 12

The defendants' six motions to dismiss invoke Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Although consideration of a request for abstention only makes sense when the Court has jurisdiction over both the subject matter and the parties, it is said that such a motion "is akin to a motion to dismiss for lack of subject matter jurisdiction."  DeLoreto v. Ment, 944 F. Supp. 1023, 1029 (D. Conn. 1996).  Unlike abstention, a challenge concerning a litigation's ripeness directly concerns the court's jurisdiction because it amounts to a contention that the plaintiff has failed to present a justiciable case or controversy and a court must dismiss an unripe action.  Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995).  The standards that apply to the abstention doctrines and to the ripeness issue are addressed below, in the discussion section of this recommendation.  For either issue, it is permissible for the Court to consider certain exhibits expressly relied upon or incorporated into the plaintiff's complaint as well as to—if necessary—accept evidence and enter findings concerning the jurisdictional questions.  See, e.g., Hernandez-Santiago v. Ecolab, Inc., 397 F.3d 30, 33 (2005) ("Where a party challenges the accuracy of the pleaded jurisdictional facts, the court may conduct a broad inquiry, taking evidence and making findings of fact."); Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363-64 (1st Cir. 2001) (same, discussing the two formats for challenging the existence of jurisdiction).

As for the Rule 12(b)(6) challenges:  "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief."  Greenier v. Colgan Air, Inc., 295 F. Supp. 2d 123,

124 (D. Me. 2003).   To determine that issue, the Court must "take the well pleaded facts as they appear in the complaint, indulging every reasonable inference in plaintiff's favor."  Id. (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)).  Ordinarily, a court considering a 12(b)(6) motion may not consider any "facts" other than those alleged within the four corners of the complaint, unless the court gives all parties a reasonable opportunity to present all material pertinent to the motion and "converts" the motion into a motion for summary judgment subject to Rule 56.  Id.  An exception is recognized, however, which permits a court to consider evidence beyond the allegations of the complaint so long as that evidence consists of documents that are not reasonably subject to challenge based on lack of authenticity, such as some public records and documents that are central to, incorporated into or sufficiently referred to in the complaint.  Greenier v. Pace, Local No. 1188, 201 F. Supp. 2d 172, 177 (D. Me. 2002) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

In effect, the record for purposes of the pending motions to dismiss is comprised of the allegations set forth in the First Amended Complaint, certain official court records, i.e., court orders entered in the matter of SN Commercial, LLC v. Guptill, Sr., et al., RE-04-02 (Me. Sup. Ct., Wash. Cty.), and, finally, a certain Reimbursement Agreement and associated documents executed by, among others, Carol Guptill on June 28, 2000, which agreement is referred to by Downeast Ventures in its First Amended Complaint and has been filed as an exhibit in support of Jasper Wyman & Son's motion.[1]  As always, all of the material facts are to be construed in the light most favorable to the non-movant, here Downeast Ventures.

---

[1]       As reflected in the Affidavit of Neal Pratt (Docket No. 40), submitted in support of Jasper Wyman & Son's Motion to Abstain and/or Dismiss (Docket No. 39), which is incorporated by reference into the other defendants' motions, the defendants would have the Court incorporate into the record numerous additional documents such as deposition transcripts, affidavits and motion papers produced in connection with the state court proceeding.  I have not incorporated all of these items into my factual recitation because I think that they would require the Court to convert all of the pending motions into summary judgment motions and none of the defendants other than the Washington County defendants (albeit to a limited extent) have taken the steps necessary to properly present

In addition to the foregoing Rule 12 challenges, Washington County, the Washington County Sheriff's Department, the Sheriff and his deputy ask that the Court "convert" a portion of their Motion to Dismiss into a motion for summary judgment to the extent that they may have sovereign immunity to Downeast Venture's state law tort claims. (Docket No. 50.) In support of this request, the County defendants have submitted a narrowly tailored statement of facts that complies with Local Rule 56. (Docket No. 51.) For purposes of addressing this contention, the Court might consider evidence outside the First Amended Complaint and should consider the exhibits expressly referred to therein, and, if it decides to base its disposition on a finding drawn from the former category of evidence, it would be required to convert the motion into a motion for summary judgment subject to Rule 56, including Rule 56(f) and this District's Local Rule 56. See, e.g., Coyne v. Cronin, 386 F.3d 280, 286 (1st Cir. 2004) (asserting that the district court should have "taken into account" certain concessions contained in the plaintiff's affidavit to the extent they were germane to the defendant's Rule 12 immunity defense, which the district court was legally obliged to resolve as soon as possible); McMillan v. College Pro Painters (U.S.) Ltd., 350 F. Supp. 2d 132, 135 (D. Me. 2004) (declining to convert a motion to dismiss into a motion for summary judgment where the Worker's Compensation Act's immunity provision was raised but the defense turned on a "nuanced" factual dispute, the defendant's sole evidentiary submission was an affidavit from an interested witness and the defendant's motion was not in compliance with Local Rule 56). However, the record need not be expanded for a summary judgment analysis of the county defendants' arguments because Downeast Ventures concedes judgment on the state tort claims against these defendants.

---

summary judgment motions in compliance with Local Rule 56. If the defendants believe that their motions turn directly on any of these omitted documents, they are free to take the matter up in objection to my recommendation.

**Facts**

Downeast Ventures Ltd. is a New York corporation with a place of business in the Town of Wesley, Maine.  Since May 15, 2000, the stock of Downeast Ventures has been owned in the following percentages:  25% by Kurt J. Guptill, 25% by William R. Guptill, Jr., and 50% by Carol A. Guptill.  (Compl. ¶¶ 1-2.)  Carol Guptill at all relevant times has been the President of Downeast Ventures.  William Jr. and Kurt also work for Downeast Ventures.  William Sr. does as well, but he owns none of the stock of Downeast Ventures.  (Id. ¶ 14.)

In June 2000 Key Bank National Association loaned Guptill Farms, Inc., $2.5 million.  Guptill Farms is owned 100% by William Guptill Sr.  The loan was secured by various assets of a blueberry business operated by Guptill Farms.  William Guptill, Sr., and his wife, Carol Guptill, guaranteed the loan, as did defendant Jasper Wyman & Son ("Wyman"), another corporation located in Washington County and engaged in the business of growing, processing and selling blueberries.  (Id. ¶ 13.)  At the time of the loan to Guptill Farms, Downeast Ventures was engaged primarily in the construction business.  Downeast Ventures was not a party to the loan transaction and none of the Guptills pledged any of Downeast Ventures's assets in connection with the loan.[2]  (Id. ¶ 14.)  As the caption reflects, neither the Guptills nor Guptill Farms is a party to this action.

---

[2]     The defendants contend that the Guptills have been using Downeast Ventures to hide their personal assets and Guptill Farms's assets from creditors and that Downeast Ventures's corporate veil ought to be pierced based on the Guptills's failure to observe corporate formalities.  (Wyman's Mot. to Dismiss at 10-11, Docket No. 39.)  There is some evidence in the record of a transfer of assets from William Guptill Sr. to Downeast Ventures (Docket No. 13, Ex. D), but there is a dispute as to whether these assets were excepted from Mr. Guptill's otherwise broad pledge of assets and, in any event, the existing 12(b)(6) record does not appear to be designed to permit the Court to determine whether all of the assets in which Downeast Ventures claims a possessory interest that were seized by the Receiver or the Sheriff were Guptill or Guptill Farms assets when the loan documents were executed.  An asset by asset analysis would be more appropriate based on a summary judgment record, wherein Downeast Ventures will have to establish ownership or title and an absence of any reasonable basis to conclude that the asset in question was collateral for the loan.  Alternatively, if documents in the possession of the defendants clearly and comprehensively reveal that all of the relevant asset seizures recited in the First Amended Complaint concern loan collateral, the defendants should have laid those facts out in a statement of material facts.

Sometime in 2003, Jasper Wyman & Son, through some agent of that corporation, made a report to Washington County Sheriff Joseph Tibbetts of the Washington County Sheriff's Department that William Guptill Sr. had fraudulently deprived Jasper Wyman of $300,000 worth of blueberries and attempted to have a criminal prosecution commenced against Guptill Sr.  (Id. ¶ 15.)  In June 2004, the Guptills asserted legal claims against Wyman and also against KeyBank based on the allegedly false accusations concerning the misappropriation of blueberries.  (Id.)[3] According to Downeast Ventures, Wyman and KeyBank thereafter cooked up a scheme to undermine Downeast Ventures in order to "effectively shut down the ability of the Guptill family to subsist."  (Id.)  Allegedly, this tactic was designed to pressure the Guptills to abandon their legal claims against Wyman and KeyBank.  (Id.)

Downeast Ventures asserts that Wyman officials are "very close friends of Sheriff Tibbetts and communicate with him on a first-name basis."  (Id. ¶ 16.)  They contend that Wyman consulted informally with Sheriff Tibbetts in 2003 about how best to pursue Guptill Sr. (Id.)  In addition, according to Downeast Ventures, in September 2003, Deputy Sheriff David Denbow of the Sheriff's Department assisted Wyman in pursuing its insurance claim for the blueberries Wyman claimed Guptill had taken.  Denbow allegedly "spoke at length with Wyman's insurance adjuster, violating state confidentiality laws in the course of defaming Mr. Guptill."  (Id. ¶ 17.)

Sometime in 2004, KeyBank instituted foreclosure proceedings against Guptill Sr., Carol Guptill and Guptill Farms in Washington County Superior Court under the caption KeyBank National Association v. Guptill, RE-04-02 (Me. Sup. Ct., Wash. Cty.).  In conjunction with that

---

[3]    The First Amended Complaint does not explain KeyBank's connection with the allegedly defamatory statement.  Nor does it explain the nature of Guptill Farms's business relationship with Wyman (processing and cold storage of Wyman's blueberry crop).  It is my understanding that that business relationship and the revenue Guptill Farms generated from it was a basic condition of KeyBank's loan and that severance of that business relationship was a primary justification for KeyBank's declaration of default and acceleration of the entire loan balance.

6

proceeding KeyBank petitioned the Superior Court for appointment of a receiver, as authorized in the loan documents. (Id., June 17, 2004, Order for Appt. of Receiver, Docket No. 40, Ex. 1.) The Superior Court ordered the appointment of, upon KeyBank's designation, the McShane Group, Inc. (Id. at 6.) Among the powers afforded to the Receiver are the powers to "require any person to immediately turn over to the Receiver possession and control of the Collateral, monies, accounts and all books and records relating to the Collateral" (id. at 8) and to "hire such agents . . . as may be necessary to assist it in carrying out the terms and provisions of this Order" (id. at 10). The McShane Group, allegedly KeyBank's and Wyman's joint designee for the receivership, operated as Receiver through the person of its employee, James C. Ebbert, a Rockland resident. (Id. ¶ 19.)

Downeast Ventures alleges that in 2004 and 2005, Wyman and KeyBank "used" Sheriff Tibbetts, Deputy Lester Seeley, and also the Receiver and Harry Bailey, a private investigator hired by the Receiver, "to cause the collapse of the business activities of Downeast" and with "flagrant disregard . . . undertook no precautions to assure that innocent third parties such as Downeast would not have their property taken" as collateral for the loan. (Id. ¶ 18.) According to Downeast Ventures, the defendants knew or should have known that the Receiver lacked the authority to take or interfere with the property of Downeast Ventures. (Id.) Downeast Ventures also asserts that the private defendants, KeyBank, Wyman, Bailey, and SN Commercial, conspired with the state defendants, Ebbert,[4] the Sheriff's Department, Sheriff Tibbetts and

---

[4]     The parties do not brief the issue of whether or when a court-appointed receiver is a state actor, although Downeast Ventures appears to conclude that it is when it acts under color of law to repossess property. Ebbert and McShane's motion to dismiss suggests there is some room for debate on this issue, but it does not provide any legal analysis. (Receiver's Mot. to Dismiss at 12, Docket No. 42 (stating that "McShane and Ebbert were appointed pursuant to contract[,] . . . not under state law").) Of course, Ebbert and McShane's invocation of judicial immunity suggests that they understand themselves to be state actors, at least to the extent they engage in activities authorized by the court's order of appointment. See Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1, 2-3 (1st Cir. 1976) (suggesting receivers are court officers, at least under Puerto Rico law).

Deputy Seeley, in an enterprise to interfere with Downeast Ventures's assets and constitutional rights, thereby becoming "state actors" themselves.  (Id. ¶¶ 21, 24.)

As for the Receiver, Downeast Ventures alleges that Ebbert and McShane "acted beyond their lawful mandate and wrongfully interfered with assets not within the assets of the Guptill Farm's receivership estate" (id. ¶ 22) because "[r]ather than merely performing his duties within the scope of the authority delegated, Ebbert took actions repeatedly to further the wrongful purposes of Wyman and KeyBank and damaged the Plaintiff with activities well beyond the scope of his authority" (id. ¶ 23).  Downeast Ventures also maintains that KeyBank and Wyman jointly paid the Receiver for these activities, and, in return, the Receiver "bestowed benefits upon KeyBank and Wyman – all without seeking or obtaining any Court approval for any of those actions." (Id. ¶ 23.)  Downeast Ventures alleges based on information and belief, that "apart from the compensation arrangements, Ebbert also had other conflicting interests contributing toward his taking actions to help Wyman:  just a few months prior to being appointed receiver, Ebbert had dealings with Wyman to become a workout consultant for Wyman with respect to Wyman's financial problems arising in connection with the [roughly] $20 million judgment against Wyman [and other blueberry processors] for price fixing." (Id. ¶ 23.)

According to Downeast Ventures, the Receiver hired KeyBank's lawyer to represent him in court proceedings and worked closely with that attorney to pursue Downeast Ventures's assets over the course of many months.  (Id. ¶ 25.)  On June 24, 2004, Ebbert visited the Guptill Farms facility in Wesley, Maine, together with two top executives of Wyman, Nat Linquist and Homer Woodward.  During that visit, Mr. Lindquist (Wyman's Vice-President of Operations) led Ebbert to believe that certain pieces of Downeast Ventures's construction equipment constituted collateral for KeyBank's loan and that it had been wrongfully removed by William Guptill, Sr.,

from the Plant.  Lindquist suggested to Ebbert that the bank's collateral included certain bulldozers used in a "road building/repair business" owned by Guptill.  Upon information and belief, Lindquist insinuated wrongdoing in regard to that equipment stating to Ebbert that Lindquist had been "tipped off by someone" in the fall of 2003 that "some of the equipment" could be found "in a gravel pit in Machias."  (Id. ¶ 27.)  According to Downeast Ventures, Lindquist knew, or should have known, that the construction equipment he was referring to was owned by Downeast and was not bank collateral and that it should not be interfered with by Ebbert and McShane.  Upon information and belief, Lindquist knew that Downeast Ventures had no involvement in the KeyBank loan and also knew that none of Downeast Ventures's equipment served as collateral for KeyBank or Wyman.  According to Downeast Ventures, Lindquist knew that Downeast had turned down a specific request to have Downeast Ventures equipment added to the collateral securing the Guptill Farms debt.  (Id. ¶ 28.)  Downeast Ventures asserts that the Receiver also knew or should have known that Downeast Ventures's assets were not pledged in connection with the KeyBank loan or for any obligations owing to Wyman & Sons.  (Id. ¶ 29.)

On several occasions Downeast Ventures "warned" Ebbert and McShane that they were wrongfully interfering with Downeast Ventures's assets.  On July 16, 2004, Downeast wrote to KeyBank and Wyman objecting to Ebbert's having taken possession of various items of Downeast Ventures's property and pointing out that the property was not subject to any security interest running to the bank.  (Id. ¶ 35.)

On or about July 16, 2004, without obtaining court approval, KeyBank agreed to pay Ebbert $250 per hour for his work as the Receiver, which Downeast Ventures characterizes as "an extraordinary hourly rate."  (Id. ¶¶ 30, 33.)  Thereafter, Wyman agreed to pay KeyBank half

of the Receiver's fees and expenses.  (Id. ¶ 31.)  Later still, SN Commercial agreed to undertake KeyBank's obligations (and receive its benefits) in respect to both agreements.  (Id. ¶ 32.) According to Downeast Ventures, KeyBank, SN Commercial and Wyman paid Ebbert for activities such as "searches" through the woods, clerical record examinations, attendance at depositions and "reconnaissance" drives with Detective Bailey, even though the Receiver had over 25 employees available to perform such tasks.  Downeast Ventures alleges that these defendants willingly paid these sums in order to curry favor with Ebbert and to encourage continued interference with Downeast Ventures.  (Id. ¶ 33.)  In early August 2004, Ebbert leased Guptill Farms's cold storage facility and various equipment and machinery on the site to Wyman, allegedly at a rate well below market value.  (Id. ¶ 34.)

    In August 2004, Ebbert, McShane, KeyBank and Wyman agreed to retain a private investigator named Harry Bailey who operated through the entity, Harry Bailey & Associates.  According to Downeast Ventures, Bailey has represented to at least one person that he is currently a state police detective.  (Id. ¶ 36.)  On or about August 17, 2004, Ebbert, Bailey and an officer of the Maine State Police, without a warrant and without notice to or authorization from the third party property owner, entered onto private property and seized a Kenworth dump truck as well as two Case International Tractors and other assets belonging to Downeast Ventures over the property owner's protest, thanks to the active participation of the state police officer.  (Id. ¶¶ 37-38.)  On August 19, 2004, Downeast Ventures wrote to KeyBank to protest the seizure of the dump truck and provided evidence of ownership or title in Downeast Ventures.  (Id. ¶ 39.)

    On August 20, 2004, Ebbert, Bailey and one or two deputy sheriffs (including Deputy Seeley) entered a gravel pit owned by another third party and seized a front-end loader and two

bulldozers.  Downeast Ventures does not allege a possessory interest in either vehicle and expressly denies such an interest in the front-end loader.  (Id. ¶ 40.)  The search and the seizures were accomplished because of the active assistance of the deputy sheriffs, despite the lack of any warrant.  (Id.)

On August 24, 2004, Ebbert, Bailey and a deputy sheriff entered another third-party property and seized numerous items owned by Downeast Ventures.  The entry onto the land was again without permission and without a warrant and the seizure of the property was accomplished with the active assistance of law enforcement authorities.  (Id. ¶¶ 43.)  On August 25, 2004, Downeast Ventures's attorney wrote separately to Ebbert and KeyBank to object to an alleged conversion of and interference with assets owned by Downeast Ventures.  (Id. ¶ 45.)

Between 8:30 p.m. on August 25 and 1:30 a.m. on August 26, 2004, Ebbert, with the assistance of Bailey and at least one officer of the Maine State Police went on land owned by William Guptill and seized more property belonging to Downeast Ventures.  The property seized included six very valuable pieces of heavy equipment (each valued at $60,000 or more by Downeast Ventures) that William Guptill had transferred to Downeast Ventures in April 2003.  (Id. ¶¶ 46-47.)  According to Downeast Ventures, KeyBank had specifically excluded that equipment from the list of collateral associated with the loan because it was subject to preexisting financing with Soris Financial.[5]  These seizures were also accomplished without a warrant, and without notice or any authorization and were achieved because of the active assistance of one or more state officers who Ebbert and Bailey brought to the scene after dark and after first being refused access by one Richard Peasley.  According to Downeast Ventures, the officers demanded the keys to allow Ebbert, Bailey and the officers onto the property and

---

[5]       The defendants assert that these assets were expressly pledged as collateral.  Even if that is so, it does not explain away the other alleged seizures.

Ebbert and Bailey threatened Mr. Peasley by stating they were going to get Sheriff Tibbetts if he did not comply.  (Id. ¶ 46.)

According to Downeast Ventures, on September 1, 2004, Ebbert's and McShane's attorney responded to the August 25, 2004, letter from Downeast Ventures's attorney and acknowledged that Ebbert had no right to take possession of, or to interfere with, property of Downeast.  That letter was copied to Ebbert.  Nevertheless, Ebbert, KeyBank, Wyman and SN Commercial continued thereafter (with the active assistance of Sheriff Tibbetts and Deputy Seeley) to interfere with Downeast Ventures's assets acting as if those assets were the property of the receivership estate.  (Id. ¶ 52.)

Downeast Ventures alleges that, as a result of the seizures of much of its equipment, its business faltered and it was forced to attempt to sell its remaining equipment.  (Id. ¶ 56.) Downeast Ventures asserts that Ebbert and McShane knew as of September 2004 that they had violated Downeast Ventures's rights, but instead of returning the property, attempted to obtain a written release from Downeast Ventures of all wrongs done by Ebbert.  (Id. ¶ 57.)  Also in September 2004, Seeley seized a Mack dump truck owned by Downeast Ventures despite being informed by a Downeast Ventures employee that the vehicle was Downeast Ventures's property and that it should not be taken.  (Id. ¶ 58.)  Seeley threatened to take action against the employee if he did not cooperate with Seeley in finding yet another Mack truck that Seeley claimed he was entitled to seize.  (Id. ¶ 59.)

On or about September 23, 2004, KeyBank sold the Guptill Farm loan to SN Commercial, LLC.  SN Commercial advised the Guptills by a letter dated October 11, 2004, that it was the new holder of the KeyBank obligations.  SN Commercial was then substituted as a

party in pursuing the Guptills on the KeyBank debt.  SN Commercial thereafter allegedly took up KeyBank's "interfering and harassing" behavior.[6]  (Id. ¶ 60.)

Around Thanksgiving 2004, Ebbert and McShane seized a $20,000 backhoe owned by Downeast Ventures that was located in Bought Corners, New York.  (Id. ¶ 53.)  In November and December 2004, despite explicit requests, SN Commercial refused to call upon Ebbert to cease his activities against assets of Downeast Ventures.  SN Commercial continued to finance Ebbert's activities against Downeast Ventures and failed to require the return of Downeast Ventures's assets.  KeyBank, Wyman, Ebbert and SN Commercial continued to ignore the fact that Downeast Ventures's assets were not the proper subject of any collection activities.

In February 2005, Ebbert, Bailey and Seeley (in uniform) came onto the property of a third party and seized a vehicle owned by Downeast Ventures.  The vehicle seized (another dump truck) had Downeast Ventures's insignia painted along the doors of the truck, and the vehicle had been entirely paid for by Downeast and was listed on its financial statements from the day it was purchased.  The third party advised Seeley not to take the vehicle and that he was in effect stealing property, to which Seeley allegedly responded that it did not matter to him and that he would take the vehicle in any event.  (Id. ¶ 67.)

In March 2005, Downeast Ventures terminated its business and lost construction projects and other sources of income as a consequence of the defendants' actions.  (Id. ¶¶ 68-69, 73.) Seizures of Downeast Ventures's property continued with similar seizures occurring in May 2005, albeit with the participation of Sheriff Tibbetts, including threats of legal action if third

---

[6]     Downeast Ventures alleges that the defendants interfered with Downeast Ventures's activities by preventing it from selling certain Downeast Ventures's assets that it could no longer maintain payments on due to the disruption of its business caused by the seizure of other property.  Downeast Ventures asserts that the equipment was repossessed as a result and that Downeast Ventures will likely be faced with a deficiency judgment in regard to these pieces of property.  (Id. ¶ 62.)

parties did not comply with his instructions.  (Id. ¶¶ 70-71.)  Downeast Ventures commenced this lawsuit on June 16, 2005.

The Term Loan Agreement lists various categories of security.  With respect to Downeast Ventures's property, the closest category mentioned in the Agreement is a "[c]ontinuing first (1st) priority security interest cover of [sic] each Borrower's . . . investment property . . . now owned or hereinafter acquired."  (Wyman's Mot. to Dismiss, Ex. 2.C at § 1.2.)[7]  However, although the Agreement expressly recites as security a "[p]ledge and [s]ecurity [a]greement covering all stock and rights in Guptill Farms, Inc.," there is no corresponding pledge or security agreement listed in respect to Downeast Ventures.  (Id.)

## Discussion

Downeast Ventures presses the following claims, by count:

1.      § 1983;
2.      Conversion;
3.      Wrongful repossession (11 M.R.S.A. § 9-503);
4.      Interference with chattels;
5.      Interference with existing business relationships;
6.      Interference with prospective economic advantage;
7.      Abuse of process;
*8.*      *omitted;*
9.      Maine Civil Rights Act;
10.      Punitive damages; and
11.      § 1988 (attorneys' fees).

## A.      Ripeness

 Wyman argues, and the other defendants echo by reference, that this action is not ripe because the Receiver is merely collecting and preserving assets pending a final ruling on the state court foreclosure claim.  (Wyman's Mot. to Dismiss at 28, Docket No. 39.)  Because the state court proceeding would permit the state court to determine the ownership of the subject

---

[7]      Wyman also submitted, among other documents, a Commercial Loan Security Agreement which appears to exhibit Carol Guptill's hypothecation of various categories of personal property.  (Wyman's Mot. to Dismiss, Ex. 2.H.)  The categories include accounts, equipment, inventory, farm products and general intangibles.

property, Wyman proposes that this federal claim will not be ripe until the state court rules.  (Id.)

I fail to see the logic in this argument.  This lawsuit is obviously ripe because it alleges a real and

immediate deprivation of property seized under color of state law without any basis in reason,

which implicates, at least, the Fourth Amendment.  That claim can be determined based entirely

on an application of historical facts to the law.  It is further alleged that this deprivation has

essentially destroyed Downeast Ventures's ability to conduct its business and, by extension, the

Guptills' ability to subsist, which presents a significant hardship for purposes of the second,

prudential prong of the ripeness test.  McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 70 (1st

Cir. 2003).  Although there is a concern regarding the Fourteenth Amendment due process claim

because of the potential availability of a post-deprivation remedy, the state law tort theories

alleged by Downeast Ventures, over which this Court may exercise jurisdiction supplemental to

its federal question jurisdiction, are all ripe for the same reason that they would be ripe in state

court if they had been presented there.

**B.      Rule 12(b)(6): "failure to state a claim upon which relief can be granted"**

Wyman argues, and the other defendants echo by reference, that the allegations in the

First Amended Complaint do not implicate any constitutional rights and, therefore, Downeast

Ventures fails to state a claim under § 1983.  Wyman and the other "private" parties also argue

that the claims cannot be pressed against them because they are not state actors.  The Receiver

(McShane and Ebbert) and the individuals acting in concert with the Receiver (Bailey and the

county defendants) argue judicial immunity and derived judicial immunity, respectively.  The

county defendants also argue that they have sovereign immunity with regard to the state tort

claims.

      *1.     Unreasonable Seizure*

Downeast Ventures has alleged a Fourth Amendment claim premised upon seizures of property that allegedly could not have occurred without the active participation of state officers. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  This suit is premised on the Receiver's seizure and alleged ongoing interference with Downeast Ventures's possessory interests in business equipment and assets.  The Supreme Court's opinion in Soldal v. Cook County, 506 U.S. 56 (1992),[8] demonstrates that this action may proceed on an unreasonable seizure theory regardless of the fact that it might not be viable on a due process theory based on the availability of post-deprivation remedies afforded by the State.  Id. at 60-62; see also id. at 70 (rejecting an argument that the court should construe this sort of claim as, exclusively, a due process claim).

      *2.     Due Process*

The defendants contend that the First Amended Complaint fails to state a due process violation because it alleges unauthorized deprivations and state law affords meaningful post-

---

[8]      This Fourth Amendment claim's contours are not very completely drawn in these papers.  None of the parties' memoranda contain a detailed analysis of applicable Fourth Amendment law, including its reliance upon the *objective* reasonableness of the state actor's conduct.  To the extent the Wyman memorandum makes this argument it relies in part on the Heuser Affidavit and an analysis of other exhibits that could be properly undertaken only in the context of a motion for summary judgment.  Clearly a motion to dismiss for failure to state a claim must be examined under the pleading standard set forth in Watterson, 987 F.2d at 3, not to mention Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (concerning Rule 8 and reliance upon conclusory allegations), and under that standard I cannot recommend dismissal of the Fourth Amendment claim.  See also Walker v. Thompson, 288 F.3d 1005, 1007 (6th Cir. 2002) (citing Swierkiewicz and observing that "there is no requirement in federal suits of pleading the facts or the elements of a claim, with the exceptions (inapplicable to this case) listed in Rule 9 [so that] it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with").  Nor do the parties discuss the concept of qualified immunity as to some of the defendants in the context of these particular facts.  Although the Soldal case clearly endorsed the notion that a civil dispute such as this could give rise to a Fourth Amendment claim, there are important distinctions in this case, including, primarily, the fact that the Receiver purports to have acted pursuant to a court order.  While I reject that absolute judicial immunity is called for in the context of these motions, I do not mean to suggest that ultimately this Fourth Amendment claim would necessarily survive dispositive motions brought by some or all of the defendants or that the doctrine of judicial immunity could not be reasserted in the context of a summary judgment motion.  It is simply that these motions have not focused directly upon the core reasonableness issue that underlies the Fourth Amendment claim.

deprivation remedies.  (See, e.g., Wyman's Mot. to Dismiss at 31-32.)  Downeast Ventures addresses the Rule 12(b)(6) challenge to its § 1983 claim in its brief in opposition to Washington County's Motion to Dismiss.   In that brief Downeast Ventures fails to discuss or cite authority supportive of its claim for a due process violation, effectively abandoning it.[9]  In any event I am satisfied that the proper basis for any constitutional claim in this case would arise under the Fourth Amendment unreasonable seizure of property rubric.

    *3.*    *The state actor issue*

    Wyman, KeyBank, SN Commercial and Harry Bailey all argue that the First Amended Complaint fails to state a § 1983 claim against them because they are not state actors and the allegations are insufficient to generate the possibility that a set of facts might be proven to support a finding of a conspiracy to violate Downeast Ventures's civil rights.  (Wyman's Mot. to Dismiss at 36-43; KeyBank's Mot. to Dismiss at 2-4, Docket No. 43; SN Commercial's Mot. to Dismiss at 13-16, Docket No. 44.[10])  Downeast Ventures responds to the banks' motions as follows:

> Paragraph 21 of the Complaint alleges that SN and KeyBank conspired with and actively assisted the various law enforcement personnel and the receiver in interfering with Downeast's assets in violating Plaintiff's constitutional rights. The Complaint alleges that there were repeated and frequent consultations with KeyBank and SN and that KeyBank and SN were the beneficiaries of the taking of the property and had a contract with the receiver to take the property[footnote omitted].[11]  They, in fact, paid for receiver's time and all of the activities that

---

[9]     Downeast Ventures makes a passing reference to due process in the context of its opposition to Colorado River abstention, but it nowhere briefs its due process claim.  (See Mem. in Opp'n to Wyman's Mot. to Dismiss at 9, Docket No. 57.)

[10]     Mr. Bailey does not address this issue or incorporate the other defendants' "state actor" arguments by reference.  (See Bailey's Mot. to Dismiss at 9, Docket No. 49, incorporating arguments concerning lack of a constitutional deprivation, but not the state actor argument.)

[11]     Downeast Ventures refers to Maine law on agency relationships, noting that principals (meaning the bank defendants) are liable for the acts of their agents (meaning the Receiver).  It is not clear to me exactly how state agency law relates to whether these private entities were state actors within the meaning of § 1983.  Washington County, the Sheriff and his deputy incorporate Wyman's § 1983 arguments by reference (County Defendants' Mot. to Dismiss at 6, Docket No. 50).  The county defendants are clearly state actors.  It seems to me, at this juncture, that the only way the bank defendants become state actors is through the allegation of a conspiracy between them and Sheriff Tibbetts.  (I also recognize that, at least for purposes of this motion, the Receiver claims he is a state

were undertaken.  They are alleged also to have paid excessive amounts of money
to the receiver to encourage his interference with Downeast's property.  See
Complaint ¶¶ 25, 32, 33.

    If these allegations are not sufficient, the Complaint continues on and notes
that SN interfered with Downeast's assets and took the position with no legal
basis that SN did have the right to take Downeast's assets and interfere with its
assets.  The attorney for the receiver had earlier issued an opinion that they had no
right to such assets.  See Complaint ¶ 52.  It is alleged in paragraph 61 that SN
also refused to call upon the receiver to cease his activities in pursuing assets of
Downeast and that SN continued to finance those continuing activities against
Downeast and failed to require the return of Downeast's assets.  See Complaint ¶
61.  It is also alleged that KeyBank and SN continued to ignore the fact that
Downeast's assets were not the proper subject of any collection activities.  Those
activities continued through to at least March of 2005.  See Complaint ¶¶ 61-71.

(Mem. in Opp'n to KeyBank's and SN Commercial's Mot. to Dismiss at 1-2, Docket No. 58.)

With respect to Wyman, Downeast Ventures points to allegations that characterize Wyman as an

instigator of the asset seizures in question and as a party, alongside the banks, who bankrolled

the Receiver's activity and dissuaded the Receiver from relinquishing possession of the property

despite an alleged expression of opinion from the Receiver's attorney that the Receiver lacked the

authority or power to continue in possession of Downeast Ventures's property.  (Mem. in Opp'n

to Wyman's Mot. to Dismiss at 18-19 & n.19, Docket No. 57.)  With respect to Washington

County, the Sheriff and his deputy, Downeast Ventures alludes to Soldal and argues that the

Sheriff and his deputy participated in planning strategies with the other defendants regarding

how to seize Downeast Ventures's property, without having a reasonable basis to conclude that

the property in question was actually subject to seizure and in the face of assertions to the

contrary by those individuals having custody of the property.  (Mem. in Opp'n to Wash. Cty.

Defs.' Mot. to Dismiss at 7-8, Docket No. 54.)

---

actor and theoretically his involvement in such a conspiracy would also satisfy the "under color of state law"
component of § 1983.)

A section 1983 claim does not lie absent state action.  Casa Marie, Inc. v. Superior Court of P.R., 988 F.2d 252, 258 (1st Cir. 1993);  42 U.S.C. § 1983 (providing remedy for deprivations "under color of any statute, ordinance, regulation, custom, or usage" of any state or territory).  There are two components to the "state action" requirement.  First, the deprivation must be shown to have been caused by the exercise of some right or privilege created by the state, or by a rule of conduct imposed by the state, or by a person for whom the state is responsible.  Casa Marie, 988 F.2d at 258.  Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.  Id. Where a private individual is a defendant in a section 1983 action, there must be a showing that the private party and the state actor jointly deprived plaintiff of her civil rights.  Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir. 1987); Casa Marie, 988 F.2d at 258-59; see also Dennis v. Sparks, 449 U.S. 24, 27-28, 66 L. Ed. 2d 185, 101 S. Ct. 183 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.").

Alexis v. McDonald's Rest., 67 F.3d 341, 351 (1st Cir. 1995).  I conclude that Downeast Ventures adequately pleads a civil rights conspiracy claim against all of the defendants because the seizures in question were allegedly accomplished through the exercise of power or authority bestowed by the state and the private defendants were allegedly jointly engaged with the state defendants in the exercise of said power and authority.  Thus, for example, it is alleged that the Receiver followed the dictates of the bank defendants and Wyman over the advice of its own counsel with regard to the seizure and retention of the subject property and the Sheriff and his deputy exercised the coercive power of their state offices on behalf of the bank defendants, Wyman and the Receiver even in the absence of, allegedly, reasonable cause to believe that the property they were seizing and/or repossessing was part of the receivership estate.  This symbiotic relationship was also, allegedly, sympathetic [12]:  certain Wyman officials and the Sheriff are alleged to be close friends; Wyman and the banks are alleged to have given the Receiver a sweetheart financial arrangement, which the Receiver is alleged to have reciprocated by leasing the Guptill Farms cold storage facility at a below market rate to Wyman and by

---

[12]      The parties do not brief what role, if any, the Sheriff's motivations should play in assessing whether or not a Fourth Amendment violation has been pled.

pursuing Downeast Ventures's property at the behest of Wyman and the banks; and the Receiver

and KeyBank are alleged to have retained the same litigation counsel in the state law

proceedings.  In sum, the allegations of the First Amended Complaint suggest that a set of facts

could be proven to justify extending § 1983 liability to the private defendants based on the

existence of a civil rights conspiracy.  See Walker, 288 F.3d at 1007 ("[I]t is enough in pleading

a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the

defendant has notice of what he is charged with").

## C.    Immunity

Ebbert and McShane (the Receiver defendants) argue that they have derived absolute

judicial immunity from the court that appointed them.  (Receiver's Mot. to Dismiss at 8-10,

Docket No. 42.)  Bailey, the private investigator, contends that he, too, is absolutely immune

based on a further derivation of immunity from the Receiver.  (Bailey's Mot. to Dismiss at 5-9,

Docket No. 49.)  Finally, the Washington County defendants assert both derived judicial

immunity and, in relation to the several state law tort claims in the First Amended Complaint,

sovereign immunity.  (Wash. Cty.'s Mot. to Dismiss & Mot. Summ. J. at 5-12, Docket No. 50.)  I

address judicial immunity first.

### 1.    Judicial immunity

According to the Receiver, "there is no question that McShane and Ebbert were faithfully

and carefully carrying out their duties as delineated in the Receivership Order and the Amended

Receivership Order."  (Receiver's Mot. to Dismiss at 9.)  The Receiver draws the "faithfully and

carefully" language from Kermit Construction Corporation v. Banco Credito Y Ahorro Ponceno,

547 F.2d 1, 3 (1st Cir. 1976), in which the First Circuit Court of Appeals observed that "a

receiver who faithfully and carefully carries out the orders of his appointing judge must share the

judge's absolute immunity" and that it "would seriously encroach on the judicial immunity already recognized by the Supreme Court" if such immunity were denied.  Absent such broad immunity, reasoned the <u>Kermit</u> Court, receivers would be "a lightning rod for harassing litigation aimed at judicial orders."  <u>Id.</u>[13]  In a case cited approvingly by the First Circuit, <u>Bradford Audio Corporation v. Pious</u>, the Second Circuit Court of Appeals held that a state court-appointed receiver was immune from a civil rights due process claim where his act of taking custody over an existing fund was specifically ordered by the state court.  392 F.2d 67, 73 (2d Cir. 1968).  Thus, the court distinguished the case from a situation in which a receiver or other state administrative official exercises discretion in carrying out court mandates and strays beyond the scope of the mandate in question.  <u>Id.</u>  Also cited approvingly by the First Circuit was <u>Drexler v. Walters</u>, 290 F. Supp. 150 (D. Minn. 1968).  In <u>Drexler</u>, the court granted motions to dismiss § 1983 claims filed against a receiver.  As in <u>Bradford Audio</u>, the acts undertaken by the receiver that served as the gravamen of the complaint (the opening of certain mail that had accumulated in a post office box and the turning over of accounts receivable subject to the receiver's control) were specifically ordered by the court.  <u>Id.</u> at 154.[14]  In any event, the First Circuit has expressed

---

[13]     <u>See also</u> <u>Cok v. Cosentino</u>, 876 F.2d 1, 3 (1st Cir. 1989) (affirming dismissal of due process claims and conspiracy claims brought against state court and its court-appointed guardian ad litem and conservator in a divorce proceeding where guardian merely prepared reports and made recommendations and the conservator's disposition of certain assets by sale was previously found by the state court to be "performed to aid and inform the family court").

[14]     The Fifth Circuit Court of Appeals appears to have taken the federal, absolute judicial immunity doctrine the furthest in aid of a state court receiver in <u>Davis v. Bayless</u>, 70 F.3d 367 (5th Cir. 1995).  In that case, the Fifth Circuit affirmed the dismissal of a Fourth Amendment claim by a homeowner against a receiver based on judicial immunity where the homeowner's residence was searched by an agent of the receiver pursuant to permission granted by the judgment debtor, who was a co-inhabitant at the home but whose authority to grant permission was assumed not to exist.  The Court reasoned that immunity applied because of the receiver's general authority under state law to take possession of the judgment debtor's property and the judgment debtor's legal obligation to cooperate "by providing access to places where such property might be located."  <u>Id.</u> at 371-72.  Other courts have taken a more circumscribed approach.  In <u>Brown v. Costello</u>, 905 F. Supp. 65 (N.D.N.Y. 1995), the district court addressed federal claims against a receiver premised on allegations that the receiver had exceeded his authority in taking possession of certain property on the plaintiff's junkyard premises.  The court ruled on the matter at the summary judgment stage, not on a motion to dismiss, based on a summary judgment record that established that the receiver was instructed by the court to take possession of and sell certain offending automobiles, auto parts and miscellaneous junk on the premises that had been the subject of a municipal enforcement action.  <u>Id.</u> at 75-77.  In the course of carrying out these specifically assigned duties, the receiver, among other things, had "sought an order from

21

that immunity will not extend to a receiver where he fails to act "faithfully and carefully," the standard that the Receiver, Bailey and the Sheriff all rely on.  This language reflects that there is a limit to judicial immunity for receivers.  A state court-appointed receiver has been denied immunity at the dismissal stage for allegedly stealing assets of an estate and for slandering parties, New Al. Dev. Corp. v. Guetschow, 869 F.2d 1298, 1304-305 (9th Cir. 1988) (declining to characterize theft and slander as judicial acts).

In the instant case, the material allegations are that the Receiver conspired to wrongfully dispossess Downeast Ventures of the tools and equipment of its trade even in the face of an opinion by its counsel that Downeast Ventures's assets were not collateral subject to his appointed office.  Contrary to the Receiver's assertion, the First Amended Complaint suggests that a set of facts could be proven that are inconsistent with a finding that the Receiver "faithfully and carefully" performed his quasi-judicial duties.  Furthermore, to the extent the Receiver engaged in discretionary law enforcement functions like searching for and seizing property that he knew was subject to a competing claim to possession, immunity is likely to be qualified rather than absolute.  Cf. Bernard v. County of Suffolk, 256 F.3d 495, 502-503 (2d Cir. 2004) (discussing the "functional approach" to deciding whether a prosecutor has absolute immunity for engaging in "advocacy" during the "judicial phase of the criminal process" or qualified immunity for engaging in law enforcement functions).  Based on these allegations Downeast Ventures has asserted state law tort claims of conversion, wrongful repossession, interference with chattels, interference with existing business relationships and prospective economic advantage.  I find it difficult to construe such tortious acts as judicial in nature or to explain how

---

the [state] court clarifying the term 'miscellaneous junk'" and subsequently the receiver's accounting of what was taken and sold was "settled by order of the [state] court." Id. at 77.  The court, thus, awarded summary judgment to the receiver based on the "inescapable conclusion that plaintiffs have failed to demonstrate that [the receiver's] actions were taken in clear and complete absence of . . . authority." Id.

the Receiver's court-ordered authority to take possession of "collateral" can be broadly construed as an authorization to seize the property of an entity who was not party to the loan and, according to the First Amended Complaint and an initial reading of the loan security documents, whose assets (in the main) do not readily appear to have been hypothecated in connection with the loan.[15]  Accordingly, I conclude the Court cannot resolve the question of the applicability of the immunity defense at the pleading stage.  Even if it could, the doctrine would not extend beyond the Receiver.  See Kermit, 547 F.2d at 3 (reversing dismissal of claims against private parties alleged to have conspired with receiver despite receiver's immunity).

   2.   *Sovereign immunity for the Washington County defendants*

   Washington County, its Sheriff and his deputy assert in the summary judgment portion of their motion that sovereign immunity applies to all of the tort claims raised against them because Downeast Ventures failed to comply with the notice requirements of the Maine Tort Claims Act. (Wash. Cty. Mot. to Dismiss at 7-8, Docket No. 50.)  They also argue that, even if notice had been provided, there is no exception to sovereign immunity that would apply for the tort claims presented in this case.  (Id. at 8-12.)  Downeast Ventures concedes that the Washington County defendants have no liability "under the state law, non-statutory tort claims."  (Pl.'s Opp'n to Wash. Cty. Mot. Summ. J. at 1 n.1, Docket No. 54.)  Accordingly, judgment should enter for Washington County, the Washington County Sheriff's Department, Sheriff Tibbetts and Deputy Seely against Downeast Ventures's state law tort claims.

---

[15]      By no means do I presume to determine the merits of this issue at this juncture.  The parties memoranda do not even attempt to brief the issue and it would be premature to venture any speculation.  The defendants suggest that some or all of the assets in question were fraudulently conveyed to Downeast Ventures to avoid the creditors of the Guptills and Guptill Farms and that Downeast Ventures's corporate form ought to be disregarded, but the existing record does not support such categorical findings.

**D.      The Maine Superior Court need not authorize this suit.**

The Receiver argues that because the Receiver has possession of the disputed property, that property is in *custodia legis* and, therefore, the Superior Court has exclusive jurisdiction to control the disposition of that property unless it consents to let an interested party pursue a claim in another forum.  (Receiver's Mot. to Dismiss at 4-6.)  In addition to treatises on receivers, the Receiver cites some common law cases including Hazzard v. Westview Golf Club, 217 A.2d 217 (Me. 1966), and Chalmers v. Littlefield, 69 A. 100, 104-105, 103 Me. 271, 283 (1907).  Of course, Downeast Ventures's § 1983 claim is predominantly a claim for damages, although Downeast Ventures also requests the return of its property.  In any event, Downeast Ventures asserts that because its First Amended Complaint alleges wrongful possession obtained by the Receiver through unauthorized, unconstitutional activity, the Superior Court has no heightened prerogative over Downeast Ventures's claims, citing another selection of common law cases in which it is stated that receivers who act beyond their authority are subject to personal liability. In Hazzard, the Law Court observed:

> A receiver appointed by a court of equity is an officer thereof and property in his possession which constitutes a part of the estate that is the subject of the receivership is in custodia legis until it is disposed of by the receiver in compliance with an order of that court.

217 A.2d at 223.  One possible consequence of this rule of law is that, assuming this Court should rule or declare that the property in question was unreasonably seized and is not rightfully in the possession of the Receiver, that ruling would not necessarily be sufficient in itself for Downeast Ventures to recover possession of its property. [16]  However, such concerns would not exist with regard to a judgment entered on a verdict for money damages, should that come to

---

[16]      The Superior Court's first receivership order denies the Receiver the authority to dispose of collateral without a court order, but it does not appear to prevent him from releasing non-collateral.  (Order for Appointment of Receiver at 9, ¶ 11, Docket No. 40, Ex. 1.)

pass.  Thus, the rule stated in <u>Hazzard</u> does not appear to dictate that the factual question of whether Downeast Ventures was unconstitutionally or wrongfully dispossessed of the property in question must be passed upon by the state court.

In <u>Chalmers</u>, the Law Court observed that property in *custodia legis* is not "subject to seizure and sale on execution."  69 A. at 104, 103 Me. at 282.  Instead, if a creditor of the estate believes that articles of property are "not properly in the hands of the receiver, or that the demands for which it is placed there are unjust, it is his duty to apply to the same court which appointed the receiver and placed him in possession thereof, for its discharge from legal custody, that he may proceed against it by suitable process in his own behalf."  <u>Id.</u>  The Receiver appears to concede that this rule does not undermine this Court's jurisdiction over Downeast Ventures's claims, but argues instead that it amounts to a "condition precedent" restricting Downeast Ventures's right to institute any action against the Receiver in this Court.  (Receiver's Mot. to Dismiss at 5-6.)  The difficulty of applying this rule is that Downeast Ventures is not a "creditor" of the estate and is not seeking to seize or sell on execution any of the estate's assets.  It is, instead, attempting to vindicate Ebbert and McShane's alleged violations of federal rights and state tort duties committed in concert with the other defendants, while acting under color of state law but beyond the scope of the authority bestowed by the Superior Court, in their individual capacities, not in their official capacity as "the Receiver."  This distinction was raised by the plaintiffs in the <u>Chalmers</u> case, but the Law Court ruled that the distinction had no effect there because "it was not in controversy that whatever was done by [the defendants] was done in their capacity as receivers."  <u>Id.</u>  I am ultimately not persuaded that the common law pertaining to receivers somehow prevents this lawsuit from going forward or requires that the Superior Court pre-approve this litigation against Ebbert and McShane.

**E.      Abstention**

Finally, the defendants contend that the Court should abstain from exercising jurisdiction over Downeast Ventures's suit until the state court has the opportunity to dispose of SN Commercial's debt collection and foreclosure action against Guptill Farms and the Guptills.  The arguments raised by the defendants invoke the abstention doctrines discussed in Younger v. Harris, 401 U.S. 37, 44 (1971), and Colorado River Conservation Dist. v. United States, 424 U.S. 800 (1976).  As did Wyman, I address Younger abstention first.

1.   Younger

The memoranda that contribute to the discussion of so-called Younger abstention are Wyman's (Docket No. 39 at 16-23), the Receiver's (Docket No. 42 at 10-12) and Downeast Ventures's memoranda in opposition to the former (Docket No. 57 at 11-17).  According to Wyman, this Court *must* abstain based on the Younger doctrine because consideration of the pending action would unduly interfere with the state court proceeding.  (Wyman's Mot. to Dismiss at 15-16.)  The Receiver echoes this refrain, arguing that Downeast Ventures is "closely intertwined" with the Guptills and that the state court has a special interest in overseeing a business it places in receivership and the conduct of its appointed receiver.  (Receiver's Mot. to Dismiss at 10-11.)

As a general rule, "federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 68 (1st Cir. 2005) (quoting Col. River Water Conservation Dist., 424 U.S. at 817).  Nevertheless, abstention is mandatory when the Younger criteria are met.  Id.  In Younger, the Supreme Court vacated a district court order that enjoined an ongoing state court prosecution, an equitable "remedy" having very little in common with the kinds of remedies requested by Downeast

Ventures in this suit.  401 U.S. at 41, 43-44.  However, the basic doctrine expressed there has been expanded by the Supreme Court to potentially apply in "all cases in which the court has discretion to grant or deny relief."  Quakenbush v. Allstate Ins. Co., 517 U.S. 706, 718 (1996).  Nevertheless, most of the cases of abstention appear to concern federal litigation having a tendency to prevent state executive action (criminal prosecution, tax enforcement, eminent domain proceedings, etc.), in which the federal suit is apt to forestall or frustrate the state's pursuit of some policy or interest,  see id. at 719-20 (discussing precedent).  According to the First Circuit, Younger abstention applies to two categories of civil cases.  The first category contains "quasi-criminal (or at least 'coercive') state civil proceedings—and even administrative proceedings—brought by the state as enforcement actions against an individual."  Id. at 69.  The pending case does not fall in that category.  The second category is reserved for situations in which permitting the state court to proceed first to judgment would be "uniquely in furtherance of the fundamental workings of a state's judicial system" and is, similar to the first category, also related to the "coercion/enforcement rationale."  Id.  An example of such a case would be a state contempt proceeding and a federal proceeding challenging the manner in which the state compels compliance with state court judgments.  Id. at 69 & n.9.  Such a case, e.g., Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987), typically involves a request in the federal litigation to enjoin a state judicial proceeding on the ground that state law is unconstitutional or a request that the federal court rule on the constitutionality of a state law that a state court might chose to interpret in a manner that would entirely avoid the constitutional question.  Id. at 10-12.

The defendants maintain, in effect, that consideration of Downeast Ventures's claims would interfere with the fundamental workings of the state judicial system because the state court appointed the Receiver to collect and preserve the bank defendants' collateral pending final

judgment in the state court debt collection action.  I reject that contention because the Receiver

was not appointed by the Superior Court (a neutral arbiter) for "coercive" or "enforcement"

purposes, but to preserve collateral pending a final disposition.  Glidden v. Rines, 128 A. 4, 6,

124 Me. 286, 291 (1925).  As a consequence, the fundamental workings of the state court are

simply not at stake.  Indeed, there is no readily identifiable reason why the state court would be

opposed to having this court determine the controversy between Downeast Ventures and the

defendants, including Ebbert and McShane, because only private pecuniary and chattel interests

are at stake in the litigation and Ebbert and McShane are subject to liability only in their

individual capacities, assuming they acted outside the scope of their authority.  Additionally, the

relief sought by Downeast Ventures in this action would not have the practical effect of

enjoining the state proceeding because, even if this Court determined that some or all of the

property in dispute should be returned to Downeast Ventures and awarded money damages

against the Receiver, Guptill Farms would remain subject to receivership and the receivership

estate would retain all items of collateral that are not the subject of the federal litigation.  See id.

("Interference is thus usually expressed as a proceeding that either enjoins the state proceeding or

has the 'practical effect' of doing so.").  As Downeast Ventures asserts, the state simply does not

have a substantial interest in the outcome of this contest.  (Pl.'s Mem. in Opp'n to Wyman's Mot.

to Dismiss at 13.)  On a related note, it is difficult to imagine that any state court judge would

prefer to have a private debt collection action transformed into a federal civil rights action,

particularly where the federal claim would be interjected by a third party, as opposed to having

the additional controversy litigated in federal court.[17]  In effect, having this court and the state

---

[17]       In its initial memorandum the Receiver attempts to advance the cause for abstention with a string cite of
cases in which courts abstained based on ongoing state receiverships or like proceedings (Docket No. 42 at 11).
Wyman does the same in its reply memorandum (Docket No. 70 at 5).  These cases are distinguishable because they
concern efforts to collaterally attack state court judgments, see Borkowski v. Fremont Inv. & Loan, 368 F. Supp. 2d

court divide the work load is comity.  Thus, this Court's exercise of jurisdiction would not

"disregard the comity between the States and the National Government."  Pennzoil, 481 U.S. at

11.

      2.      Colorado River

     The memoranda that contribute to the discussion of Colorado River abstention are found

in Wyman's Motion to Dismiss (Docket No. 39 at 23-27), Bailey's Motion to Dismiss (Docket

No. 49 at 9-13) and Downeast Ventures's memoranda in opposition to the same (Docket No. 55

at 1-5 & Docket No. 57 at 1-10).  The defendants contend that the various Colorado River factors

weigh in favor of abstention, as discussed below.

     "Colorado River [abstention] is scarcely a formal 'doctrine' at all" and the case from

which it arises is "peculiarly tied to its own facts and to the federal statute there construed."

Sevigny v. Emplrs. Ins. of Wausau, 411 F.3d 24, 29-30 (1st Cir. 2005).  In Sevigny, the First

Circuit Court of Appeals vacated an order of remand premised, in part, on Colorado River

---

822 (N.D. Oh. 2005), Doscher v. Menifee Circ. Ct., 75 Fed. Appx. 996, 997 (6th Cir. 2003) (unpublished opinion) (noting that the plaintiff "made it clear that he wanted the district court to review the state court foreclosure action"), Smith v. Litton Loan Servicing, LP, Civ.A.04-2846, 2005 WL 289927 *3 (E.D. Penn. Feb. 4, 2005) (unpublished mem. order) (noting that the plaintiff was a "frequent filer of intentionally frivolous claims"), efforts to enjoin the state proceeding, see Nilsson v. Ruppert, Bronson & Chicarelli Co., 888 F.2d 452, 453-54 (6th Cir. 1989) (also asking the federal court to determine factual allegations of state court bias that were already ruled on in the state court), Prindable v. Ass'n of Apt. Owners of 2987 Kalakaua, 304 F. Supp. 2d 1245, 1262 (D. Haw. 2003), or a federal suit that followed two previously filed state court actions that asserted the same allegations by the same plaintiff, Howard v. Roesch, No. 93-15281, 1993 WL 263447, *2 (9th Cir. July 13, 1993) (unpublished opinion). The Howard opinion, which perhaps is roughly analogous to the instant case (but for the fact that the same plaintiff previously filed the same claims in state court), is unpublished, was decided without oral argument, had a *pro se* plaintiff (like all of the other cases cited by Wyman and the Receiver), offers only a terse characterization of the plaintiff's claims, fails to recite the plaintiff's factual allegations and offers only an *ipse dixit* as to the significance of the state court's interest in regulating a receiver.  It may be telling that the defendants could not cite any more persuasive precedent.

     The parties' memoranda also focus largely on whether the instant federal suit and the state suit are parallel or involve duplicitous issues.  The most significant overlap between the two cases is that each court is being asked to determine the scope of the security pledged by Carol Guptill, a state law question that both courts are fully capable of determining.  I do not consider the presence of this single legal issue in both cases to require abstention from the exercise of this Court's jurisdiction to decide the claims presented, which have not been joined in the state court proceeding.  Younger abstention is concerned with interference with state policies, not concurrent consideration of a single state law issue.  It might be that the case for abstention would have been stronger if Downeast Ventures had intervened in the action or, indeed, if the Receiver had instituted proceedings against Downeast Ventures in the first instance, rather than taking the self-help approach to obtaining the prospective collateral, which approach, it would seem, was understood to be highly damaging to Downeast Ventures as a going concern.

abstention principles.  The district court's justification for abstention was similar to the arguments raised by the defendants herein: the state court had appointed a liquidator to oversee the liquidation of an insurance company and the state process for accomplishing that ought be given a chance to work without interference.  Id. at 26.  Nevertheless, and despite the fact that the liquidator had himself commenced a suit in state court, the Court concluded that abstention was not called for and that the United States District Court ought to exercise *removal* jurisdiction over the action in the absence of any federal question, based largely on its related discussion of Burford abstention factors, without engaging in any additional consideration of the *ad hoc* Colorado River factors.  Id. at 30.  As for the Burford analysis, the Court observed that the financial impact a federal court ruling might have on the estate being liquidated was not a sufficient cause to abstain:  "Otherwise the [liquidator] could invoke Burford in every federal suit between himself as liquidator and any third party who had a still-unsettled tort or contract dispute [with the estate subject to liquidation], regardless of its actual disruptive effect upon the liquidation."  Id. at 29.  That is essentially the gist of my discussion of the Younger doctrine, above, which I believe is also a sufficient basis to reject the request for this Court to abstain under Colorado River.  In any event, consideration of the *ad hoc* factors would not change this conclusion.

There is at present a list of eight non-exclusive factors for a court to consider when a party requests abstention under Colorado River:

> (1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

Rio Grande Cmty. Health Ctr., 397 F.3d at 71-72.  As for a *res*, it is a disputed issue whether Downeast Ventures's property constitutes collateral subject to the state court order appointing the Receiver.  Thus, a decision by this Court is not apt to interfere with the state court's exercise of jurisdiction over a *res*.  The state court will retain jurisdiction over property properly seized by the Receiver.  As for geography, there is no appreciable inconvenience in litigating in this forum.  Almost all of the legal counsel of record in this case are based in Portland, Maine.  This courthouse is more convenient than the Washington County Courthouse.  As for piecemeal litigation, sometimes it has advantages: the instant litigation would permit a focused contest concerning Downeast Ventures's state and federal rights without burdening an already busy state court with a new party and new civil rights and tort claims.  The order in which the forums obtained jurisdiction is no obstacle, either: the Superior Court's docket reflects that the collections action has been moving slowly and, in any event, Downeast Ventures is not a party to that litigation.  Moreover, it does not appear that Downeast Ventures has filed or pursued its claim in this Court in response to an adverse ruling by the state court.[18]  Next, federal law is central to Downeast Ventures's suit, which asserts an illegal seizure and a conspiracy to violate Downeast Ventures's rights under the Fourth (*via* the Fourteenth) Amendment.  Finally, although the Superior Court is certainly equal to the task of addressing Downeast Ventures's rights, I discern nothing inherently vexatious about the claims Downeast Ventures has presented in this forum.

---

[18]    I do note that SN Commercial filed a motion for summary judgment in the state proceeding on August 2, 2005.  (See Sup. Ct. Docket Rec. at 15, Docket No. 44, Ex. IV.)  If the Superior Court should resolve that pending motion in favor of SN Commercial, including issues surrounding the ownership of the disputed property and/or the unity of interest between the Guptills and Downeast Ventures alluded to in the defendants' motion papers, then claims of issue preclusion may be raised in this litigation.

**Conclusion**

For the reasons set forth above, I RECOMMEND that the Court GRANT, IN PART, the

pending motions to dismiss (Docket Nos. 39, 42, 43, 44, 49, 50), to the extent they seek

judgment against a due process claim on Rule 12(b)(6) grounds.  Additionally, I RECOMMEND

that the Court GRANT the Washington County defendants' Motion for Summary Judgment

(Docket No. 50), which is asserted exclusively against the state law tort claims.  In all other

regards, I RECOMMEND that the pending motions be DENIED, including the incorporated

motions to stay and/or abstain found at Docket Nos. 41, 45, 46, & 47.

NOTICE

A party may file objections to those specified portions of a magistrate judge's
report or proposed findings or recommended decisions entered pursuant to 28
U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  December 12, 2005