UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DOWNEAST VENTURES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 05-87-B-W |
| WASHINGTON COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION ON MOTION TO EXCLUDE EXPERT TESTIMONY**

The defendants have moved to preclude the plaintiff's accounting expert from offering lost profit projections in support of the plaintiff's claims. I conclude that the motion should be granted in part.

**Background**

In this case the plaintiff, Downeast Ventures, contends that the defendants unlawfully destroyed its business due to the fact that Downeast Ventures's principals, members of the Guptill family, were principals of another entity, Guptill Farms, that went into receivership. Among other assertions, Downeast Ventures claims that the defendants wrongfully seized business equipment owned by Downeast Ventures that was not subject to any security interest issued by Guptill Farms or the Guptill family and, in so doing, caused the demise of Downeast Ventures. The challenged expert is Mark G. Filler, an accounting expert, who would like to assist the finder of fact with the task of understanding the extent of the economic loss suffered by Downeast Ventures, exclusive of the value of the taking of its equipment. (Expert Desig. and Exhibits, Docket No. 170, Ex. 2.) The record reflects that Downeast Ventures was a business

enterprise engaged in construction site work and plowing during the years 2000-2004.  In 2003 Downeast Ventures pursued a side venture in blueberry sales and realized most of its 2003 income from that activity.[1]  Concomitantly, Downeast Ventures's construction site work and plowing revenue dropped precipitously in 2003 as compared with 2002 due to the loss of one customer that had provided roughly three-quarters of Downeast Ventures' construction and plowing revenue for 2001 and 2002.  (Filler Dep. Tr. At 114, 118-19.)   Also in 2003 Downeast Ventures secured a one-year dealer agreement with Capital Steel Industries (CSI) that gave it the right to sell and construct steel buildings manufactured by CSI.  (Dealer Agreement § 8.1, Docket No. 170, Ex. 5.)  Although it was the plan of the principals at Downeast Ventures to begin marketing, selling and constructing these buildings, Downeast Ventures never sold any of CSI's buildings and failed to renew its dealer agreement in 2004.  (Guptill Dep. Tr. at 208-209, Docket No. 170, Ex. 4.)  In 2004, the receiver for Guptill Farms, allegedly in collusion with the other defendants, began seizing Downeast Ventures's business equipment because of the Guptills' relationship with Downeast Ventures, maintaining that Downeast Ventures's equipment was collateral securing the debt of Guptill Farms.

The defendants contend that Mr. Filler should not be permitted to testify about any economic loss suffered by Downeast Ventures because Downeast Ventures suffered such a major loss in construction and plowing revenue in 2003 and never got its steel building business off the ground.  (Mot. to Exclude at 1-2, Docket No. 170.)  The defendants argue that Mr. Filler inappropriately "cherry-picked" the sales figures to produce his projection of future revenue, in particular by treating 2003 construction and plowing revenue figures as an aberration, on the theory that the loss of one large customer was a temporary setback that Downeast Ventures would overcome.  (Id. at 4-7.)  The defendants also argue that any projection of future revenue

---

[1]   Downeast Ventures had no intention of continuing with blueberry sales beyond what it did in 2003.

cannot be based on projected sales of CSI buildings because that venture was never embarked on and because Downeast Ventures let its dealer agreement lapse. (Id. at 7-10.) This component of Mr. Filler's loss opinion appears to provide the lion's share of projected revenue. (Filler Dep. Tr. at 120-22.)

## Discussion

Pursuant to Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court discussed the gate-keeping role federal judges play under Rule 702 in screening unreliable expert opinion from introduction in evidence. Id. at 597. That role is "to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). The proponent of the expert opinion must demonstrate its reliability, but need not prove that the opinion is correct. Id. at 63. "Once a trial judge determines the reliability of the expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to inferences and conclusions he draws from it and any flaws in his opinion may be exposed through cross-examination or competing expert testimony." Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

Because Downeast Ventures never erected a single steel building and because its contract to do so expired, the defendants assert that there is no basis to project what revenue, if any, such a venture would have yielded. This challenge is primarily focused on subpart 1 of Rule 702 because it is focused on the problem of whether adequate facts exist upon which to found an opinion concerning lost profit. The defendants also contend that Mr. Filler's income projections are unreliable because they disregard a precipitous drop in construction revenue in 2003 and treat income data from the prior two years alone as a sufficient basis to make a 20-year projection. This challenge touches on all three of the subparts of Rule 702. Nevertheless, it is the easier challenge to overcome because Mr. Filler's decision to emphasize certain data and discount other data goes to weight; it does not render his opinion unreliable. The parties are agreed that the year 2003 was unlike the years 2001 and 2002 in terms of construction and plowing revenue. Whether the precipitous decline in related revenue was the death knell for the company or a mere aberration presents an ordinary factual dispute about which reasonable minds can differ. Mr. Filler's opinion is not rendered unreliable because he chose not to give the 2003 figures any weight when forming his projections, though his projection may be less persuasive on account of this decision. It is not the role of a court addressing a Rule 702 challenge to take sides with regard to such disputes, so long as there is a plausible evidentiary basis for an expert's opinion. This point is made clear in the advisory committee notes discussing Rule 702(1):

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Accordingly, with respect to Mr. Filler's projections of construction and plowing revenue, for which there is some data on which to rely, I conclude that a sufficient evidentiary foundation exists for Mr. Filler's proposed testimony to be of assistance to the factfinder.

The defendants' arguments are more persuasive with respect to Mr. Filler's projections about future revenues from the sale and construction of steel buildings, a line of construction work Downeast Ventures never engaged in. Downeast Ventures indicates that it took steps to embark on that line of business in 2003 by acquiring rights from the manufacturer/designer of certain steel building kits. The defendants assert that those efforts are irrelevant because Downeast Ventures let its contract with CSI expire as of the end of 2003, before the receiver for Guptill Farms began seizing Downeast Ventures' equipment, which fact calls into question whether Downeast Ventures could reacquire the necessary rights from the manufacturer and whether it is reliable to forecast 20 years worth of revenue on the basis of a dealer agreement that renews annually. Ultimately, I am not persuaded that there was or is any insurmountable obstacle for Downeast Ventures to reacquire those rights and Mr. Filler is entitled to rely on Mr. Guptill's assurances that Downeast Ventures would have pursued that line of business in 2004 and beyond but for the defendants' allegedly wrongful interference. Nevertheless, the question still remains whether the absence of any hard data upon which to base a revenue projection for the steel building construction venture renders this component of Mr. Filler's projection unreliable. I am not simply concerned that the evidence is weak. I am concerned that there is not sufficient data upon which to base a projection. The advisory committee notes for Rule 702 indicate that subpart (1) of the Rule "calls for a quantitative rather than qualitative analysis." As for that quantitative analysis, there is precious little in the way of data to support Mr. Filler's projections. What he tells us is that he expects Downeast Ventures could have sold and erected

one building in its first year of activity, two buildings in each of the next two years and four buildings per year over the next 16 or 17 years. (Filler Dep. Tr. at 39-41.) He arrived at these sales figures based entirely on Mr. Guptill's subjective expectations, although he claims to have moderated those expectations somewhat. (Id.) I am not persuaded that Mr. Filler can turn Mr. Guptill's subjective expectations into evidence merely by calling the expectations reasonable based on his own, albeit considerable, experience in the accounting field. Without any actual "data" on which to base the volume of future sales, all that is left are the facts that each building would realize $250,000 in revenue and that Downeast Ventures had an intention of pursuing this line of work in 2004 and beyond.[2] Standing alone, this is insufficient data on which to base a lost profits projection. See Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) (granting Daubert motion with respect to expert's economic loss calculation that was based on the plaintiff's own sales projections, without any explanation of the basis for those projections or independent market analysis).[3] Subpart 1 of Rule 702 is clearly directed to this kind of problem. Mr. Filler acknowledged during his deposition that there were shortcomings in the record with respect to this particular projection, but he endeavored to fill the void with an application of accounting methodology; specifically, by application of an increased discount rate. (Id. at 78-80.) An expert is permitted to assist the finder of fact in the task of understanding the evidence or determining which among competing theories makes the most sense in light of the evidence, but he or she cannot simply fill in an evidentiary vacuum with

---

[2] Due to the lack of any historical sales data, Mr. Filler attempted to perform a market analysis by obtaining data from comparable enterprises. This effort was unfruitful as he was unable to find any steel-building-erection companies to look at for purposes of market comparisons. (Filler Dep. at 32.)

[3] In addition to falling short of the Rule 702 standard, this kind of presentation probably falls short of the preponderance standard that governs proof of damages. Cf. Snow v. Villacci, 2000 ME 127, ¶ 13, 754 A.2d 360, 364-65 (addressing a claim for lost future earning opportunity).

principles and methods. In this case, Mr. Filler's application of a heightened discount rate would essentially do just that.

  Downeast Ventures cites <u>Great Northern Storehouse v. Peerless Insurance Company</u>, Civ. No. 00-7-B, 2000 WL 1900299 (D. Me. Dec. 29, 2000), as contrary authority. In <u>Great Northern</u>, I addressed a <u>Daubert</u> challenge to an expert's opinion on a restaurant's lost earnings due to a fire loss. I concluded that the expert's reliance on financial figures supplied by the restaurant owner passed Rule 702 muster even though the expert did not independently verify the figures supplied by the owner. <u>Id.</u> at *2. The distinction between that case and this case is that the owner actually supplied data to the expert in <u>Great Northern</u>, whereas in this case there is only conjecture on the part of Mr. Guptill. Downeast Ventures also cites Magistrate Judge Cohen's order on the <u>Daubert</u> motion advanced in <u>Whitney v. Wal-Mart Stores, Inc.</u> In that matter the expert relied on data supplied by the plaintiff concerning his past annual bonuses to determine a percentage figure to apply to calculate the value of lost future bonuses. Civ. No. 03-65-P-H, 2003 WL 22961210, *3 n.2, 2003 U.S. Dist. LEXIS 2629, *10-*11 n.2 (D. Me. Dec. 16, 2003). Again, the distinction is that actual data supported the opinion in <u>Whitney</u>. There is no past sales data or other reliable data in this case. Judge Hornby's resolution of the <u>Daubert</u> challenge in <u>McLaughlin v. Denharco, Inc.</u>, also cited by Downeast Ventures, is distinguishable along the same line. 129 F. Supp. 2d 32, 36 (D. Me. 2001) (indicating that the expert relied on photographs and testimony concerning past usage of a machine to form an opinion that "metal fatigue" caused it to break). Because the *quantity* of data on likely sales is *nil* in this case, I conclude that Mr. Filler's projection of steel building construction revenue is unreliable and must be excluded from the trial.

## Conclusion

For the reasons stated above, the motion to exclude Mr. Filler's testimony is GRANTED PART and DENIED IN PART.  Mr. Filler will be permitted to testify concerning his economic loss analysis as its relates to Downeast Ventures's construction site work and plowing lines of business, but he may not include in his presentation an economic loss analysis for lost revenue from the construction of steel buildings.

*So Ordered.*

## CERTIFICATE

Any appeal of this Order may be filed in accordance with Fed.R.Civ.P. 72.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: March 1, 2007