UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DOWNEAST VENTURES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-87-B-W |
| | ) | |
| WASHINGTON COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON THE COUNTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Downeast Ventures, Ltd., filed suit against KeyBank National Association, SN

Commercial, LLC, Jasper Wyman & Son, Washington County, the Washington County

Sheriff's Department, Joseph Tibbetts, the former sheriff, Lester Seeley, a sheriff's

deputy, James Ebbert and his employer, the McShane Group, Inc. (the state court-

appointed receiver of property in a foreclosure action commenced by KeyBank and

presently being maintained by SN Commercial against third parties), and Harry Bailey, a

private investigator hired by the receiver to assist in the location and acquisition of the

bank defendants' collateral. The gravamen of the complaint is that the defendants

conspired to violate Downeast Ventures's federal rights and various state law duties owed

to Downeast Ventures, by wrongfully seizing under color of state law and refusing to

return certain assets allegedly owned by Downeast Ventures. Now pending are a raft of

summary judgment motions filed by both sides. This recommended decision addresses

the motion for summary judgment filed by the Washington County Defendants (Docket

No. 220). The Court previously dismissed a due process claim and state law tort claims

against these defendants (Docket Nos. 77 & 92). That leaves federal civil rights claims (a § 1983 Fourth Amendment claim and a § 1988 attorney fees claim), an analogous Maine civil rights claim and a plea/claim for punitive damages. (First Am. Compl. Cts. I, IX, X, XI, Doc. 13.)

## Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of material facts in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). When a statement offered by a party is uncontested and is supported by a citation to record material having evidentiary quality, the statement has been set forth herein essentially as offered. When a statement of fact is contested and the evidentiary record is capable of supporting alternative findings of fact, the statement in dispute has been characterized in the manner favorable to, or favored by, the non-movant. Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Downeast Ventures, LTD., ("Downeast") is a New York corporation with a place of business in Wesley, Maine. (Defs.' Consol. Statement (DCS) ¶ 1, Docket No. 222.) Prior to 2000, the corporation now known as Downeast operated under the name Celebrations Entertainment Concepts, Incorporated ("Celebrations") in New York. (Id. ¶ 2.) Carol Guptill was the sole owner of Celebrations. (Id. ¶ 3.) Celebrations changed its name to Downeast in May 2000. (Id. ¶ 4.) At about the time of the name change, the corporation entered the construction business. (Id. ¶ 7.) Carol Guptill was at all relevant

times the President of Downeast.  (Id. ¶ 8.)  Carol Guptill owns at least fifty percent of Downeast's shares.  (Id. ¶ 9.)  Carol Guptill claims to have transferred fifty percent of Downeast's shares to two sons (William, Jr. and Kurt) in May 2000 when Celebrations became Downeast.  (Id. ¶ 10.)  However, Downeast's tax returns listed Carol Guptill as its sole owner from 2000 through 2003.  (Id. ¶ 11.)  Moreover, in 2004, Carol Guptill testified under oath that she was then the sole shareholder of Downeast Ventures, Ltd. (Id. ¶ 12.)  William Guptill, Sr. (Carol Guptill's husband) oversaw generally all the business operations of Downeast, including its day-to-day operations and its financial performance.  (Id. ¶ 14.)  William Guptill, Sr. ("Bill Guptill"[1]) thinks of Downeast as his company.  (Id. ¶ 15.)

Bill Guptill is the sole shareholder of Guptill Farms, Inc., a New York corporation.  (Id. ¶ 16.)  Guptill Farms is a blueberry business situated in Wesley, Maine. (Id. ¶ 35.)  KeyBank National Association ("Key") is a financial institution authorized to do business within the State of Maine.  (Id. ¶ 25.)  On or about June 28, 2000, Key loaned $2.5 million to Bill Guptill, Carol Guptill and Guptill Farms, Inc.  (Id. ¶ 35.)  Under the governing loan documents, Carol and Bill Guptill, as well as Guptill Farms, were jointly and severally obligated to repay the Key loan.  (Id. ¶ 37.)  As part of the documentation evidencing the parties' loan agreement, the Guptills executed and delivered to Key a Commercial Term Note dated June 28, 2000, in the original principal amount of $2,500,000.00.  (Id. ¶ 38.)  The Guptills also executed and delivered to Key (among numerous other documents) a Term Loan Agreement dated June 28, 2000, that provides for a first priority security interest in the borrowers' farm products, accounts receivable,

---

[1]     I refer to William Guptill, Sr. as Bill Guptill throughout because that is the manner in which his counsel refers to him.

inventory, machinery and equipment, furniture and fixtures, investment property, deposit accounts, cash collateral and general intangibles.  (Id. ¶¶ 39-40.)  The agreement also gives the lender the right to enter premises where any collateral might be for purposes of removing and taking possession of the collateral.  (Id. ¶ 41.)  The note and agreement are secured by mortgages on all real estate owned by Carol and Bill Guptill or Guptill Farms that is situated in Washington County, as well as by security agreements in all personal property and equipment owned by Carol and Bill Guptill and all equipment and inventory owned by Guptill Farms.  (Id. ¶ 42.)  Equipment is defined as:

> All machinery, equipment and fixtures, motor vehicles, office furniture, furnishings and trade fixtures, specialty tools and parts, motor vehicles and materials handling equipment of the Borrower, all irrigation equipment, freezers, processing and handling equipment, all farm equipment, all together with the Borrower's interest in, and right to, any and all manuals, computer programs, data bases and other materials relating to the use, operation or structure of any of the foregoing; and all other property constituting "equipment" as such term is defined in the Uniform Commercial Code and including without limitation that equipment described on the attached Exhibit B.

(Id. ¶ 45.)  These security interests have been duly perfected.  (Id. ¶¶ 43-44.)

As a condition for making the loan, Key required the Guptills to enter into an agreement with some other person or entity who would assure that Guptill Farms, Inc. would have a regular source of blueberry processing revenues.  (Id. ¶ 49.)  The Guptills decided to ask Jasper Wyman & Son ("Wyman") to enter into the required agreement, and Wyman agreed.  (Id. ¶ 52.)  Wyman is a grower, packer and marketer of wild blueberries and other berry fruits with operations in Washington County, Maine.  (Id. ¶ 26.)  On June 28, 2000, Wyman and the Guptills entered into a Supply and Storage Agreement, which, among other things, and subject to a number of specified terms and conditions, provided that Wyman would purchase the Guptills' yearly blueberry

production (up to a specified amount), that the Guptills would process blueberries for Wyman, and that Wyman would store blueberries at the Guptills' cold storage facility. (Id. ¶ 53.)  Key further required the Guptills to have a guarantor.  (Id. ¶ 55.)  Wyman guaranteed the Key loan and in connection with that guarantee the Guptills entered into a "Reimbursement Agreement" under which they jointly and severally agreed, among other things, "to reimburse Wyman for all payments made and costs incurred under or pursuant to the Wyman Guaranty or otherwise paid by Wyman to Lender in connection with the [Key] Loan." (Id. ¶¶ 56-57.)  To secure their obligations under the reimbursement agreement, the Guptills executed a number of mortgages and security agreements in favor of Wyman that were materially identical to, but junior to, those executed in favor of Key. (Id. ¶¶ 58-59.)

In June or July of 2003, Wyman personnel accused Guptill Farms of stealing 345,322 pounds of blueberries.  (Pl.'s Add'l Statement (PAS) ¶ 27, Docket No. 253.)   Bill Guptill attests that the accusations were false and that his own investigation makes him conclude that no blueberries were ever even missing.  (Id. ¶¶ 28-29.)  The defendants deny these statements and cite a collection of record evidence (all circumstantial) that they say demonstrates the Guptills' complicity in the alleged theft.  Whether the accusations were true or not is clearly a disputed issue.  Wyman reported the matter to Sheriff Joseph Tibbetts of the Washington County Sheriff's Department in June of 2003. (Id. ¶¶ 44, 57-58.)  Prior to filing the report, a Wyman executive officer, Carmen Look, spoke to Tibbetts and inquired of him what Wyman's options were.  They discussed Wyman's option of pursuing the matter with either the Sheriff's Department or the Maine State Police.  After speaking with Sheriff Tibbetts, Look sent an email to Nat Lindquist,

another Wyman executive, and stated that she thought "[t]he County might be more likely to keep us in the loop, so to speak," as compared with the State Police.   (Id. ¶¶ 59-60, 65; *see also* Docket No. 259-6.)   She also indicated in her email that Tibbetts "had a couple of ideas and wanted to check them out before advising on the appropriate course of action." (PAS ¶ 66; Docket No. 259-6.)   Tibbetts testified that he did not tell Look he would get back to her with any ideas, but that he simply provided her with her options. (PAS ¶ 66.)   Look memorialized in her email that they also discussed the fact that Tibbetts had run into Everett Ramsdell, yet another Wyman executive, while on vacation in Alaska.   Tibbetts testified that he had not talked about that with Look.   (Id.)   After Wyman filed a report, Sheriff Tibbetts assigned the investigation to his chief investigator, Deputy David Denbow.  (PAS ¶¶ 61-63, 67-68.)

Look told Tibbetts that a private investigator named Harry Bailey had been working for Wyman on the blueberry theft investigation and that he would come by to meet with Tibbetts.  (Id. ¶ 70.)   Harry Bailey is an individual who resides in Grand Lake Stream, Maine.   Bailey is a licensed private investigator who operates a private investigation firm known as Harry Bailey Associates.  (DCS ¶ 30.)   Bailey met with Sheriff Tibbetts to discuss the blueberry theft investigation.  (PAS ¶ 71.)   Carmen Look and Harry Bailey called Sheriff Tibbetts and Deputy Denbow on several occasions over the next few years to inquire about the ongoing investigation.  (Id. ¶¶ 61, 72-73.)   No charges have ever been brought as a result of the investigation and the Sheriff's Department has completed its investigation.  (Id. ¶¶ 75-77.)

Harry Bailey and Sheriff Tibbetts are acquaintances.   Bailey was a sergeant in the Maine State Police until he retired in February 1986.  (Id. ¶ 1.)   Bailey was familiar with

Sheriff Tibbetts and had instructed him in firearms training while the two men were working for the Maine State Police.  (Id. ¶ 6.)  Bailey referred to Tibbetts by the nickname "Joey."  (Id. ¶ 5.)  Tibbetts described Bailey as a friend, though the two had not worked directly with one another other than in connection with periodic firearms training and they did not socialize outside of work.  (Defs.' Reply Statement (DRS) ¶ 8, Docket No. 271.)

Sheriff Tibbetts knows some of the people in management at Wyman, including one, and possibly two, executive officers.  (PAS ¶¶ 12-15.)  Although Sheriff Tibbetts grows blueberries, he has always sold them to Cherryfield Foods, not Wyman.  (Id. ¶ 34.)  Tibbetts has known Bill Guptill for years and understood that Mrs. Guptill or her family had a business named Downeast Ventures that performed plowing work and was separate from the blueberry business.  (Id. ¶ 16.)  He has described Bill Guptill as "a respected businessman around town."  (Id. ¶ 18.)

On or about March 10, 2004, Key commenced a foreclosure action in Maine Superior Court naming the Guptills as defendants and Wyman as a party-in-interest.  (DCS ¶ 61.)  On May 17, 2004, Key filed a motion for appointment of a receiver.  (Id. ¶ 62.)  In the receivership motion Key requested that the McShane Group be appointed as the receiver.  (Id. ¶ 65.)  After a contested hearing, the Superior Court issued its order for appointment of a Receiver dated June 17, 2004, (the "Receivership Order").  (Id. ¶ 66.)  Among other things, the Receivership Order appointed McShane as "receiver of certain real and personal property of Defendants William R. Guptill (Sr.), Carol A. Guptill and Guptill Farms, Inc., both tangible and intangible, more particularly identified and referenced in the loan documents (hereinafter 'Collateral') now held by Key Bank and

identified in the Affidavit of Dennis A. Heuser." (Id. ¶ 67.)[2]  The Receivership Order

defined the term "collateral" as meaning "certain real and personal property of

Defendants William R. Guptill (Sr.), Carol A. Guptill and Guptill Farms, Inc. both

tangible and intangible, more particularly identified and referenced in the loan documents

now held by [Key] and identified in the Affidavit of Dennis A. Heuser."  (Id. ¶ 68.)[3]  The

Receivership Order empowers the Receiver[4], among other things, "[t]o take possession of

the Collateral or any part thereof, and to exclude the Defendants including any person or

entity acting on behalf of the Defendants from possession or control of the Collateral."

(Id. ¶ 69.)[5]  The Receivership Order also empowers the Receiver, among other things,

"[t]o require any person to immediately turn over to the Receiver possession and control

of the Collateral, monies, accounts and all books and records relating to the Collateral

including without limitation, any outstanding contracts, payables, inventory and accounts

receivable, without hindrance or delay."  (Id. ¶ 70.)[6]

The claims in this action against Washington County, the Washington County

Sheriff's Department, Joseph Tibbetts and Lester Seeley ("the County Defendants") arise

out of their participation in the seizure of equipment in cooperation with the Receiver and

the Receiver's private investigator, Mr. Bailey.  Lester Seeley is a part-time sheriff's

deputy who was specifically assigned by Sheriff Tibbetts to assist the Receiver and its

agents in relation to the Receiver's efforts to repossess Guptill collateral.  (Id. ¶ 33.)

Sheriff Tibbetts asked Bailey to provide him with a copy of a list of equipment to be

seized.  (PAS ¶ 118.)  Ebbert then supplied Tibbetts, and Tibbetts supplied Deputy

---

[2]     Order for Appointment of a Receiver at 6, Doc. 222-12.
[3]     Id.
[4]     I mean to refer to both McShane and its agent, James Ebbert, when I use the title, "the Receiver."
[5]     Id.
[6]     Id. at 8-9.

Seeley, with a copy of a document entitled "l998 Guptill Farms Equipment List." (PAS ¶¶ 120-121.) Sheriff Tibbetts understood that if an item was on the list, then Ebbert was entitled to the item. (Id. ¶ 122.) Seeley testified that he "went by" the list to verify whether an article of equipment should be taken and that he took the list with him when he went on collateral seizure-related assignments. (Id. ¶¶ 150, 152.)

Although normally Sheriff Tibbetts would leave it to his chief deputy to assign deputies to tasks as they arose, Tibbetts chose to assign Deputy Seeley to the collateral seizure effort generally, because having one person assigned would "save time . . . [and] make things simpler." (Id. ¶¶ 123-124.) Tibbetts testified that "it appeared like there was going to be a lot of assistance or a lot of materials repossessed." (Id. ¶ 125.) Tibbetts instructed Seeley that, "if they (Bailey and Ebbert) called," then Seeley should go with them. (Id. ¶ 126.) Likewise, Tibbetts told Bailey and Ebbert that if they found items they should "give Lester a call to go with them because it would make it easier." (Id. ¶ 127.) Tibbetts felt that Lester was the best person to work with Bailey and Ebbert because of the 36 years he had been with the Sheriff's Department and the fact that he is "usually very diplomatic and works well at something like that." (Id. ¶ 128.) Like Tibbetts, Seeley was acquainted with Bailey from his work with the State Police. (Id. ¶ 146.) Seeley knew Sheriff Tibbetts and Bailey were friendly and had both worked as state troopers. (Id. ¶ 147.) Seeley also liked Bailey and had given him some "side boards" from a saw mill operation that Seeley had.[7] (Id. ¶ 148.) Seeley testified that he had blanket authorization to go on these assignments whenever he got a call from "Jim or from Harry Bailey" to meet at a particular place. (Id. ¶ 135.) As a result, Seeley did not

---

[7]     Seeley describes the side boards as the boards that "come off" when he is sawing logs into landscaping timbers and that he gives them to various people because "they're no good to me." (Seeley Dep. at 36, Doc. 199.)

call dispatch on many of the occasions he went with Ebbert and Bailey.  (Id. ¶ 137.)
After the Sheriff told Seeley of his assignment, Bailey paid a visit to Seeley at Seeley's
home to discuss with Seeley when he would be available.  (Id. ¶ 142.)

Sheriff Tibbetts has met with Bailey at Tibbett's office five or six times to discuss
the issues of collecting Guptill property.  (Id. ¶ 129.)  On one occasion, Bailey visited
Tibbetts along with Mr. Ebbert and talked about "the different places they'd picked up
equipment," what had been picked up and what was still missing; and Mr. Ebbert told
Tibbetts that "Lester was doing a good job and thanked us for helping them."  (Id. ¶ 130.)
On another occasion, Bailey visited Tibbetts and said he appreciated having Seeley to
work with because "Lester was easy to work with."  (Id. ¶ 133.)

Seeley had a log of his hours and notes of his activities with Ebbert and Bailey,
but has not provided them because he contends they are inaccessible.  (Id. ¶ 138.)  Seeley
submitted bills for his time directly to the Receiver.  (Id. ¶ 139.)  His pay was routed from
the Receiver through the Sheriff's Department.  (Id. ¶ 141.)  Seeley usually reported to
Bailey because it was easier for Bailey to reach Ebbert than it was for Seeley to do so.
(Id. ¶ 153.)

The parties' fact statements provide considerable detail concerning the seizure of
certain items of equipment located on various pieces of Washington County real estate.
Among the disputed issues is whether the specified items of equipment were subject to
seizure by the Receiver.  Downeast maintains that they were not, because they were
owned by Downeast at the time, not by Guptill Farms or by Carol or Bill Guptill.  The
Receiver maintains that they were, on divers grounds.  The County Defendants agree
with the Receiver, but their duty was merely to assess whether a seizure of property was

reasonable, not to attempt to resolve legal contests on the spot between the Receiver and Downeast over which entity had the better possessory right to a particular piece of equipment. I have for that reason not reproduced here[8] all of the factual bases cited by the Receiver and Downeast in support of their respective possessory interests. Instead, the following distillation should suffice to characterize the material facts for purposes of the claims against the County Defendants:

> (1) That Deputy Seeley, on more than one occasion, interceded in a collateral seizure effort on behalf of James Ebbert (the Receiver's agent) when a Guptill employee named Holmes asserted that the Receiver was stealing Downeast equipment and, on two such occasions, cautioned Holmes to stand aside or risk arrest. (DCS ¶¶ 301-309, 319-323; PAS ¶¶ 246-248, 271.)

> (2) That, on one of the foregoing occasions, Seeley allowed a seizure to go forward for a dump truck that was then (in 2003) registered to Downeast even though it was not on the 1998 Guptill Farms Equipment List, because its VIN "matched the VIN on the paper that [Ebbert] had." (PAS ¶ 257.) The Receiver states that the piece of paper was a vehicle registration for the year 2002 in the name of Guptill Farms. (DRS ¶ 263.) Downeast admits that Seeley matched the VIN to that of a truck on a copy of a motor vehicle registration statement dated 12/31/03 in the name of Guptill Farms, which was provided to him by Ebbert. (DCS ¶ 321; Pl.'s Opposing Statement (POS) ¶ 321, Docket No. 253.)

> (3) That Sheriff Tibbetts on one occasion attempted to locate someone to haul heavy equipment for the Receiver. (DCS ¶ 241; PAS ¶¶ 199-201.)

> (4) That Sheriff Tibbetts, Deputy Seeley and other sheriff's deputies on numerous occasions entered[9] onto the land of certain third parties, without their permission, to assist in the Receiver's efforts. (DCS ¶¶ 236-237, 239, 246-249, 253, 335-347; PAS ¶¶ 166, 182-185, 281, 291, 293, 299-302.)

> (5) That, on one such occasion, Sheriff Tibbetts suggested to a third party that he might have to get a search warrant if the person did not consent to the Receiver's entry onto his premises. (PAS ¶¶ 310, 314.)

---

[8]     These matters will be plumbed in greater detail in connection with the Receiver's motion for summary judgment.

[9]     Downeast prefers the term "trespassed." I have not used that term because it states a legal conclusion.

(6)  That Sheriff Tibbetts on one occasion stopped by a building to follow up on a lead from Bailey about a steam engine that was allegedly stored there and that was sought by the Receiver.  (PAS ¶¶ 323-328.)

(7)  That Deputy Seeley took some independent action to search out some dump trucks for the Receiver, searching along some rural roads and, on one occasion, stopping a truck on the road to investigate whether the truck was one they were looking for.  (PAS ¶¶ 212-231.)  When Sheriff Tibbetts learned of this activity, he instructed Seeley to let Ebbert and Bailey look for the equipment and to just be present to assist in retrieving the equipment.  (Id. ¶ 232.)

(8)  That the Sheriff's Department sent a bill to Key for certain of Seeley's time and travel on one collateral seizure outing.  (Id. ¶¶ 258-261.)

*Policies*

As the Sheriff of Washington County, Joseph Tibbetts was the only individual with final decision making authority regarding policies and practices of the Washington County Sheriff's Department.  (Id. ¶ 521.)  The Washington County Sheriff's Department has a Policy and Procedure Manual (Standard Operating Procedure).  (Id. ¶ 522.)  Regulation 1-5 contains the following language:

4. Civil Disputes – All Deputies shall take a neutral position in any dispute of a civil nature, acting only to prevent or control any breach of the peace that may arise.

(Id. ¶ 525.)  However, Sheriff Tibbetts testified at his deposition that he and his deputies can assist in "repossessions" and prevent others from interfering if they believe that the recovering party has a right to an item.  (POS ¶ 526; PAS ¶ 344.)

Despite having a policy to place in writing reports of all incidents in which the department becomes involved, neither Seeley nor Tibbetts generated any report about any of the collateral seizure incidents.  (PAS ¶ 341.)  All deputies when they are hired are encouraged to read and follow the department's standard operating procedures.  Sheriff Tibbetts did not know that the Department had a written policy for deputies to follow in

12

regard to handling civil matters, though he understood that the state civil process manual would be relevant.  (Id. ¶ 342; DRS ¶ 342.)

The Department's policy since 1991 has been to stay neutral and not actively assist a creditor in finding collateral.  (PAS ¶ 343.)  Sheriff Tibbetts testified that the deputies are not supposed to actively search for collateral for creditors.  (Id. ¶ 345.)  The Department has a written policy stating that it is "imperative to avoid any situation involving a conflict of interest whether in fact or in appearance."  (Id. ¶ 347.)  Tibbetts testified that Seeley was not supposed to be making decisions about whether property was owned by Downeast as opposed to somebody else and was not supposed to be making any threats to others to elicit cooperation in finding assets for Mr. Ebbert.  (Id. ¶ 348.)  Tibbetts also testified that he understood that he and his deputies could assist the Receiver in taking a piece of equipment if it was on a list (the 1998 Guptill Farms Equipment List) that Ebbert provided him with.  In his deposition testimony Tibbetts erroneously described the list as having the save significance as a court order.  (Id. ¶¶ 349-350.)

*Conspiracy?*

 Downeast admits:

(a)  That Key did not communicate with the Washington County Sheriff's Department concerning either Downeast or the Guptills, apart from counsel's communications with respect to service of process.  (DCS ¶ 452.)

(b)  That Key never discussed with anyone at the Washington County Sheriff's Office the notion of pursuing or interfering with any property of Downeast or any other property that was not part of Key's Collateral.  (Id. ¶ 460D.)

(c)  That SN Commercial did not communicate with the Washington County Sheriff's Department concerning either Downeast or the Guptills,

13

apart from counsel's communications with respect to service of process. (Id. ¶ 466.)

(d)  That Wyman did not communicate with the Washington County Sheriff's Department concerning the receivership or the Receiver's efforts to recover collateral for the Guptill Loan.  (Id. ¶ 476.)

(e)  That when the Receiver and/or Bailey located a particular item of property, the Receiver alone made the decision as to whether the subject item would be recovered.  (Id. ¶ 481.)

Notwithstanding the foregoing admissions, Downeast contends that the defendants conspired on the basis of certain relationships and happenings.  Most of those things pertain to the Receiver, Wyman and Key.  The connections that are stated with respect to the County Defendants tend rather to disprove their participation in any conspiracy.  In particular, Downeast asserts in its additional statement of facts:

82.  At the very outset (about the same time Seeley was assigned), Sheriff Tibbetts said to Bailey and Ebbert that in view of the fact that Bill Guptill was a "prominent business person around," why did they not simply call him up and ask where the items are that they were looking for.[10]

83.  The Sheriff could see at the very outset that the project Ebbert and Bailey were contemplating "was going to be quite time-consuming and quite costly to the taxpayers."

84.  The Sheriff told Bailey that he knew Bill Guptill and asked why did they not "talk to Bill about this" since it would make things a lot easier and Bailey responded "they just didn't feel that would work."

. . . .

359.  Ebbert misled[11] Sheriff Tibbetts to have the impression that the 1998 equipment list that Ebbert provided him had in fact come from the court.

---

[10]    Downeast complains that no one from the County ever called Bill Guptill to solicit his assistance in locating collateral.  (PAS ¶ 109.)

[11]    Acceptance of the "misled" term requires a rather extreme inference to be drawn.  (See Tibbetts Depo. at 103-104, Doc. 207.)  I simply quote Downeast's language in order to illustrate the tenor of its case against the County Defendants, who are described in this instance more as dupes than conspirators.

*Procedural Matters*

The Guptills and Downeast have never filed any pleadings or correspondence with the Maine Superior Court that issued the receivership order to ask that court to examine the Receiver's recovery efforts or to determine ownership over disputed equipment.  (Id. ¶¶ 508, 534.)  Downeast was at all times aware of the state court proceedings, of the appointment of the Receiver, and that the Receiver was subject to the supervision of the Superior Court.  (Id. ¶¶ 531-532.)

**Discussion**

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merch., 143 F.3d at 7.  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and

15

summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

The County Defendants argue that they are entitled to summary judgment against the federal civil rights claims because:

> (1)  they did not engage in "state action" in regard to the Receiver's seizure of Downeast property;

> (2)  the individual officers did not act unreasonably in relation to the seizures that took place;

> (3)  the individual officers are entitled to qualified immunity; and

> (4)  there is no basis in the record for derivative, "municipal" liability on the basis of any county custom or policy.

("County Mem." at 9-29, Doc. 220.)  The County Defendants also argue that summary judgment should enter against the Maine civil rights claim because their conduct was reasonable in light of the circumstances, (id. at 9 n.3), and against the punitive damages claim because the facts are not sufficiently offensive to justify the imposition of a punitive, as opposed to compensatory, remedy.  I address these arguments in turn.

## A.      State action

The County Defendants lead off with the argument that, although they are clearly state officers, they did not engage in "state action" with respect to the Receiver's seizure of property because they simply stood by to keep the peace.  (County Mem. at 10-16.)  See, e.g., Moore v. City of Poplar Bluff, 404 F.3d 1043, 1046 (8th Cir. 2005) ("When a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not

have occurred without the officer's help.").  The state action requirement is set forth well

in Alexis v. McDonald's Restaurant:

> A section 1983 claim does not lie absent state action.  42 U.S.C. §
> 1983  (providing remedy for deprivations "under color of any statute,
> ordinance, regulation, custom, or usage" of any state or territory).  There
> are two components to the "state action" requirement.  First, the
> deprivation must be shown to have been caused by the exercise of some
> right or privilege created by the state, or by a rule of conduct imposed by
> the state, or by a person for whom the state is responsible.  Second, the
> party charged with the deprivation must be a person who may fairly be
> said to be a state actor.  Where a private individual is a defendant in a
> section 1983 action, there must be a showing that the private party and the
> state actor jointly deprived plaintiff of her civil rights.

67 F.3d 341, 351 (1st Cir. 1995) (citations omitted).  The record in this case supports a

finding of state action because the presence and authority of Sheriff Tibbetts and Deputy

Seeley were material to the success of at least three seizures.

In Moore, the Court of Appeals for the Eighth Circuit observed that the officer

defendants' attendance at a repossession was not state action because, among other

things, "[t]he officers were not asked to accompany [the repo man] to ensure the

repossession went smoothly[,] did not arrive with him, . . . . were summoned to a scene

not of their making only to resolve a breach of the peace that was in progress [and] did

not tell the [plaintiffs] the repossession was legal or that they would be arrested if they

interfered."  Id.  This case is unlike Moore.  The record reflects that both Sheriff Tibbetts

and Deputy Seeley assisted the Receiver in searching for collateral, that Tibbetts

attempted to locate someone to tow certain equipment, that Seeley frequently

accompanied the Receiver and Bailey on their collateral seizure outings and was

specifically assigned to do so, that Seeley's time was compensated by the Receiver and,

on one occasion, by the bank, and that Tibbetts's and Seeley's presence and authority

facilitated some of the collateral seizures. Such conduct amounts to state action in connection with the Receiver's seizures.

**B.      Reasonableness**

The gravamen of this civil action is the allegedly wrongful seizure of numerous items of personal property, which implicates the Fourth Amendment because the Fourth Amendment protects the people from unreasonable seizures of "their persons, houses, papers, and effects," U.S. Const. amend. IV, and a seizure occurs whenever there is "meaningful interference with a . . . possessory interest" in personal property. Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)).[12] As with all Fourth Amendment seizures, the touchstone is the objective reasonableness standard, which entails "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." Scott v. United States, 436 U.S. 128, 137 (1978). The Court must consider whether "the facts available to the officer at the moment of the seizure" were sufficient to "warrant a man of reasonable caution in the belief that the action taken was appropriate," in order to guard against "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

I am comfortable concluding that, as a matter of law, the actions taken by Sheriff Tibbetts and Deputy Seeley could not fairly be regarded as unreasonable in light of the facts available to them and the circumstances existing at the time. The County Defendants are alleged to be liable for their part in depriving Downeast of property.[13]

---

[12]      See also Soldal, 506 U.S. at 67 n.11 ("[W]e reaffirm today our basic understanding that the protection against unreasonable searches and seizures fully applies in the civil context.").

[13]      In its opposition memorandum Downeast continues to complain of being "deprived of property without due process" (Opp'n Mem. at 6), although the due process aspect of the case has already been

That part involved some search activity and their show of authority in order to enable the Receiver to effectuate certain seizures. The County Defendants did not actually seize the items in question and they have no authority to direct the Receiver to return any of the seized items. With respect to their search activity, there is no suggestion in the parties' memoranda that this conduct violated any of Downeast's Fourth Amendment rights. As for the occasions when the County Defendants made a show of authority to facilitate certain seizures,[14] that show of authority accompanied the Receiver's assertion of a possessory interest in the item being seized and an absence of any opposing claim that was, from the perspective of the County Defendants, plainly superior to the Receiver's claim. The County Defendants understood that the Receiver's authority to seize equipment arose from an order of the Maine Superior Court. That order empowered the Receiver not only to take possession, but also to require third parties to turn over collateral into the Receiver's possession. In the face of such authority, I find no merit in Downeast's position that the County Defendants violated its Fourth Amendment rights when they assisted the Receiver's efforts to enter onto the land of third parties and prevented others from interfering with the Receiver's exercise of authority. In the absence of any knowledge or evidence that the Receiver was acting beyond his court-appointed authority, the County Defendants certainly could not reasonably be expected to second-guess the Receiver, much less to interfere with his efforts. To be sure, this would be a different case if there were any evidence that the County Defendants aided the Receiver in what they knew or should have known to be a constitutional violation, but

---

dismissed. Downeast did not brief the contours of its purported due process claim in the earlier motion to dismiss and I recommended its dismissal as abandoned at that time. (Rec. Dec. at 15-16, Doc. 77.)

[14]      I have in mind here the representations made by Sheriff Tibbetts to Mr. Hawkins (DCS ¶¶ 334-347) and by Deputy Seeley to Mr. Holmes (id. ¶¶ 302-309, 322-323).

there is simply no evidence that the County Defendants ever had cause to suspect, let alone believe, that they were ever involved in such an enterprise.

Downeast suggests in its fact statements[15] that the County Defendants are somehow liable for wrongful seizures because they regarded the 1998 Guptill Farms Equipment List and the Receiver's representations as proof that certain items were collateral. (*e.g.*, POS ¶¶ 173-176, 432, 445, 446, 526; PAS ¶¶ 249, 359, 403.) Downeast also faults the County Defendants in its memorandum because they "undertook no precautions to assure that innocent third parties such as Downeast would not have their property taken." (Opp'n Mem. at 4, Doc. 257.)  I think such arguments miss the point of the objective reasonableness inquiry in the context of this factual scenario.  I am not persuaded that Sheriff Tibbetts and his deputies needed any documentary or other "proof" that a particular item of equipment was collateral or that they had a constitutional duty to guard the public from the Receiver, absent knowledge that the Receiver was exceeding his authority.  There is no evidence of such knowledge in this record.  Instead, the evidence reflects that  the County Defendants knew the Receiver was a court officer appointed to collect Guptill Farms collateral and that he was asserting that the items in question were Guptill collateral subject to his authority.  Given the Receivership Order and the absence of any knowledge that should have led them to suspect overreaching on the Receiver's part, I find that the County Defendants' conduct did not violate the Fourth Amendment as a matter of law.[16]

---

[15]      Downeast does not fully incorporate into its legal memorandum all of the issues raised in its Local Rule 56 statements.  I have nevertheless tried to address them all.

[16]      There is also some mention of the County Defendants' failure to remain neutral in respect to a civil dispute.  I fail to understand how mere partiality on the part of law enforcement toward a court-appointed receiver in the context of a collateral seizure gives rise to a claim under the Fourth Amendment, particularly as the receiver is cloaked with the authority of the court.  Even if a policy of neutrality was breached, that breach did not violate a constitutional right.

Nothing in Soldal undermines this conclusion.  In Soldal, the Supreme Court

repudiated a novel theory that the Fourth Amendment was not implicated by property

seizures arising from civil disputes unless they involved an invasion of privacy or liberty.

506 U.S. at 65.  The Supreme Court did not enter any holding with respect to whether the

circumstances of the Soldal case actually supported a Fourth Amendment claim.  It held

only that the circumstances "implicated" the Fourth Amendment's protections.  Id. at 60;

see also id. at 61-62 ("Whether the Amendment was in fact violated is, of course, a

different question that requires determining if the seizure was reasonable.  That inquiry

. . . is not before us.").  In any event, assuming that the facts of Soldal were actionable

under the Fourth Amendment, those facts are the mirror-image of what is presented in the

summary judgment record of this case.  In Soldal the sheriff's deputies prevented the

plaintiff from interfering with the removal of his mobile home from a park even though

they *knew* that the owner of the park had not complied with Illinois law and that no

judgment of eviction had ever issued.  Id. at 57.  Here, the County Defendants knew that

the Receiver was a court-appointed officer with the authority to demand possession of

property held by third parties.[17]  Although the Receiver's authority was not unlimited, it

---

On a related note, Downeast complains that Sheriff Tibbetts "wanted to help friends . . . and an entity [Wyman] which was a very powerful force in Washington County."  (Opp'n Mem. at 4.) Overlooking the fact that this assertion is not incorporated into any legal argument, I am not persuaded that any of the personal relationships between Tibbetts and Harry Bailey, between Tibbetts and Wyman employees or between Deputy Seeley and Harry Bailey could fairly support an inference of a conspiratorial or malicious mindset or purpose on the part of the County Defendants.  Moreover, motive is generally regarded as immaterial to the objective reasonableness inquiry that governs the Fourth Amendment claim. See Whren v. United States, 517 U.S. 806, 813 (1996); Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).

[17]     The Supreme Court observed that it would be particularly difficult to make a case in these circumstances:

> Assuming, for example, that the officers were acting pursuant to a court order, . . . as often would be the case, a showing of unreasonableness on these facts would be a laborious task indeed.

was nevertheless established by court order that he was empowered to demand possession

of contested property.  Because there is no evidence that the County Defendants

knowingly participated in any abuse of the Receiver's power and authority, the summary

judgment record is insufficient, as a matter of law, to support a finding that the County

Defendants violated Downeast's Fourth Amendment rights.  That deficit in the record

also effectively disposes of any derivative claims for failure to train against Washington

County and its Sheriff's Department, as well as any claim against the County Defendants

for conspiring to violate civil rights, or for attorney fees or punitive damages.

**C.      Qualified immunity**

Should the Court disagree with my assessment of the merits of the Fourth

Amendment claim against them, the County Defendants also argue that they are entitled

to qualified immunity.  I find that argument unassailable.  "[T]he qualified immunity

defense . . . provides ample protection to all but the plainly incompetent or those who

knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1st Cir. 1986).  The

Court of Appeals for the First Circuit utilizes the following three-part test for determining

whether the qualified immunity defense applies:

> (1) whether the claimant has alleged the deprivation of an actual
> constitutional right; (2) whether the right was clearly established at the
> time of the alleged action or inaction; and (3) if both of these questions are
> answered in the affirmative, whether an objectively reasonable official

---

Soldal, 506 U.S. at 71.  I note that case chiefly relied upon by Downeast differs from the
circumstances of this case precisely on the ground that the defendants acted in the absence of a
court order.  See Thomas v. Cohen, 304 F.3d 563, 565 (6th Cir. 2002) (involving evictions
"without a judicial order").  Downeast also cites Bonds v. Cox, 20 F.3d 697 (6th Cir. 1994), in
which liability arose from damage and destruction of property during the execution of a search
warrant, but this case does not present a scenario in which the County Defendants themselves
seized or damaged any equipment.  Downeast's argument is limited to the notion that the County
Defendants have "not heeded the advice to police officers set forth in Soldal to avoid choosing
sides and making decisions over who should get particular items of property."  (Opp'n Mem. at 9.)
I do not think the County Defendants can fairly be said to have run afoul of any constitutional
principle stated in Soldal.

would have believed that the action taken violated that clearly established constitutional right.

Jennings v. Jones, 479 F.3d 110, 118 (1st Cir. 2007).  Assuming that the seizure of any particular item of equipment by the Receiver violated a Fourth Amendment right held by Downeast, an objectively reasonable officer in the position of Sheriff Tibbetts would not have believed that he was violating one of Downeast's clearly established Fourth Amendment rights by assisting the court-appointed Receiver and his chosen agent in entering upon the land of third parties to seize equipment that the Receiver asserted was collateral subject to his power, when no cause existed to believe the Receiver was abusing his office.  Nor would an objectively reasonable officer in the position of Deputy Seeley have believed that he was violating Downeast's clearly established Fourth Amendment rights by searching out property on the roads and in the woods or by preventing others from interfering with the seizure of equipment in which the Receiver asserted a possessory interest.

## D.    Maine Civil Rights

Neither party analyzes the case in terms of Maine law.  The County Defendants assert in a footnote that their arguments on the federal civil rights claims are dispositive of the Maine civil rights claim.  (County Mem. at 9 n.3.)  Downeast similarly argues that "the same analysis" applies to its Maine civil rights claim as applies to its federal civil rights claim and it takes the position that its presentation on the federal claim is sufficient to justify a trial of its state claim.  (Opp'n Mem. at 12.)  I note that the state statute relied upon by Downeast has no state action requirement and requires a showing oriented toward use of force, damage to property, trespass or threats of the same, which is different from the showing required for the § 1983 claim.  See 5 M.R.S.A. § 4682.  In any

event, for the reasons set forth above in section B, the record cannot support a finding that these defendants engaged in objectively unreasonable conduct under the Fourth Amendment to the United States Constitution or Article I, section 5 of the Maine Constitution, and such a finding is required for liability under section 4682 of the Maine Civil Rights Act.

### Conclusion

Downeast's allegations of conspiracy, bad faith and/or recklessness on the part of Washington County's former sheriff and his deputies are not supported by the summary judgment record.  Furthermore, Downeast's considerably tamer argument that liability for Fourth Amendment violations nevertheless arose based on the County Defendants' failure to second-guess the Receiver or remain neutral when Downeast made competing claims simply does not involve, as a matter of law, the kind of conduct that must be shown in order to justify a finding that these defendants engaged in objectively unreasonable conduct under the Fourth Amendment.  This is necessarily the case because the Receiver purported to act pursuant to his authority as an officer of the court and there is nothing in the record capable of establishing that the County Defendants knew or should have known that the Receiver was exceeding his authority or abusing his office.  Accordingly, I RECOMMEND that the Court GRANT the County Defendants' motion for summary judgment (Doc. 220) against the remaining federal and state civil rights claims (Counts I & IX), and the associated claims for attorney fees and punitive damages (Counts X & XI).  In conjunction with the Court's earlier entry of judgment against any due process claim and any state law tort claims, adoption of this recommendation would effectively dispose of all of the claims pressed against the County Defendants.

NOTICE

     A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

     Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                      /s/ Margaret J. Kravchuk
                      U.S. Magistrate Judge

June 13, 2007

25