UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DOWNEAST VENTURES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-87-B-W |
| | ) | |
| THE McSHANE GROUP, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON RECEIVER'S
MOTION FOR SUMMARY JUDGMENT**

Downeast Ventures, Ltd., filed suit against KeyBank National Association, SN

Commercial, LLC, Jasper Wyman & Son, Washington County, the Washington County Sheriff's

Department, Joseph Tibbetts, the former sheriff, Lester Seeley, a sheriff's deputy, James Ebbert

and his employer, the McShane Group, Inc. (the state court-appointed receiver of property in a

foreclosure action commenced by KeyBank and presently being maintained by SN Commercial

against third parties), and Harry Bailey, a private investigator hired by the receiver to assist in the

location and acquisition of the bank defendants' collateral.  The gist of the complaint is that the

defendants conspired to violate Downeast Ventures's federal rights and various state law duties

owed to Downeast Ventures, by wrongfully seizing under color of state law and refusing to

return certain assets allegedly owned by Downeast Ventures.  Now pending are a raft of

summary judgment motions filed by both sides and a motion to strike Downeast's jury demand as

to the defendants' "alter ego defense."  This Recommended Decision addresses the motions for

summary judgment filed by the receiver (James Ebbert and the McShane Group), the creditors

(KeyBank, SN Commercial and Wyman) and their private investigator (Harry Bailey).  (Docs.

176, 214, 215, 216, 221, 223 & 225.)  It also addresses the defendants' motion to strike the jury

demand.  (Docket No. 213.)  A companion recommended decision addresses the motion for

summary judgment filed by the Washington County Defendants.  (Docket No. 220.)  I

recommend that the Court grant the motions addressed herein to the extent they seek an entry of

judgment against the counts brought under the Federal Civil Rights Act (Count I & Count IX),

and dismiss the pendent state law claims without prejudice.

## Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of

material facts in accordance with this District's summary judgment practice.  See Doe v. Solvay

Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v.

Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and

purpose" of Local Rule 56).  When a statement offered by a party is uncontested and is supported

by a citation to record material having evidentiary quality, the statement has been set forth herein

essentially as offered.  When a statement of fact is contested and the evidentiary record is

capable of supporting alternative findings of fact, the statement in dispute has been

characterized, for purposes of summary judgment only, in the manner favorable to, or favored

by, the non-movant.  Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Downeast Ventures, LTD., ("Downeast") is a New York corporation with a place of

business in Wesley, Maine.  (Defs.' Consol. Statement (DCS) ¶ 1, Docket No. 222.)  Prior to

2000, the corporation now known as Downeast operated under the name Celebrations

Entertainment Concepts, Incorporated ("Celebrations") in New York. (Id. ¶ 2.)  Carol Guptill

was the sole owner of Celebrations.  (Id. ¶ 3.)  Celebrations changed its name to Downeast in

May 2000.  (Id. ¶ 4.)  At about the time of the name change, the corporation entered the

construction business.  (Id. ¶ 7.)  Carol Guptill was at all relevant times the President of Downeast.  (Id. ¶ 8.)  Carol Guptill owns at least fifty percent of Downeast's shares.  (Id. ¶ 9.) Carol Guptill claims to have transferred fifty percent of Downeast's shares to two sons (William, Jr. and Kurt) in May 2000 when Celebrations became Downeast.  (Id. ¶ 10.)  However, Downeast's tax returns listed Carol Guptill as its sole owner from 2000 through 2003.  (Id. ¶ 11.) Moreover, in 2004, Carol Guptill testified under oath that she was then the sole shareholder of Downeast Ventures, Ltd.  (Id. ¶ 12.)  William Guptill, Sr. (Carol Guptill's husband) oversaw generally all the business operations of Downeast, including its day-to-day operations and its financial performance.  (Id. ¶ 14.)  William Guptill, Sr. ("Bill Guptill"[1]) thinks of Downeast as his company.  (Id. ¶ 15.)

Bill Guptill is the sole shareholder of Guptill Farms, Inc., a New York corporation.  (Id. ¶ 16.)  Guptill Farms is a blueberry business situated in Wesley, Maine.  (Id. ¶ 35.)  KeyBank National Association ("KeyBank" or "Key") is a financial institution authorized to do business within the State of Maine.  (Id. ¶ 25.)  On or about June 28, 2000, KeyBank loaned $2.5 million (the "Key loan") to Bill Guptill, Carol Guptill and Guptill Farms, Inc. (collectively, "the Guptills").  (Id. ¶ 35.)  Under the governing loan documents, Carol and Bill Guptill, as well as Guptill Farms, were jointly and severally obligated to repay the Key loan.  (Id. ¶ 37.)  As part of the documentation evidencing the parties' loan agreement, the Guptills executed and delivered to KeyBank a Commercial Term Note dated June 28, 2000, in the original principal amount of $2,500,000.00.  (Id. ¶ 38.)  The Guptills also executed and delivered to KeyBank (among numerous other documents) a Term Loan Agreement dated June 28, 2000.  (Id. ¶ 39.)

Paragraph 1.2 of the Term Loan Agreement includes the following provision:

---

[1]     I refer to William Guptill, Sr. as Bill Guptill throughout because that is the manner in which his counsel refers to him.

**1.2  Security**.  This Agreement is secured by:

. . . .

Continuing first (1st) priority security interest covering of each Borrower's farm products, accounts receivable, inventory, machinery and equipment, furniture and fixture, investment property, deposit accounts, cash collateral and general intangibles, etc. now owned or hereinafter acquired.

. . . .

(Id. ¶ 40.)[2]  Section 7(c) of the Term Loan Agreement provides as follows:

**7.  REMEDIES**.  At all times, Lender shall have, in addition to all other rights provided for herein and in the other Loan Documents, all of the rights and remedies of a secured party under the Uniform Commercial Code of Maine and any other applicable law.  All of Lender's rights shall be deemed cumulative and nonexclusive. . . .  In addition, Lender may at its option, without notice of its election and without demand, through an agent or otherwise, do any one or more of the following, all of which are hereby authorized by each Borrower, and all of which rights and remedies shall be cumulative and may be exercised singularly or concurrently:
. . . .
(c) Enter, with or without process of law, any premises where any Collateral might be, and without charge or liability, take possession of the Collateral and use or store it in said premises, and at the option of the Lender, remain thereon and use the same, or remove the same to such place or places as Lender deems convenient.

(Id. ¶ 41.)  The Commercial Term Note and Term Loan Agreement were secured by the

following collateral documents:

a.  Mortgage, Security Agreement and Financing Statement from William and Carol Guptill to KeyBank dated June 28, 2000, and recorded in the Washington County Registry of Deeds in Book 2438, Page 211 (the "Personal Mortgage");

b.  Mortgage, Security Agreement and Financing Statement from Guptill Farms, Inc. to KeyBank dated June 28, 2000, and recorded in the Washington County Registry of Deeds in Book 2438, Page 130 (the "Corporate Mortgage");

---

[2]     The "Term Loan Agreement" can be viewed as Exhibit C to the Affidavit of Dennis Heuser.  (Docket No. 214-7.)

c. Commercial Security Agreement from William and Carol Guptill to KeyBank dated June 28, 2000 (the "Personal Security Agreement"); and

d. Commercial Security Agreement from Guptill Farms, Inc. to KeyBank dated June 28, 2000 (the "Corporate Security Agreement").

(Id. ¶ 42.)[3] The security interests in the personal property of William and Carol Guptill were duly perfected by UCC Financing Statements from William and Carol Guptill to Key, filed with the Maine Secretary of State and the New York Secretary of State. (Id. ¶ 43.)[4] The security interests in the personal property of Guptill Farms, Inc. were duly similarly perfected. (Id. ¶ 44.)[5] The Personal Security Agreement and the Corporate Security Agreement each provide that "Borrower hereby grants Lender a continuing security interest in the following described collateral, whether now owned or hereafter acquired, and all products and proceeds thereof." The list includes "equipment," which is defined as follows.

> Equipment: All machinery, equipment and fixtures, motor vehicles, office furniture, furnishings and trade fixtures, specialty tools and parts, motor vehicles and materials handling equipment of the Borrower, all irrigation equipment, freezers, processing and handling equipment, all farm equipment, all together with the Borrower's interest in, and right to, any and all manuals, computer programs, data bases and other materials relating to the use, operation or structure of any of the foregoing; and all other property constituting "equipment" as such term is defined in the Uniform Commercial Code and including without limitation that equipment described on the attached Exhibit B.

(Id. ¶ 45.)[6] The Personal Mortgage and the Corporate Mortgage each provide that "Borrower does hereby give, grant, bargain, sell, transfer, assign, mortgage and convey unto Lender and its successor and assigns . . . all of the following described property":

> (a) All tracts or parcels of land located in Washington County, Maine, including without limitation the property located in the Town of Wesley, Township 31, Town of Marshfield, Town of Northfield, Town of Jonesport and all other locations in Washington County . . .; and

---

[3]   Heuser Aff. Exs. D-H, Docket No. 214-8, 9, 10, 11, 12.
[4]   Id., Ex. I, Docket No. 214-13.
[5]   Id., Ex. J, Docket No. 214-14
[6]   Id., Exs. F, G, Docket No. 214-10, 11.

> (b) All buildings, structures, parking areas, landscaping and other improvements of every nature now or hereafter situated, erected or placed on the Land or appurtenant thereto . . . ;  and
>
> (c) All fixture, machinery, equipment, furniture, inventory, building supplies, appliances, farming and harvesting equipment, and other articles of personal property (the "Personal Property") and all other fixtures and equipment now or hereafter owned by Borrower and located in, on or about, or used or intended to be used with or in connection with the Land or the Improvements, whether installed in such a way as to become a part thereof or not, including all additions, improvements, betterments, renewals and replacements of any of the foregoing, whether now owned or hereafter acquired by Borrower . . . .

(Id. ¶ 46.)[7]  At Section 1.5 of the Personal Security Agreement, William and Carol Guptill represented and warranted that they had no subsidiaries and conducted their business under no other name.  (Id. ¶ 47.)  Section 6 of both the Personal Mortgage and the Corporate Mortgage provides as follows:

> **6. Transfers.**  Borrower will not, directly or indirectly, voluntarily or involuntarily, without the prior written consent of Lender in each instance: (a) sell, convey, assign, transfer, lease, option, mortgage, pledge, hypothecate, or dispose of the Property, or any part thereof or interest thereon, except as expressly permitted by the terms of this Security Deed; or (b) create or suffer to be created or to exist any lien, encumbrance, security interest, mortgage, pledge, restriction, attachment or other charge of any kind upon the Property, or any part thereof or interest therein, except for Permitted Encumbrances.

(Id. ¶ 48.)[8]

As a condition for making the loan, KeyBank required the Guptills to enter into an agreement with some other person or entity that would assure that Guptill Farms, Inc. would have a regular source of blueberry processing revenues.  (Id. ¶ 49.)  The Guptills had worked with various blueberry companies over the years.  (Id. ¶ 51.)  The Guptills decided to ask Jasper Wyman & Son ("Wyman") to enter into the required agreement, and Wyman consented.  (Id. ¶ 52.)  Wyman is a grower, packer and marketer of wild blueberries and other berry fruits with

---

operations in Washington County, Maine.  (<u>Id.</u> ¶ 26.)  KeyBank never required that the agreement be with Wyman.  (<u>Id.</u> ¶ 50.)  On June 28, 2000, Wyman and the Guptills entered into a Supply and Storage Agreement, which, among other things, and subject to a number of specified terms and conditions, provided that Wyman would purchase the Guptills' yearly blueberry production (up to a specified amount), that the Guptills would process blueberries for Wyman, and that Wyman would store blueberries at the Guptills' cold storage facility.  (<u>Id.</u> ¶ 53.)  This multi-year Supply and Storage Agreement was critical to Key's decision to provide financing.  (<u>Id.</u> ¶ 54.)  KeyBank further required the Guptills to have a guarantor.  (<u>Id.</u> ¶ 55.)  Wyman guaranteed the Key loan and in connection with that guarantee the Guptills entered into a "Reimbursement Agreement" under which they jointly and severally agreed, among other things, "to reimburse Wyman for all payments made and costs incurred under or pursuant to the Wyman Guaranty or otherwise paid by Wyman to Lender in connection with the [Key] Loan." (<u>Id.</u> ¶¶ 56-57).  To secure their obligations under the Reimbursement Agreement, the Guptills executed a number of mortgages and security agreements in favor of Wyman, including the following:  a Mortgage, Security Agreement and Financing Statement executed by William and Carol Guptill;  a Mortgage, Security Agreement and Financing Statement executed by Guptill Farms;  a Security Agreement executed by William and Carol Guptill;  and a Security Agreement executed by Guptill Farms.  (<u>Id.</u> ¶ 58.)  These documents granted Wyman security interests, rights and remedies that were materially identical but junior to those set forth in the Personal Mortgage, the Corporate Mortgage, the Personal Security Agreement and the Corporate Security Agreement in favor of Key.  (<u>Id.</u> ¶ 59.)  As a result of the foregoing instruments duly executed by the Guptills, KeyBank and Wyman had a continuing interest in the property referred to therein.  (<u>Id.</u> ¶ 60.)

Downeast was not a party to the KeyBank loan with Guptill Farms. None of Downeast's equipment, vehicles, machinery or other assets were pledged to KeyBank in connection with the KeyBank loan. (Pl.'s Add'l Statement (PAS) ¶ 79, Docket No. 253.) Downeast turned down specific requests by KeyBank and Wyman to have Downeast's equipment added to the collateral securing the Guptill Farms loans. (Id. ¶ 158.)

According to Bill Guptill, two KeyBank loan officers told him that KeyBank wanted Wyman's banking business, and hoped that having Wyman as the guarantor of the Guptill Farms loan would lead to getting that business. (Id. ¶ 20.) He also attests that, in September 2001, Blair Morrison of Wyman, who was in charge of the dealings with Guptill Farms, informed him that he had been called into a meeting with Wyman's President, Ed Flanagan, and KeyBank's loan officer, Flewelling, and that they had asked what he (Blair) thought Bill Guptill would do if they foreclosed on Guptill Farms. (Id. ¶ 21.)[9] Morrison then, according to Guptill, told him that Wyman wanted out of the Storage and Supply Agreement and that Ed Flanagan wanted to take over Guptill Farms' facility. (Id. ¶ 22.)

On September 5, 2002, KeyBank declared a default against Guptill Farms for an alleged breach of a "Cash Flow Coverage Ratio Covenant." (Id. ¶ 24.) At the time of the September 2002 declaration of default, Guptill Farms was current with its loan payments. (Id. ¶ 25.) KeyBank offered to eliminate the covenant in a subsequent correspondence of January 13, 2003, though it is not clear what became of that offer. (Id. ¶ 26; Defs.' Reply Statement (DRS) ¶ 26, Docket No. 271.) According to Bill Guptill, KeyBank wanted Downeast Ventures to be pledged as collateral for the Guptill Farms loan, though there does not appear to be any documentation so stating. (PAS ¶ 26.) The defendants assert that KeyBank was inquiring to determine whether cash flow from Downeast would justify the offer to eliminate the cash flow ratio covenant, which

---

[9]     These statements rely on the Guptill Affidavit dated April 4, 2006. (Docket No. 228-2.)

is referenced in the January 13, 2003, correspondence from KeyBank to the Guptills.  (DRS ¶ 26.)

Several months later, in June or July of 2003, Wyman personnel (Flanagan, Nat Lindquist, Carmen Look) accused Guptill Farms of losing, and then of stealing, 345,322 pounds of blueberries.  (PAS ¶ 27.)   Bill Guptill attests that the accusations were false and that his own investigation makes him conclude that no blueberries were ever missing.  (Id. ¶¶ 28-29, 87.)  The defendants deny these statements and cite a collection of record evidence that they say demonstrates his complicity in the alleged theft.  In order for the Court to resolve this dispute favorably to the defendants the circumstantial evidence they cite would have to serve as a basis for an inference of guilt to be drawn.  Unfortunately for the defendants, inferences are not to be drawn in the favor of summary judgment movants.

Downeast asserts that Wyman had "full access" to the Guptill Farms storage facility.  (Id. ¶ 31.)  Downeast also sets out numerous statements of circumstantial evidence in an effort to support a finding that it and the Guptills played no role in any conversion of Wyman blueberries and, by extension, that Wyman must have made up the charge to undermine Guptill Farms and the Guptills.  (Id. ¶¶ 32-35, 42.)  This controversy over the alleged conversion of blueberries is obviously not the kind of controversy that can be neatly resolved in a summary judgment statement of material facts.  Whether it proves material to the federal claims presented in this case can be addressed in the context of the parties' legal arguments.  The upshot of the allegations is that, by the end of the summer of 2003, the business relationship between Wyman and Guptill Farms that arose from the Supply and Storage Agreement had reached an impasse.  (Id. ¶ 36; DRS ¶ 36.)  Downeast states that, by the time Wyman advised Guptill Farms that it was no longer going to process or store blueberries in accordance with the Supply and Storage

Agreement, it was the second week of August 2003 (after the blueberry season had begun) and that, and as a result, Guptill Farms lost processing and storage fees that could have been earned from two other suppliers.  (PAS ¶ 40.)

According to Bill Guptill's affidavit, KeyBank's response to the matter was that it would not accept further payments from Guptill Farms on the Key loan until the alleged "defaults" with Wyman were resolved.  (Id. ¶ 43.)  Downeast cites an August 2003 Commercial Loan Statement reflecting a statement date of August 17, 2003, with an amount due of $34,253.45, and a September 16, 2003, check referencing the invoice number and drawn on a trust account held by Lambert Coffin, Guptill's counsel.  (Id.; Docket No. 228-3 Ex. 7.)  KeyBank rejected the late payment on the account.  A responsive affidavit cited by the defendants asserts that the Key loan was accelerated on August 20, 2003, based on the "critical" concern "that the Guptill Defendants had breached the Supply and Storage Agreement" as well as the occurrence of late payments, and that the September payment was returned because acceptance of the payment would have constituted a waiver of the outstanding defaults.  (DRS ¶ 43; Docket No. 249-7 ¶¶ 6, 12-13.)  In Bill Guptill's view, KeyBank "sided with Wyman" because it was "the more lucrative account." (PAS ¶ 88.)

Wyman began communicating with the Washington County Sheriff's Department about the alleged theft as early as June 23, 2003.  (PAS ¶¶ 44, 57-58.)  Joseph Tibbetts was the elected Sheriff of Washington County from January 1, 1999, through December 31, 2006.  (DCS ¶ 32.) A Wyman executive officer, Carmen Look, spoke first to Tibbetts and inquired of him what Wyman's options were.  They discussed Wyman's option of pursuing the matter with either the Sheriff's Department or with the State Police.  After speaking with Sheriff Tibbetts, Look sent an email to Lindquist, another Wyman executive, and stated that she thought "[t]he County might

be more likely to keep us in the loop, so to speak," as compared with asking the state police to investigate the matter.  (Id. ¶¶ 59-60, 65; Docket No. 259-6.)  She also indicated in her email that Tibbetts "had a couple of ideas and wanted to check them out before advising on the appropriate course of action." (PAS ¶ 66; Docket No. 259-6.)  Tibbetts testified that he did not say he would get back to her; that he simply provided her with her options.  (PAS ¶ 66.)  Look memorialized in her email that they also discussed the fact that Tibbetts had run into Everett Ramsdell, another Wyman executive, while on vacation in Alaska.  Tibbetts testified that he had not talked about that with Look.  (Id.)

Wyman decided to file a report with the Sheriff's Department and Tibbetts assigned the investigation to his chief investigator, Deputy David Denbow.  (PAS ¶¶ 61-63, 67-68.)  Carmen Look communicated with Denbow several times during the course of the investigation.  (Id. ¶ 61.)  Look told Tibbetts that Harry Bailey had been working on the blueberry theft investigation and that he would come by to meet with Tibbetts.  (Id. ¶ 70.)  Harry Bailey is an individual who resides in Grand Lake Stream, Maine.  Bailey is a licensed private investigator who operates a private investigation firm known as Harry Bailey Associates.  (Id. ¶ 30.)  Harry Bailey met with Sheriff Tibbetts to discuss the blueberry theft investigation.  (Id. ¶ 71.)  Carmen Look and Harry Bailey called Tibbetts on several occasions over the next few years to inquire about the investigation.  (Id. ¶¶ 72-73.)  Sheriff Tibbetts made monthly inquiries of Deputy Denbow about the status of the blueberry investigation during the first year after it commenced.  (Id. ¶ 74.)  No charges have ever been brought as a result of the investigation, though the Sheriff's Department has completed its investigation.  (Id. ¶¶ 75-77.)  On one occasion when the Sheriff's Department seized Guptill Farms' computers early on in its criminal investigation, Nat Lindquist of Wyman

11

drove onto the premises of the Guptill Farms facility with Brian Flewelling of KeyBank.  (Id. ¶ 45.)

On or about March 10, 2004, KeyBank commenced a foreclosure action in Maine Superior Court, Washington County, naming the Guptills as defendants and Wyman as a party in interest.  (DCS ¶ 61.)  On May 17, 2004, KeyBank filed an Emergency Motion for Appointment of a Receiver.  (Id. ¶ 62.)  In support of its receivership motion, KeyBank submitted an affidavit of Dennis A. Heuser.  The Heuser Affidavit identified and attached a number of the Key loan documents, including the Term Loan Agreement, the Personal Mortgage, the Corporate Mortgage, the Personal Security Agreement and the Corporate Security Agreement. (Id. ¶ 63.) The Guptills opposed the Receivership Motion.  (Id. ¶ 64.)  In the receivership motion KeyBank requested that the McShane Group be appointed as the receiver.  (Id. ¶ 65.)  McShane Group, Inc. ("McShane") is a consulting company with a principal place of business in Baltimore, Maryland.  McShane provides workout and turnaround services for businesses experiencing financial difficulty.  (Id. ¶ 28.)  James C. Ebbert ("Ebbert") is an agent of McShane.  Ebbert has experience in workouts and turnarounds and in handling the assets of businesses experiencing financial difficulty.  (Id. ¶ 29.)  It appears that papers submitted in support of the motion falsely described McShane as an outfit having 26 employees.  In fact, McShane consists of only six individuals.  (PAS ¶¶ 91-96.)  After a contested hearing, the Superior Court issued its order for appointment of a Receiver dated June 17, 2004 (the "Receivership Order").  (DCS ¶ 66.)  Among other things, the Receivership Order appointed McShane as "receiver of certain real and personal property of Defendants William R. Guptill (Sr.), Carol A. Guptill and Guptill Farms, Inc., both tangible and intangible, more particularly identified and referenced in the loan documents (hereinafter 'Collateral') now held by KeyBank and identified in the Affidavit of Dennis A.

Heuser."  (Id. ¶ 67.)[10]  The Receivership Order defined the term "Collateral" as meaning "certain

real and personal property of Defendants William R. Guptill (Sr.), Carol A. Guptill and Guptill

Farms, Inc. both tangible and intangible, more particularly identified and referenced in the loan

documents now held by [Key] and identified in the Affidavit of Dennis A. Heuser."  (Id. ¶ 68.)[11]

The Receivership Order empowers the Receiver, among other things, "[t]o take possession of the

Collateral or any part thereof, and to exclude the Defendants including any person or entity

acting on behalf of the Defendants from possession or control of the Collateral."  (Id. ¶ 69.)[12]

The Receivership Order also empowers the Receiver, among other things,

> To require any person to immediately turn over to the Receiver possession and
> control of the Collateral, monies, accounts and all books and records relating to
> the Collateral including without limitation, any outstanding contracts, payables,
> inventory and accounts receivable, without hindrance or delay.

(Id. ¶ 70.)[13]  No order was ever issued that allowed the Receiver to take possession of or to

interfere with property simply because it was owned by, or was in the possession of, Downeast.

(PAS ¶ 80.)

Also in June of 2004, Bill Guptill filed certain claims against KeyBank and Wyman

based on allegations that the blueberry theft accusation was false.  (Id. ¶ 86.)

Moving back in time, on May 25, 2004 (approximately nine months after KeyBank

declared the Guptills in default and two months after KeyBank initiated the foreclosure action

against the Guptills), Bill Guptill, in his capacity as president of Guptill Farms, sold nine pieces

of equipment to Guptill Logging Supply, Inc. ("Guptill Logging"), a company owned and

operated by Bill Guptill's second-cousin Lyle Guptill.  (DCS ¶ 159.)  This sale was evidenced by

a bill of sale.  (Id. ¶ 160.)  Four of the items allegedly sold to Lyle Guptill, an International log

---

[10]     Order for Appointment of a Receiver at 6, Docket No. 222-12.
[11]     Id.
[12]     Id.
[13]     Id. at 8-9.

truck, a Mack R 600 Diesel, a GMC Brigadier oil truck, and a Hay Wagon, are identified on Exhibit B to the Key Loan Documents (Docket No. 222-21), the Guptill Equipment List (Docket No. 222-22), and the Key Appraisal (Docket No. 222-23).  (DCS ¶ 161.)  When questioned during a hearing about this conveyance to Lyle Guptill, Bill Guptill stated that "since [Key] didn't keep any agreements with me, I don't see why I had to keep any agreements with [Key] at this point."  (Id. ¶ 162.)  Downeast Ventures admits that Mr. Guptill still feels he does not have to honor any of his agreements with Key.  (Id. ¶ 163.)

On September 20, 2004, the Superior Court issued an Amended Order for Appointment of a Receiver.  (Id. ¶ 71.)  The Amended Order was the result of negotiations between Key, the Guptills and the Receiver and was intended to "amend or otherwise clarify the Receivership Order."  (Id. ¶ 72.)[14]  The Amended Receivership Order required the Guptills to provide the Receiver and KeyBank with "a complete listing of all assets, including bank or financial accounts, wherever located, owned by the Guptills jointly or severally in excess of $500" on or before September 5, 2004; provide the Receiver and KeyBank with "a complete and accurate accounting of all assets sold, conveyed, gifted or otherwise transferred by the Guptills to any person or entity from June 28, 2000 to date" on or before September 5, 2004; provide the Receiver and KeyBank "with the present location of all assets wherever located, including without limitation, machinery, equipment, trade fixtures, furniture, tools and inventory" on or before September 5, 2004; and respond, through counsel, "within one business day with respect to any requests submitted by the Receiver in connection with this Amended Receivership Order." (Id. ¶ 73.)[15]

---

[14]     Am. Order for Appointment of Receiver at 1, Docket No. 222-13.
[15]     Id. ¶¶ 2, 3, 4, 6.

There is a dispute over whether the Guptills ever provided KeyBank or the Receiver with a complete listing of assets, a complete accounting of transfers or the location of all of those assets as required by the Amended Receivership Order.  (Id. ¶ 74.)  The Receiver says the Guptills did not comply with the order and supports this statement with a citation to the affidavit of James Ebbert, the agent of the appointed receiver, McShane.  Ebbert is competent to testify that McShane did not receive an accounting.  Downeast Ventures denies the statement, but cites an averment in a Bill Guptill affidavit to the effect that Ebbert never contacted Guptill or Downeast Ventures to learn its position with regard to the ownership of certain assets.  (Pl.'s Opposing Statement (POS) ¶ 74, Docket No. 253, citing Guptill Aff. ¶ 12, Docket No. 253-2.)

In January of 2004, before and unrelated to the foreclosure action, McShane was interviewed by Wyman about potentially providing Wyman with turnaround services.  (DCS ¶ 75.)  Wyman did not select McShane to provide those turnaround services and neither McShane nor Ebbert had any further contact with Wyman until after entry of the Receivership Order.  (Id. ¶ 76.)  In April 2004, Key's counsel, Lawrence R. Clough, of Tompkins, Clough, Hirshon & Langer, P.A., met with Ebbert to discuss the possibility of Ebbert and/or the McShane Group (collectively, the "Receiver") serving as receiver in connection with the Guptill Collateral.  (Id. ¶ 79.)  As a condition for accepting the appointment, the Receiver required KeyBank to enter into a Receivership Agreement dated July 15, 2004.  (Id. ¶ 80.)  As a necessary condition for acceptance of the appointment, the Receiver required KeyBank to agree on the Receiver being represented by independent counsel.  (Id. ¶ 81.)  The Receiver has never retained the firm of Tompkins, Clough, Hirshon & Langer, P.A., or any of its attorneys.  (Id. ¶ 77.)  Instead, the Receiver retained the law firm of Marcus, Clegg & Mistretta, P.A.[16]  (Id. ¶ 82.)  For the Guptill

---

[16]     This fact is included because the complaint includes an allegation that the Receiver retained KeyBank's counsel in the state court proceedings and the allegation was one of the facts I flagged in connection with the

Receivership, the Receiver charged its customary rates.  (Id. ¶ 85.)  Downeast admits that the fees and rates charged by the Receiver have been reasonable and fairly typical of the industry. (Id. ¶ 86.)  McShane paid Mr. Ebbert approximately 60% of the revenue it received for his work because he originated the account.  (PAS ¶ 101.)  Under this arrangement Ebbert has received between $150,000 and $180,000 in regard to the Guptill Farm and Downeast matters.  (Id. ¶¶ 105-106.)  Ebbert's compensation was based on a rate of $250 per hour.  (Id. ¶ 112.)  In addition to such fees, KeyBank agreed to indemnify the Receiver for liability arising from his activity. (Id.)  In another agreement, Wyman agreed to compensate KeyBank for one-half of its costs and expenses connected with the Receiver.  (Id. ¶ 113.)

Ebbert learned that he had been appointed receiver for the Guptill collateral on June 18, 2004, the day after the entry of the Receivership Order.  (DCS ¶ 103.)  On June 18, 2004, to ensure that the Guptill Farms' commercial operation in Wesley, Maine (the "Guptill Facility") was secure, the Receiver arranged for the locks to be changed that day and for 24-hour security to commence on June 23, 2004.  (Id. ¶ 104.)  The Facility is located on Route 9 in Wesley, Maine and consists of real estate and four large structures: a warehouse for storing and repairing equipment; a large structure housing a blueberry processing line, a cold storage freezer and generators and compressors; a house formerly used by Guptill Farms as offices and living quarters for hired staff; and a final building used for storage and containing equipment, tools, and miscellaneous items.  (Id. ¶ 105.)

There is a dispute over the condition of the processing line and whether collateral was missing from the Guptill Facility as of June 24, 2004.  According to Ebbert, he visited the site with two representatives of Wyman on that date: Nat Lindquist, Vice President of Operations,

defendants' motions to dismiss as supporting a finding of conspiratorial conduct or joint activity for purposes of treating the private defendants as having state actor status.  (First Am. Compl. ¶ 25, Docket No. 13; Rec. Dec. on Mots. to Dismiss at 19-20, Docket No. 77.)

and Homer Woodward, Director of Operations.  (Id. ¶ 106.)  According to the defendants, these two Wyman employees were familiar with the Facility and with the equipment and machinery located there because of the past business relationship between Guptill Farms and Wyman and visits they made to the Facility in connection with that relationship.  (Id. ¶¶ 107-108.)  The defendants assert that Lindquist and Woodward noticed that the warehouse was missing various pieces of equipment such as forklifts and scales.  (Id. ¶¶ 109-110.)  The defendants also assert that Lindquist and Woodward recognized that a section of the processing line was missing, rendering it inoperable, that certain control panels were missing from the compressors, and that replacement parts could not readily be acquired because the processing line was custom built.  (Id. ¶¶ 111-112.)  Ebbert attests that he believed that these representations concerning missing equipment and line components were true.  (Id. ¶ 114.)  Downeast Ventures denies these statements concerning missing equipment and components, as well as the implications of them, and it cites Bill Guptill's affidavit, which states that Lindquist knew that the construction equipment was owned by Downeast Ventures and that Lindquist and Woodward visited the Facility only once or twice per year and, therefore, were not really familiar with what should have been present in the Facility, particularly in the summer.  Guptill attests that the processing line was being replaced with a more advanced system and had been taken out in the preceding year and that the control panels were present in the Facility when Ebbert locked up the plant.  Finally, Guptill offers that he expected Ebbert would contact him so that he could have made the processing line operational.  (POS ¶¶ 107-112, citing Guptill Aff. ¶ 14, Docket No. 253-2.)

The Receivership Order expressly authorizes the Receiver to "lease . . . any . . . of the Collateral."  (DCS ¶ 115.)  The Guptill Facility constitutes collateral for the Key loan.  (Id. ¶ 116.)  Rather than allowing the Guptill Facility to sit idle, the Receiver thought it prudent to

lease it in order to generate cash flow.  (Id. ¶ 117.)  The Receiver sent a Request for Proposal (RFP) to the four major blueberry growers/processors located in Maine: Allen's Blueberry Freezer, Inc., Cherryfield Foods, Inc., Merrill Blueberry Farms, Inc., and Wyman.  (Id. ¶ 118.) Despite follow-up phone conversations with representatives of each grower, only Wyman expressed any interest and responded to the RFP; the Receiver then notified KeyBank of Wyman's interest.  (Id. ¶ 122.)  The terms of the lease were negotiated thereafter and the lease was executed in early August of 2004.  (Id. ¶ 123.)

In July 2004, the Receiver approached KeyBank about the possibility of hiring Harry Bailey, the private investigator who had worked for Wyman on its alleged blueberry theft investigation, to assist in the location of Guptill Collateral.  (Id. ¶¶ 132, 136.)  The Receiver felt that he needed to obtain Key's approval, because there was no money for such expenditure in the operating account and he was looking to KeyBank for the funding.  (Id. ¶ 133.)  KeyBank agreed to pay and Bailey was hired on August 12, 2004, whereupon he and the Receiver discussed a strategy regarding the investigation.  (Id. ¶ 135; PAS ¶ 155.)  All subsequent investigative activities undertaken by Harry Bailey Associates were at the specific request and direction of the Receiver.  (DCS ¶ 137.)  The Receiver advised Bailey that some Guptill Farms equipment was missing and that Bailey's investigative duties included trying to locate it.  (Id. ¶ 139.)  Bailey was not authorized to, nor did he in fact, ever make any decisions or recommendations about whether to recover a particular item of property.  (Id. ¶ 140.)

At some point after the appointment of the Receiver, Ebbert met with Sheriff Tibbetts of the Washington County Sheriff's Department about receiving assistance with collateral seizures. Ebbert faxed a copy of a document entitled 1998 Guptill Farms Equipment List to Tibbetts, and Tibbetts provided a copy of the list to Lester Seeley, the deputy assigned to accompany the

Receiver on seizures.  (PAS ¶¶ 120-127, 134-136.)  Lester Seeley was hired by the Washington County Sheriff's Department in 1971 and has been a part-time deputy since 1974.  (Id. ¶ 33.) The Sheriff understood that if an item was on the 1998 equipment list, then Ebbert was entitled to seize it.  (Id. ¶ 122.)

In searching for Guptill Collateral the Receiver consulted a number of documents, including the Key Loan Documents (including but not limited to Exhibit B, entitled "Guptill Farms, Inc. to KeyBank National Association"), a document provided to him by Wyman and entitled "Guptill Farms Equipment List 1998" (the "Guptill Equipment List"), an appraisal dated June 5, 2000, generated by Farm Credit Appraisal Service on behalf of KeyBank (the "Key Appraisal"), UCC filings, documents provided by Case Credit Corporation (including documents under the names of Soris and Equipment Finance Partners), documents subpoenaed from Blueberry Ford and Southworth Milton (an authorized Caterpillar equipment dealer), various financing documents, motor vehicle registration statements, motor vehicle titles, motor vehicle purchase agreements, tax records provided by the towns of Marshfield and Wesley, Maine, and reports from Maine's Department of Motor Vehicles.  (DCS ¶ 171.)  The Receiver also examined various business records, including federal and state income tax returns of the Guptills and Downeast and he also spoke with various individuals familiar with the whereabouts of equipment owned by the Guptills and with the business affairs of the Guptills and Downeast. (Id. ¶ 172.)

*The Guptill Farms Facility*

One of the Receiver's duties was to secure and safeguard the Guptill Collateral, including the Facility.  (Id. ¶ 177.)  That responsibility included precluding William and Carol Guptill and third parties from entering any of the real estate included in the Guptill Collateral (including the

Guptill Facility) without the Receiver's prior permission.  (<u>Id.</u> ¶ 178.)  To advance that objective, the Receiver changed the locks on the Facility and hired Vescom Corporation to provide round-the-clock security at the site.  (<u>Id.</u> ¶ 179.)  The Receiver claims he saw no evidence during his inspection of the Facility – such as segregated and/or labeled items or equipment – that caused him to believe that any of the personal property located at the Facility was owned by anyone other than the Guptills.  (<u>Id.</u> ¶ 180.)  Bill Guptill responds that there were numerous items there that were clearly construction-related, like a vibrating roller, cutting edges for snow plows and a Fleero rake.  (PAS ¶ 163.)

On July 16, 2004, counsel for Downeast and the Guptills sent a letter to counsel for KeyBank and Wyman enclosing a list of items alleged to be in the Guptill Facility that were supposedly "not property of Guptill Farms nor covered by any mortgage agreement."  (DCS ¶¶ 182, 509.)  The list of items enclosed with the July 16, 2004, correspondence included items over which Downeast and a number of individuals claimed ownership.  (<u>Id.</u> ¶ 183.)  Neither the July 16, 2004, letter nor the attached list contained any documentation proving ownership of the items allegedly owned by Downeast.  (<u>Id.</u> ¶¶ 185, 510-511.)  The Receiver allowed Dale Thomas, who had stored items at the Facility (which items were identified in the July 26, 2004, correspondence) to retrieve those items once Thomas produced receipts showing his ownership.  (<u>Id.</u> ¶ 187.)  The Receiver maintains that Downeast never submitted any documentary support (except in the course of discovery in this case) to support its own claims to title over any of the equipment in the Guptill Facility.  (<u>Id.</u> ¶ 186.)

*Classic cars*

On August 19, 2004, Bailey was informed that a car carrier and a classic car were seen in front of the Guptill residence on the evening of August 16, 2004.  Bailey also was informed that

an antique car was being loaded onto the carrier.  (DCS ¶ 141.)  The Receiver eventually

recovered several classic cars from a dealership through which the Guptills were trying to sell

them.  This was accomplished by means of a temporary restraining order and state court

proceedings in which the court rejected an argument that the cars had been transferred to the

Guptill children prior to the execution of the Key loan and at a time when the children were

between the ages of five and seven.  (Id. ¶¶ 142-148.)  Ultimately, following several hearings,

the Superior Court ordered that the cars be turned over to the Receiver, finding they were

collateral for the Key loan.  (Id. ¶¶ 149-152.)

*August 17, 2004 seizures*

On August 17, 2004, the Receiver seized numerous items of equipment located in the

woods off of the Guptill Road in Wesley, Maine, identified in detail in the defendants'

consolidated statement, and including several trucks, tractors and mowers.  (Id. ¶ 188;  PAS

164.)  The land on which the equipment was located is owned by Lyle Guptill.  (DCS ¶ 189;

POS ¶ 189.)  Present at the time of the recovery were the Receiver, Bailey, and an officer of the

Maine State Police, which patrols that area of the state under an agreement with the Washington

County Sheriff's Department.  (DCS ¶ 190.)  No one from the Washington County Sheriff's

Department was present when this equipment was recovered from Lyle Guptill's property in

Wesley.  (Id. ¶ 192.)  During the recovery effort, Lyle Guptill arrived and indicated to the

Receiver that he had received several pieces of the equipment in trade for labor his company

performed for Bill Guptill or Guptill Farms.  (Id. ¶ 198.)  Lyle Guptill also told the Receiver that

all of the items recovered that night were placed on the property by Bill Guptill or one of his

workers.  (Id. ¶ 199.)  Lyle Guptill also said some pieces of equipment belonged to him and that

he could produce the bills of sale.  (Id. ¶ 200.)  Lyle Guptill asked that those pieces of equipment

for which he could produce bills of sale not be taken until he had an opportunity to produce the appropriate paper work.  (Id. ¶ 201.)  The Receiver complied with Lyle Guptill's wishes, after being assured that the equipment would not be moved until the matter was settled.  (Id. ¶ 202.)

Downeast claims that (a) two of the tractors, both Case Internationals (serial numbers JJF1022107 and JJF1044301); (b) a Kenworth Truck; and (c) a red Brown TCF 2615 Tree Cutter/Mower (serial numbers 20305 and 20369) recovered on August 17, 2004, were Downeast's property and were wrongfully seized by the Receiver.  (Id. ¶ 203.)   The Receiver asserts that his decision to treat the Case tractors as collateral was based on his examination of the credit sales contracts and security agreements pertaining to the tractors and identifying Guptill Farms, Inc. and William R. Guptill as purchasers, as well as certain related UCC filings and records.  (Id. ¶ 204.)[17]  Downeast denies that the Case tractors were collateral because they were not itemized on Key loan Exhibit B or otherwise expressly designated as collateral in connection with the Key loan closing documents.  (POS ¶ 204; Exhibit B, Docket No. 222-21.) Downeast admits, however, that none of the Case equipment documentation refers in any way to Downeast and that Bill Guptill was the original owner of the eleven pieces of equipment – including the two Case tractors – listed on the bill of sale.  (Id. ¶¶ 205, 210.)  Downeast claims that Bill Guptill held title to the Case tractors as "constructive trustee for Celebrations and Downeast."  (DCS ¶ 206.)  More specifically, Downeast claims that Bill Guptill transferred ownership of the Case tractors seized on August 17, 2004 (as well as the other Case tractor recovered on August 25, 2005, and nine other pieces of equipment) to Downeast on April 9, 2003, as evidenced by an April 9, 2003 bill of sale[18] (the "Alleged Soris Bill of Sale") signed by Bill Guptill.  (Id. ¶ 207.)

---

[17]   See Docket No. 222-26, beginning at page 6, for the documents described by the Receiver.
[18]   Docket No. 222-27.

On August 19, 2004, Downeast wrote to KeyBank and asserted that the seizure of the 1976 Kenworth Dump truck (Model C523) was improper because it was owned by Downeast. (PAS ¶ 176.)  Downeast demanded the return of the truck and provided evidence to KeyBank and Ebbert (including a cancelled check written on Downeast's bank account) to demonstrate that Downeast had purchased the truck for $7,500 in 2001.  (Id. ¶ 177.)  According to Downeast, it purchased the Kenworth on March 19, 2001[19] from Judson Stitham.  (Id. ¶ 397.)  The correspondence included a bill of sale purporting to show that a Judson Stitham had sold the truck to Downeast in March of 2001 and a cancelled check from Downeast to Stitham.[20]  (DCS ¶ 221.)  The Receiver asserts that he considered these instruments to be bogus because it seemed that both were written in the same handwriting and Stitham's name appeared to be spelled differently in the two instruments.  (Id. ¶ 222.)  The Receiver reports that he also felt that Stitham's signature on the back of the Downeast check did not match his purported signature on the Kenworth Bill of Sale.  (Id. ¶ 223.)  The Receiver wrote to Stitham and requested copies of any documentation Stitham had that would indicate that Downeast had purchased the Kenworth truck from Stitham, to which Stitham responded that he was unable to locate any such records. (Id. ¶ 224.)  The Receiver also compared Stitham's signature on his letter[21] to his purported signature on the bill of sale and his signature on the back of the cancelled check, and he concluded that the handwriting of the three signatures was very dissimilar.  (Id. ¶ 225.) Additionally, sometime in 2005 the Receiver examined an IRS Form 2290 Heavy Highway Vehicles (the "IRS Heavy Vehicle Form")[22] for the period July 1, 2002 through June 30, 2003,

---

[19]     At paragraph 397 of its additional statement Downeast gave the year 2000 as the date, but the 2001 date provided at paragraph 177 of the additional statement is supported by the letter of demand authored by Downeast's counsel.  See Docket No. 13-4.
[20]     Docket No. 222-29.
[21]     Docket No. 222-30.
[22]     Docket No. 222-31.

which listed a heavy vehicle belonging to Guptill Farms with a serial number of 8943786-C, which is remarkably close to that on the Kenworth Truck (serial no. 894378-C).  (Id. ¶ 226.)  The Receiver states that be declined to turn the Kenworth truck over to Downeast absent a court order based on these circumstances.  (Id. ¶ 228.)  The Kenworth truck has not been released to Downeast.  (DCS ¶ 178.)  Apart from his view of the instruments presented by Downeast, the Receiver states that he decided to take this asset as collateral because it was located on property owned by a relative of Bill Guptill in the vicinity of several other items that are agreed to be collateral and because it had in its bed a blueberry harvester belonging to Guptill Farms.  (Id. ¶¶ 218-219.)  Finally, there is the matter of the contested woods mower.  The Receiver states that he took the woods mower because it was attached to one of the Case tractors and had been placed on Lyle Guptill's property at Bill Guptill's direction.  (Id. ¶ 229.)  Downeast admits that it is unable to provide any documentation evidencing its ownership of the contested mower.  (Id. ¶ 230.)

*August 20, 2004, seizures*

The Receiver seized additional property on August 20, 2004, at a gravel pit owned by Bickford Ramsdell located in either East Machias or Whiting, Maine.  The contested items are a Caterpillar IT-28B loader bearing serial no. 1HF02445, a Caterpillar D-6 track type bulldozer bearing serial no. 9U12425, and a John Deere 550 bulldozer.  (Id. ¶¶ 231, 233; POS ¶ 231.)  The two bulldozers are both listed on the exhibit B document associated with the Key loan.[23] (Docket No. 222-21.)  As for the third piece of equipment, the Caterpillar loader, Downeast argues that it should not have been seized because it was part of the Soris loan and was, therefore, not Key loan collateral.  (Id. ¶ 232.)  Based on my review, the Caterpillar loader does

---

[23]     Oddly, Downeast claims ownership in the John Deere bulldozer, but admits that the Caterpillar bulldozer was collateral because it was on the "real collateral list," referring to exhibit B.  (POS ¶¶ 231-232.)  In fact, both bulldozers appear on what Downeast describes as the "real collateral list."  (Docket No. 222-21.)

not appear on either exhibit B or on the 1998 Guptill Farms Equipment List[24] (Docket No. 222-22).  Downeast offers a hand-written receipt dated March 8, 2004 (Docket No. 13-6), which it purports to be a bill of sale in which Bill Guptill, acting on behalf of Downeast, sold the loader to Mr. Ramsdell.  (PAS ¶ 187.)  Downeast also cites a bill of sale dated April 9, 2003 (Docket No. 13-5), in which Bill Guptill transferred ownership of the loader and other equipment to Downeast.  (PAS ¶ 187.)  Those items were subject to a purchase money agreement with Soris Financial.[25]

Bailey was involved in this recovery effort.  (DCS ¶ 234.)  Also, the Washington County Sheriff's Department sent two deputies to be present at the gravel pit during part of the recovery effort at the request of the Receiver and/or Bailey.  (Id. ¶¶ 236-237, 239.)  During the visit to the pit, Bailey contacted Sheriff Tibbetts to find out if he knew someone who might be able to transport this heavy equipment and Tibbetts contacted one person who was not interested.  The Receiver then made arrangements on his own for transportation of the equipment.  (Id. ¶ 241.)

*August 23, 2004, attempted seizure*

In August 2004 the Receiver attempted to seize a 2002 Ford Thunderbird for which the sales contract, the notice of sale document and the registration named both Downeast and Carol Guptill, but the vehicle was repossessed by another creditor first.  (Id. ¶¶ 402-415; PAS ¶¶ 188-189; Docket No. 222-38.)  Several vehicles registered to Downeast and three pieces of Caterpillar equipment were repossessed by creditors in the wake of the Key loan foreclosure due to Downeast's failure to make payments.  Downeast contends that the defendants are responsible for these developments.  (DCS ¶¶ 397-427.)

---

[24]     Downeast argues that the 1998 list is not a list of collateral owned by Guptill Farms but merely a list that Guptill Farms put together to identify equipment that was available for its use as of 1998.  (William Guptill Aff. ¶¶ 61, 63, Docket No. 253-2.)

[25]     Based on the sale of the loader to Ramsdell, I do not understand why Downeast is asserting that it has a possessory interest in this loader.

*August 23, 2004, certified letters*

On August 23, 2004, the Receiver sent certified letters to William and Carol Guptill asking them to contact him to schedule a meeting to discuss locating and turning over the Guptill Collateral.  (DCS ¶ 129.)

*August 24, 2004, seizures*

Bickford Ramsdell owned three van trailers (the sort commonly associated with tractor trailers) that were no longer road worthy.  (Id. ¶ 242.)  The trailers were located at a gravel pit in Cutler owned by Ramsdell's father.  (Id. ¶ 243; POS ¶ 243.)  Bickford Ramsdell gave Bill Guptill permission to use the trailers for storage.  (DCS ¶ 243.)  The Receiver seized the three van trailers on or about August 24, 2004, with Deputy Seeley in attendance, and he had the trailers hauled to the Guptill Farms Facility in Wesley.  (Id. ¶¶ 246-249, 253; Seeley Dep. at 39, Docket No. 199.)  On or about that same date the Receiver seized a dump trailer also located on the premises.  (DCS ¶ 257.)  On September 13, 2004, the Receiver and two Wyman employees unloaded and inventoried the contents of the Ramsdell trailers.  The Receiver reimbursed Wyman for the services of its employees.  (Id. ¶ 258.)  Some of the equipment in the three trailers belonged to Guptill Farms.  (Id. ¶ 260.)  The items contained in the van trailers are listed in exhibits II, III and IV attached to Ebbert's answers to the plaintiff's interrogatories.[26]  (Id. ¶ 262.)  The contents of the trailers included workers' uniforms (jump suits), scales, labeling and bar-coding equipment, banding equipment, farm tractors, farm implements, vibratory shakers, catcher trays, metal detectors for feed conveyers, motors and other replacement parts for produce processing and freezing equipment.  (Id. ¶ 264.)  One of the trailers also contained the piece of the processing line that the Receiver regarded as "missing" and Guptill regarded as "stored" and

---

[26]     Docket No. 222-24.

"obsolete."[27]  (Id. ¶ 265.)  Also included in one of the trailers were several documents pertaining to such matters as blueberry cultivation, agricultural pesticides and bee pollination, as well as Guptill Farms shipping labels.  (Id. ¶ 266.)  None of the items was labeled as belonging to Downeast.  (Id. ¶ 269.)  There is no suggestion that some of these items were not property of Guptill Farms and subject to Key's security interest.  (Id. ¶ 270; POS ¶ 126.)  For example, the trailers contained several Guptill Farms forklifts, though, according to Bill Guptill, they were no longer in good operating condition.  (Id. ¶ 271.)  Downeast describes the Guptill Farms property as limited to "broken forklifts" and a "discarded processing line and scales which were there in the normal course of business to protect from the dampness of the plant . . . during the winter months."  (POS ¶ 126.)  Downeast states that numerous items of Downeast property were intermixed with Guptill Farms equipment in the trailers, including two large space heaters, a York Rake, a 1969 Ferguson tractor bearing the name "Guptill Farms," a Ford 1200 tractor bearing the name "Guptill Farms," a dance floor, a holder and clamps for Case tractor dual tires; three Vicon fertilizer spreaders, various ladders, a New Way lawn aerator, two dump truck tailgates, two Seppi mowers, a Massey-Ferguson side-mower (attached to the 1969 Ferguson tractor), a Howard tiller, eight tables and 20-plus chairs, a sandwich bar, and three locker units. (Id. ¶ 274.)

On August 25, 2004, Downeast's attorney wrote to Ebbert (Docket No. 13-9) and to KeyBank (Docket No. 13-8) objecting to what he characterized as improper seizures of assets owned by Downeast.  (PAS ¶ 207.)  The Receiver asserts that he considered it fair to treat all of this equipment as collateral for the Key loan because it was stored along with several other items that are agreed to be collateral, did not bear any labels identifying Downeast, and appeared to be

---

[27]      William Guptill Aff. ¶ 57, Docket No. 253-2.

related to blueberry operations, excepting the dance floor.  (DCS ¶ 275.)  Downeast denies that these items appeared to be related to blueberry operations.  (POS ¶ 275.)

The Receiver also asserts that the two Seppi mowers, the three Vicon spreaders, and the holder and clamps for the Case tractor dual tires were Guptill Collateral based on the Case Equipment Documentation, which refers to the Seppi mowers, two of the three Vicon spreaders (serial numbers 2457 and 4017) and the holder and clamps as property of Bill Guptill.  (Id. ¶ 276.)  Two of the Vicon spreaders and the two Seppi mowers are among the equipment Bill Guptill sought to transfer to Downeast in April of 2003 pursuant to the "Soris Bill of Sale."  (Id. ¶ 277.)  Bill Guptill explains that Downeast made all of the payments on the equipment and therefore equitably owned it at the time that the bill of sale was made out and that the equipment was not collateral in any event because it was excluded as collateral because of Soris's preexisting lien.  (POS ¶ 277; Guptill Aff. ¶¶ 32-33, Docket No. 253-2.)  As for the other items, Downeast admits that it has no documentation establishing its ownership.  (Id. ¶ 280.)

*August 25, 2004, seizures*

On August 25, 2004, the Receiver seized additional property from real estate located in Jonesport and owned by Bill Guptill  (Id. ¶¶ 281, 288.)  The property included a Case International 5240 farm tractor (serial number JJF1020885), a Ford 7710 farm tractor (serial number C688374), a red Bush Hog model 406 (serial number 1102510), a blue Doug Bragg Enterprises, Ltd., flail mower, an Omar TSR225 rotary flail mower (serial number 10927), and a Ford 910 flail mower (serial number 1044).  (Id. ¶ 288.)  Downeast states that additional equipment was also seized but never accounted for, consisting of two CAT excavators, as well as two additional 5240 farm tractors (serial numbers JJF1044301 and JJF1022107) and two Woods

mowers.  (POS ¶¶ 287-289; PAS ¶ 211.)[28]  No one from the Washington County Sheriff's Department was present at the Jonesport property during the recovery of equipment on August 25, 2004.  (DCS ¶ 289.)

Downeast claims these items on the same grounds as the items taken on August 24: that they were equitably owned by Downeast and were never collateralized because of the preexisting Soris debt.  (POS ¶ 290; PAS ¶ 208.)  The Receiver asserts that he seized them because they were on property owned by Bill Guptill and they were among or attached to other equipment that was Guptill collateral.  (DCS ¶ 292.)  Downeast admits that it has no documentation evidencing its ownership of the Ford mower or the Omar mowers.  (Id. ¶ 297.)

*September 1, 2004, correspondence*

On September 1, 2004, the Receiver's counsel sent a letter to counsel for the Guptills and Downeast regarding the recovery of various equipment pursuant to the Receivership Order, conveying the message that third parties who claimed ownership over seized items should contact the Receiver or his counsel with documentation evidencing the same.  (Id. ¶¶ 515-516.)  The September 1, 2004, correspondence went on to say:

> Upon presentation of evidence satisfactory to the Receiver that someone other than Guptill acquired title to property prior to June 19, 2004 (the date of the [Receivership Order]), free and clear of Key Bank's security interest, the property can be returned as promptly as circumstances will allow.  As I am sure that you can appreciate, the Receiver cannot relinquish possession of any property that might be Key's collateral absent proof that it is not encumbered, or an appropriate court order.

(Id. ¶ 517.)

---

[28]     Starting at statement 281 of Downeast's response to the defendants' consolidated statement Downeast "drops" a statement so that its responses thereafter are "off" by one digit in relation to the defendants' statement.  For example, Downeast responds in paragraph 287 to statement 288.   This mistake in numbering appears to have arisen from the fact that Downeast offered two responses numbered 281.  The problem is resolved by paragraph 297.

*September 21, 2004, seizure*

On September 21, 2004, Bailey and the Receiver located a blue Mack dump truck with vehicle identification number (VIN) R6865T65680 at Guptill Logging on Route 1 in East Machias.  (Id. ¶ 301.)  The Receiver seized the truck, with the assistance of Deputy Seeley, who interceded when a Guptill employee, Paul Holmes, asserted that they were "stealing" Downeast property.  (PAS ¶¶ 233-235, 245.[29])  Seeley stated words to the effect that the employee could go to jail or "get in trouble" for interfering with the Receiver.  (DCS ¶ 302-309; POS ¶¶ 302-309.)  Seeley told Holmes "not to interfere," "take it to Court and prove otherwise," and that Holmes did not "want to get into trouble over [this]."  (PAS ¶¶ 247-248.)  Seeley also stated that if Holmes knew anything about a red dump truck that he ought to tell Seeley about it.  (PAS ¶ 238.)  The Mack truck was not registered at the time and did not have a company name painted on it.  (DCS ¶¶ 310-311; PAS ¶ 254.)  The Mack truck was registered to Guptill Farms in December 2002, as reflected on a Maine Department of Motor Vehicles registration statement, which records the same VIN.[30]  (Id. ¶¶ 313-314.)  Downeast asserts that it purchased the truck from one Fred Wallace on September 12, 2001.  (PAS ¶ 397.)

*Enter SN Commercial*

On September 23, 2004, KeyBank sold the Guptill Loan to SN Commercial.  (DCS ¶ 88.)  SN Commercial LLC is an Alaska limited liability company.  SN Commercial is in the business of purchasing and managing commercial loans.  (Id. ¶ 27.)  As part of the sale KeyBank assigned to SN Commercial all of the loan and collateral documents relating to the Key loan, including, without limitation, the term note, loan agreement, the mortgages, the security agreements and the collateral assignments.  (Id. ¶ 89.)  SN Commercial holds duly perfected first mortgage liens and

---

[29]   Downeast appears to discuss this seizure under two separate headings.  (See PAS ¶¶ 233-239 & ¶¶ 240-254.)

[30]   Docket No. 222-32.

security interests covering all Maine real estate and business personal property of William R. Guptill, Sr., Carol A. Guptill and Guptill Farms, Inc., excepting only (i) an $88,000 first mortgage to John Millea re: Jonesport, Maine property currently under foreclosure by the first mortgagee; (ii) a Mortgage to Machias Savings Bank, currently under foreclosure by the first mortgagee; and (iii) miscellaneous equipment UCC security interests listed in Exhibit A to the KeyBank Loan Agreement.  (Id. ¶ 90.)  By Order dated February 25, 2005, the Washington County Superior Court substituted SN Commercial as Plaintiff in the foreclosure action pending in Washington County Superior Court against William R. Guptill, Sr., Carol A. Guptill and Guptill Farms, Inc.  (Id. ¶ 91.)  There is presently due and owing from William R. Guptill, Sr., Carol A. Guptill and Guptill Farms, Inc. to SN Commercial in excess of three million dollars pursuant to the terms and conditions of the loan documentation referenced above (Id. ¶ 92), although Bill Guptill maintains that there are substantial offsets. (POS ¶ 92.)

After purchasing the Key loan, SN Commercial communicated with the Receiver to get "up to speed" on the Washington County foreclosure case and from time to time thereafter. (DCS ¶ 94.)  SN took over financing the cost of compensating the Receiver.  (Id. ¶ 95.)  The Receiver required a receivership agreement with SN largely based on the KeyBank agreement. (Id. ¶ 96.)  The Receiver also requested the same compensation as that paid by KeyBank, and SN Commercial did not consider such a request to be out of the ordinary.  (Id. ¶ 97.)  SN Commercial entered into an interim receivership agreement with the Receiver on or about November 1, 2004.  (Id. ¶ 98.)  On or about November 15, 2004, SN Commercial entered into a second receivership agreement with the Receiver which remains in force and effect.  (Id. ¶ 99.) Apart from what the Receiver has billed SN Commercial pursuant to the Receivership

Agreement, the Receiver has never received from SN Commercial or its counsel any additional payments, special favors, or promises of any kind.  (Id. ¶ 101.)

*Downeast stock*

On or about November 24, 2004, Bill Guptill received a letter that the Receiver wrote to Carol Guptill demanding that she turn over all stock of Downeast as well as all of the company's books, records and files and claiming that she was required to do so under the Receivership Order.  (PAS ¶ 363.)  On November 29, 2004, Downeast's counsel responded and asserted that the Receiver had no authority over Downeast.  (Id. ¶ 364.)  Through a letter from his attorney dated December 2, 2004, the Receiver replied that Carol Guptill was the sole shareholder of Downeast stock and that Downeast was, therefore, collateral.  (Id. ¶ 365.)  Although Downeast denies that Carol Guptill is the sole shareholder, it has admitted that she testified under oath in 2004 that she was then the sole shareholder of Downeast Ventures, Ltd.  (DCS ¶ 12.)  There is no indication that any stock was turned over.

*Bought Corners, NY seizure*

Around Thanksgiving 2004, certain equipment was taken from a Guptill facility located in Bought Corners, New York.  (Id. ¶¶ 379-389.)  This seizure arose as part of a replevin action that KeyBank instituted against the Guptills in New York state court.  (Id. ¶ 380.)  It appears to be undisputed that individuals or an entity not under the Receiver's control (possibly an agent or division of SN Commercial, which had by now taken over the loan) took certain heavy equipment from the Bought Corners facility and delivered all or some of it to the Receiver.  (Id. ¶ 379; POS ¶ 379.)  According to Downeast, one of the items seized was a Ford 555 backhoe owned by Downeast.  (PAS ¶ 337.)  The Receiver denies that any Ford 555 backhoe was seized in New York, but acknowledges that certain other equipment was.  (DRS ¶ 337; DCS ¶ 387.)  In

any event, the Receiver was not present when equipment was taken from the Bought Corners

facility.  He does, however, deny ever taking custody of this backhoe in Maine.  (DCS ¶ 385.)

Downeast asserts that the Ford backhoe was valued at $20,000 and was acquired by its

predecessor, Celebrations, in 1994.  (PAS ¶ 338.)

*January 17, 2005, seizure*

On January 17, 2005, the Receiver, with the assistance of Deputy Seeley, seized a 1995

Ford L8000 dump truck from a property owned by Mr. Holmes.  (DCS ¶¶ 319.)  The dump truck

VIN (1FDYW82E5SVA74377) matched the VIN of a truck registration dated December 31,

2003, in the name of Guptill Farms.  (Id. ¶¶ 320-321.)  A more recent (but not current)

registration was made in Downeast's name.  (PAS ¶¶ 257, 265, 284.)  Mr. Holmes interceded

once again on behalf of Downeast and, once again, to no effect.  (DCS ¶¶ 322-323.)  The L8000

bore a Downeast insignia on its doors, but it did not have a license plate and its registration was

not current.  (Id. ¶ 325; POS ¶ 329.)  The Receiver backs up the seizure with various additional

documents including the bill of sale for the vehicle, which identifies Guptill Farms as the buyer.

(DCS ¶ 329.)  Additionally, a more recent search of the Maine Registry of Motor Vehicles title

database on January 18, 2007, for the vehicle identification number of the L8000 indicates that

the L8000 is titled to Guptill Farms.  (Id. ¶ 331.)  Downeast asserts ownership on the grounds

that the truck was entirely paid for by Downeast and was listed on Downeast's financial

statements from the day it was purchased.  (PAS ¶ 397.)

*May 21, 2005, seizures*

On May 21, 2005, the Receiver seized a Cat Generator, 1993 Model 3412, mounted on a

mobile carrier (serial no. 6FAO9080 (unit); serial no. 81Z14956 (engine)).  He was tipped off

about the generator by Bailey, who spied what looked to be a mobile generator under a blue tarp

on land owned by Ivan Hawkins in Wesley, while Bailey was conducting aerial reconnaissance. (DCS ¶¶ 334, 335, 347; PAS ¶¶ 290-291.)  Bailey first went to Sheriff Tibbetts about the matter. (DCS ¶ 335.)  Because the pictures had been taken during the summer, when the foliage was out, Tibbetts advised Bailey to get some new pictures to better see what was located on this land. (PAS ¶ 296.)  Bailey did so and ultimately Tibbetts entered onto Hawkins's land with Bailey—without seeking permission from Hawkins—in order to determine if it was a generator under the tarp.  (Id. ¶¶ 297, 299-301.)  Tibbetts and Hawkins were acquaintances and, based on this acquaintance, Tibbetts later obtained permission from Hawkins for the Receiver to inspect the generator to determine the serial numbers.  (DCS ¶¶ 336-347.)

The Receiver checked the serial numbers and concluded that the generator was Guptill collateral.  (Id. ¶ 348.)  The defendants assert that the generator is identified on exhibit B (id. ¶ 349), though it is not clear that it is.  Exhibit B identifies a 1998 generator and does not provide serial numbers.  The generator is listed on the 1998 Guptill Farms Equipment List as "3412 Power on Trailer."[31]  In addition to the generator, the Receiver also seized a power broom, a lawn tiller, a snow plow and a bush hog that were located nearby and were not owned by Hawkins.[32]  (Id. ¶ 353; PAS ¶ 315.)

Downeast lays claim to all of this equipment.  (DCS ¶ 357; PAS ¶ 331.)  The generator was yet another piece of Soris equipment that Downeast says it equitably owned, but which the Receiver says was collateral by virtue of the fact that the Soris installment contract and related documents were in Bill Guptill's name.  (Id. ¶ 358; POS ¶ 358.)  The parties agree that the generator had not been used since the late 1990s.  (DCS ¶ 360.)  The other equipment was seized

---

[31]     Docket No. 222-22.
[32]     Neither Sheriff Tibbetts nor any of his deputies was present when the Receiver recovered these items. (DCS ¶¶ 351, 355.)

based on its proximity to the generator and based on Hawkins's report that it was placed there by Bill Guptill or one of his employees.  (Id. ¶ 361.)  In addition, Hawkins informed the Receiver that the snow plow and the power broom had been used at the Guptill Farms facility, though it also appeared that they were used by Downeast.  (Id. ¶¶ 363, 365, 369.)  Downeast concedes that it has no documentation evidencing its ownership of the bush hog or the lawn tiller.  (Id. ¶ 362.) The parties agree that Downeast had ceased to do business before the power broom and the EDF plow were recovered.  (Id. ¶ 370.)

*May 24, 2005, seizure*

On May 24, 2005, the Receiver recovered a red 1987 Mack dump truck (VIN R612ST2421) from the property of Hanscom Construction, Inc. located in Marshfield, Maine. The proprietor informed him that the truck had been placed there by Bill Guptill.  (Id. ¶¶ 371-372.)

*October 4 and 6, 2005, seizures*

Pursuant to a 2005 order in the classic cars litigation, the Receiver took possession of a 1914 Ford Model T, a 1930 Lincoln Model L, a 1930 Ford Model A pickup, a 1963 Chevrolet Impala convertible and a 1964 Chevrolet Impala SS convertible on October 4, 2005.  (Id. ¶ 373-374.)  On October 6, 2005, the Receiver took delivery of a 1967 Chevrolet Corvette, also pursuant to the 2005 order in the classic cars litigation.  (Id. ¶ 377.)  Downeast says the Superior Court's orders were erroneous because the cars were long ago gifted to Carol and Bill Guptill's children.  (PAS ¶¶ 332-336.)

*Frozen joint account*

The Receivership Order required the Receiver, *inter alia*:

> To control and take possession and to require the [Guptills] to assist the Receiver in gaining control and taking possession of all . . . financial and depository accounts of any type, including brokerage accounts relating to the [Guptill] Collateral wherever located, which are under the possession and/or control of the [Guptills] or their agents, with [the] Receiver having the right to withdraw any monies from said accounts without hindrance or delay, and to exclude the [Guptills] and their agents from any control of any nature relating to said accounts.

(DCS ¶ 390.)  After receiving a copy of the Receivership Order and correspondence from the Receiver, Bar Harbor Bank & Trust froze an account held jointly by Bill Guptill, Carol Guptill and Downeast.  (Id. ¶ 391.)  Downeast claims that freezing the account was improper because all of the funds were Downeast funds.  (Id. ¶ 392; PAS ¶ 340.)  The Receiver authorized $1,000.00 in outstanding checks to be funded on or around March 17, 2005, but the remaining funds in the account have remained frozen.  (DCS ¶ 395.)

*The Receiver's Perspective*

The Receiver asserts that he believed at the time of every seizure that he was recovering Guptill collateral.  (Id. ¶ 432.)  He further asserts that he has come to believe that he could have been mistaken with respect to two articles.  Specifically, he now believes that the EDF plow and the power broom taken from Ivan Hawkins's property "may in fact be owned by Downeast."  (Id. ¶¶ 433-436.)  The Receiver has offered to return these items to Downeast and the parties agree that neither item had been used by Downeast for several years prior to being seized and that Downeast was already out of business at the time.  (Id. ¶¶ 437-439; POS ¶¶ 437-439.)  Downeast admits that the Receiver generally did not contact Key, SN Commercial or Wyman in advance of seizing an item, but rather, notified KeyBank or SN after the seizure was completed.  (DCS ¶ 443; POS ¶ 443.)

36

*Procedural Matters*

The Guptills and Downeast have never filed any pleadings or correspondence with the Maine Superior Court that issued the receivership order to ask the Court to examine the Receiver's recovery efforts or to determine ownership over disputed equipment. (DCS ¶ 508.) Downeast was at all times aware of the state court proceedings and of the appointment of the Receiver. (Id. ¶ 531.) Downeast was aware that the Receiver was subject to the supervision of the appointing court. (Id. ¶ 532.) Downeast never sought to intervene in the state court Receivership proceedings and never sought to bring its claim of wrongful interference to the attention of the state court. (Id. ¶ 534.)

Downeast has never filed a notice of claim against the Receiver pursuant to 11 M.R.S.A. § 8107(1). (Id. ¶ 520.)

*Conspiracy?*

Downeast admits the following material facts regarding Key:

(a)    That KeyBank did not tell the Receiver what items were or were not part of Key's Collateral (DCS/POS ¶ 447);

(b)    That KeyBank never instructed the Receiver to take possession of any particular items of property (id. ¶ 448);

(c)    That KeyBank never asked the Receiver to take any property believed to be owned by Downeast (id. ¶ 449);

(d)    That KeyBank did not communicate with the Washington County Sheriff's Department concerning either Plaintiff or the Guptills, apart from counsel's communications with respect to service of process (id. ¶ 452);

(e)    That, although Key's officer spoke briefly with SN's officer after the assignment, KeyBank never had any discussions with SN about taking any assets of Downeast or trying to cut off the Guptills' money supply (id. ¶ 454);

(f)     That KeyBank personnel never took possession of any assets of Downeast (id. ¶ 456);

(g)     That nobody from KeyBank was ever physically present when any property was taken by the Receiver (id. ¶ 457);

(h)     That KeyBank never discussed with anyone at the Washington County Sheriff's Office the notion of pursuing or interfering with any property of Downeast or any other property that was not part of Key's Collateral (id. ¶ 460D);

Downeast admits the following material facts regarding SN Commercial:

(a)     That no one from SN Commercial was present during any of the recoveries that are the subject of this action (id. ¶ 461);

(b)     That SN Commercial did not tell the Receiver what items were or were not part of its Collateral (id. ¶ 462);

(c)     That SN Commercial never asked the Receiver to repossess property that was not collateral for the Guptill Loan (id. ¶ 463);

(d)     That SN Commercial did not communicate with the Washington County Sheriff's Department concerning either Plaintiff or the Guptills, apart from counsel's communications with respect to service of process (id. ¶ 466);

(e)     That SN Commercial never had any discussions with KeyBank about taking any assets of Downeast or trying to cut off the Guptills' money supply (id. ¶ 467);

(f)     That, after it acquired the Guptill Loan, SN Commercial learned that certain assets owned by one or more of the Guptills may have been transferred to others, including Downeast Ventures (id. ¶ 468);

(g)     That SN Commercial was concerned about transfers and/or liquidation of its collateral as it would erode its collateral position (id. ¶ 469);

(h)     That SN Commercial personnel never took possession of any assets of Downeast (id. ¶ 471);

(i)     That Downeast never wrote SN Commercial contending that the Receiver had taken any of its alleged assets or asking for the return of any asserts (id. ¶¶ 472-473).

Downeast admits the following material facts regarding Wyman:

(a)     That no Wyman representative was present during any of the asset recoveries that are the subject of this action (id. ¶ 474);

(b)     That Wyman has not taken possession of any property owned by Downeast (id. ¶ 475);

(c)     That Wyman did not communicate with the Washington County Sheriff's Department concerning the receivership or the Receiver's efforts to recover collateral for the Guptill Loan (id. ¶ 476); and

(d)     That Wyman never asked or instructed the Receiver to recover property Wyman believed to be owned by Downeast (id. ¶ 479).

Downeast also admits that when the Receiver and/or Bailey located a particular item of property, the Receiver alone made the decision as to whether the subject item would be recovered. (Id. ¶ 481.)

Notwithstanding the foregoing backdrop, Downeast contends that the defendants conspired on the basis of certain relationships. Defendant Bailey was a Sergeant in the Maine State Police until he retired in February 1986 and was a member of the Division of Special Investigations ("DSI"), a composite of state and federal police officers assigned to control drug trafficking. (PAS ¶ 1.) Bailey had been the vice-president in charge of operations of Vescom Security, the security company that had provided the security for the operations of Wyman and Sons since 1992. He also continued working for Wyman after leaving Vescom, but stopped working for Wyman about a year prior to his investigative work for the Receiver. (Id. ¶ 2; DRS ¶ 2.) Among the work Bailey performed for Wyman was some investigatory work in the summer of 2003 related to the alleged theft of blueberries from Wyman, which Wyman attributed to the Guptills. (PAS ¶ 3.)[33] In addition to being familiar with Wyman personnel, Bailey was familiar with Sheriff Tibbetts and had instructed him in firearms training while the two men were working for the Maine State Police. (Id. ¶ 6.) Bailey referred to Tibbetts by the nickname "Joey." (Id. ¶ 5.) The two men had served together in the state police and Tibbetts

---

[33]     The request to strike this statement is overruled.

described Bailey as a friend, though the two had not worked directly with one another other than in connection with periodic firearms training and they did not socialize outside of work.  (DRS ¶ 8.)

Just a few months prior to the Receivership Order that made McShane the Receiver, Mr. Ebbert interviewed with Wyman concerning Wyman's interest in hiring a workout consultant with respect to financial obligations Wyman faced on account of an antitrust ruling.  (PAS ¶ 4.)

Tibbetts became the sheriff of Washington County in 1998 and finished as Sheriff on December 31, 2006.  (Id. ¶ 10.)  Tibbetts is a blueberry grower and seller with 20 acres that have produced as many as 140,000 pounds in a year.  (Id. ¶ 11.)  There is no suggestion that he sells his berries to Wyman and the defendants assert that he sells them to Cherryfield Foods, a third party.  (DRS ¶ 11.)  Sheriff Tibbetts knows some of the people in management at Wyman, including one, and possibly two, executive officers.  (Id. ¶¶ 12-15.)  Tibbetts has also known Bill Guptill for years and understood that Mrs. Guptill or her family had a business separate from the blueberry business named Downeast Ventures that performed plowing work.  (Id. ¶ 16.)  He has described Bill Guptill as "a respected businessman around town."  (Id. ¶ 18.)

Bill Guptill characterizes the Receiver's conduct as hostile because Ebbert never called him to ask where any collateral was located or what property was owned by the Guptills or by Guptill Farms, despite being asked to simply call Bill Guptill and work cooperatively with him. (PAS ¶¶ 109-110, 159.)  The Receiver responds that he had no reason to expect cooperation from Bill Guptill and that the Guptills have never volunteered any information about the location of collateral.  (DRS ¶ 109.)  Downeast asks the Court to draw a very "strong" inference:

> 111.  A reasonable interpretation of this behavior is that they did not want to call Mr. Guptill to ask him where collateral was located or what property was owned by Mr. Guptill or Guptill Farms because they wanted to paint Mr. Guptill as a bad guy to assist in their blueberry theft charges and they did not care whether they

took Downeast's equipment and in fact wanted to disrupt that business to harm Guptill's family who were subsisting as employees of that business.

I do not disagree that one could infer that Wyman would want to "paint" Mr. Guptill as a bad guy, believing that he had stolen Wyman property.  Beyond that, I do not see how a reasonable juror could draw any further inferences about the "them" identified in paragraph 111 of Downeast's additional statement.

Over the course of this collateral seizure effort, Mr. Ebbert communicated frequently with counsel for KeyBank and SN Commercial and with officials at KeyBank and SN Commercial.  The Receiver has produced copies of hundreds of pages of emails he exchanged with these individuals.  (PAS ¶¶ 369-371, 379-380.)  There are hundreds more between the Receiver and officials of, and legal counsel for, Wyman.  (Id. ¶¶ 383-384.)  Downeast argues that the "sheer magnitude" of the correspondence is "indicative of their closeness in dealing (contrasted with no e-mails to Guptill or his counsel)."  (PAS ¶¶ 372, 385.)

On these hundreds of emails, Downeast has flagged two emails between Christina Oswald of SN Commercial and Mr. Ebbert.  In the first, Mr. Ebbert suggests that they might seek the appointment of a separate receiver to take over Downeast or else file a suit alleging that the Guptills made fraudulent conveyances to Downeast.  (PAS ¶ 378; Oswald Dep. at 59:17-25, Docket No. 194.)  In a subsequent email, Ms. Oswald wrote that it was necessary to shut down as many sources of cash flow as possible.  (PAS ¶ 378; Oswald Dep. at 62:21-66:16.)  Ms. Oswald has denied ever wanting to shut down Downeast Ventures "per se" and has testified that the objective was to prevent the Guptills from obtaining cash by selling SN's collateral.  (Oswald Dep. at 69:1-6 & 70:3-71:17, cited in PAS ¶ 378 and asserted in DRS ¶ 378.)

*The Soris equipment issue*

Downeast claims certain items of equipment formerly titled to Guptill Farms on the ground that, at the time the Key loan documents were executed, the items were already subject to a preexisting purchase money interest held by Soris Financial (a division of Case Credit) and were, therefore, excluded from the security interests given to KeyBank in connection with the Key loan.  (PAS ¶¶ 209, 354-356.)  Downeast makes the following assertion regarding the "Soris equipment":

> 209.  In the description of what it was taken [sic] as collateral when it made the 2000 loan to Guptill Farms, KeyBank had specifically excluded certain equipment which was subject to already existing financing with Soris Financial (a division of Case Credit) (hereinafter "the Soris Equipment").  <u>See</u> Exhibit I[34] attached to the Amended Complaint (Doc #13) which is a true copy of that Commercial Term Sheet with KeyBank specifically excluding as "collateral" the machinery, and equipment which was subject to a prior lien from Soris Credit.  Guptill Aff. II, ¶ 33 (filed March 12, 2007).[35]

The Receiver responds that the term sheet was not part of the final loan documents; that it indicated that "[t]his proposal is for discussion purposes only and does not present a commitment to lend"; and that the term sheet, in any event, only would have prevented KeyBank from having a priority interest in the Soris equipment.  (DRS ¶ 209.)  The term sheet describes the Guptill's personal collateral as follows:

> A first and only mortgage on all personal assets, excluding certain machinery and equipment which is subject to a prior lien from Soris credit, and your house and camp which would be subject to prior liens from Machias Savings Bank and the Jonesport property which is subject to a prior mortgage from a private individual.

(Docket No. 13-10.)  On April 9, 2003, William Guptill created a document listing numerous items of equipment that was meant to transfer ownership of these items to Downeast "in return for Down East Ventures Ltd. assuming the balance of the Soris contract and remaining

---

[34]        Docket No. 13-10.
[35]        Docket No. 253-2.

payments." (Docket No. 13-5.) This is the document on which Downeast bases its claim to ownership of the Soris equipment, allegedly free and clear of the corporate and personal security interests given by Guptill Farms and the Guptills in conjunction with the Key loan.

### *The September 1, 2004, letter*

Downeast asserts that on September 1, 2004, the Receiver's counsel wrote a letter in which it was acknowledged that the Receiver had no right to take possession of the property of Downeast. (PAS ¶ 357.) Downeast cites Bill Guptill's second affidavit exclusively, which does not in turn cite the letter at issue. (Docket No. 253-2 ¶ 37.) The Receiver refers the Court to a September 1, 2004, letter authored by the Receiver's counsel and addressed to Downeast's counsel. (DRS ¶ 357; DCS ¶ 518.) In that letter it is stated that "it has certainly been the Receiver's intent to limit the search only to . . . property now or formerly owned by Guptill and encumbered by the Key security interests," and advised that parties with claims "free and clear" of those interests should contact either Mr. Ebbert or the author of the letter with proof of ownership. (Docket No. 222-43.) The correspondence does not make any reference to the Receiver's right to seize any "property of Downeast," as Downeast puts it. Downeast had not responded to suggest that this letter is not the one to which it refers in paragraph 357 of its additional statement.

### *Damages*

Downeast has established that its ongoing business operations were dependent on the use and possession of some or all of the seized equipment discussed herein and that, as a consequence of the seizures, its business faltered and Downeast was forced to attempt to sell what equipment remained. (PAS ¶¶ 361, 367, 387.)

*Downeast's charts*

At paragraph 395 of its statement of additional material facts, Downeast asserts that there are ten exhibits attached to an affidavit of Bill Guptill (Docket No. 138, Exs. A-J) that provide schedules of the numerous items of equipment owned by Downeast and taken by the Receiver. Downeast offers codes within these schedules to indicate the manner of Downeast's "acquisition of the various items and the circumstances of the taking of each." Predictably, the Receiver has requested that the statement be stricken because it contains multiple assertions in violation of Local Rule 56(b). I sustain this objection. I have not waded through several hundred factual statements only to scrutinize them all over again in a format that is not in compliance with Local Rule 56.

*Certain concluding attestations*

Bill Guptill attests that it "was made clear during his discussions with KeyBank representatives" prior to the execution of the loan documents that the vehicles and equipment that are involved in this case "were not considered collateral by either side." (PAS ¶ 399.) In their consolidated response the defendants deny the statement and cite the security agreements, which they say contain descriptions of the collateral that are expansive enough to affect ownership rights in these vehicles and equipment, as well as merger provisions that are designed to "supersede any prior discussions." (DRS ¶ 399.) It is apparent from the record that the Receiver was not a party to the loan or to discussions related to the execution of the loan documents. Bill Guptill also attests that none of the loan documents specifically identifies any of the vehicles or equipment at issue. (PAS ¶ 400.) The defendants respond with another denial based on the broad, categorical language used in each of the security agreements. (DRS ¶ 400.) Bill Guptill further attests that none of the items at issue in this case were ever appraised by

KeyBank, although other items were.  (PAS ¶ 401.)  The defendants refer, again, to the language

of the security agreements and to the merger provisions, by way of denial.  (DRS ¶ 401.)  Two

final attestations are that KeyBank and Wyman never sought affidavits of ownership as to the

contested items, as of the time that the loan documents were executed, and that the 1998 Guptill

Farms Equipment List eventually relied upon by the Receiver was not used in connection with

the loan closing, but was simply a list of equipment available to Guptill Farms in connection

with its operations.  (PAS ¶¶ 402-403.)  As with the other attestations, it is not clear what

connections these matters have to the Receiver and his conduct.  In any event, the defendants

deny the statements based on the security agreements and they further assert that the 1998

Guptill Farms Equipment List was a list produced by Bill Guptill (*see* Guptill Dep. at 36:9-38:5,

Docket No. 184) and that the title of the list justified the Receiver's reliance on it as evidence that

the listed items were collateral.  (DRS ¶¶ 402-403.)

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay

the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container,

Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to

judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the

governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  In reviewing the record for a genuine issue of material fact, the Court must view the

summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merch. Ins. Co., 143 F.3d at 7.  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

## A.      The Receiver Has Immunity

The Receiver argues that summary judgment should enter against the § 1983 claim because quasi-judicial immunity shields court-appointed receivers from vexatious lawsuits and/or because qualified immunity shields state actors who have not knowingly violated clearly established rights.  ("Receiver Mem." at 3-6, Docket No. 216.)  In opposition to the motion, Downeast explains why it believes it had a right under the Due Process Clause of the Fourteenth Amendment to receive predeprivation process in connection with the seizure of any equipment in which it has a possessory interest or which has been titled or registered in its name.[36]  (Downeast Opp'n at 3-10, Docket No. 256.)  This is a startling development because I found in my Recommended Decision on the defendants' Rule 12(b)(6) motion, which the Court adopted, that Downeast "effectively abandon[ed]" any due process claim by failing to discuss or cite authority in support of such a claim in its memoranda opposing the defendants' various motions to dismiss and/or stay the case.  (Rec. Dec. at 17 & n.9, Docket No. 77.)  Moreover, Downeast's complaint contains only one reference to due process, and that is in relation to "substantive due process," not procedural due process.  (First Am. Compl. ¶ 78.)  Under these circumstances, I feel that it is

---

[36]      The possession issue is somewhat unclear because many seizures took place on the premises of third parties.  Also, the predeprivation notice question is not exactly straight forward because Downeast was clearly on notice that the Receiver had been appointed and that the Receiver was empowered to seize the Guptill's personal property, including property acquired subsequently to the execution of the Key Loan documents, whether or not it was presently in the possession of a third party.  Finally, if Downeast had desired a predeprivation hearing it might well have obtained one in the state court or in this court with a motion requesting injunctive relief and articulating the due process rights that were at stake.

too late to ask this Court to determine whether the Due Process Clause required that Downeast receive predeprivation process in connection with the contested seizures. The question at issue at this juncture is whether Downeast has a trial-worthy Fourth Amendment claim for unreasonable seizures under Section 1983 of the Civil Rights Act.

An analysis of the Fourth Amendment claim against the Receiver is complicated by the fact that Downeast's opposition to the Receiver's summary judgment motion focuses so heavily on the due process question without directly arguing any Fourth Amendment claim. Nevertheless, based on Downeast's opposition to the County Defendants' summary judgment motion, the positions taken in Downeast's statements of material facts, and the conspiratorial gist of the fact summary and anti-immunity argument in its opposition to the Receiver's motion, it is a relatively straight-forward matter to articulate the Fourth Amendment claim.

The Fourth Amendment protects the people from unreasonable seizures of "their persons, houses, papers, and effects," U.S. Const. amend. IV, and a seizure occurs whenever there is "meaningful interference with a . . . possessory interest" in personal property, Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)), whether or not that interference arises in a criminal or in a civil context, id. at 67 n.11 ("[W]e reaffirm today our basic understanding that the protection against unreasonable searches and seizures fully applies in the civil context."). As with all Fourth Amendment seizures, the touchstone is the objective reasonableness standard, which entails "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." Scott v. United States, 436 U.S. 128, 137 (1978). The Court must consider whether "the facts available to the officer at the moment of the seizure" were sufficient to "warrant a man of reasonable caution in the belief that the action taken was appropriate," in order to guard against "intrusions upon

constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches."
Terry v. Ohio, 392 U.S. 1, 21-22 (1968).  In this case Downeast maintains that the Receiver
lacked a reasonable basis to conclude that some or all of the contested items were Guptill
collateral subject to his powers under the Receivership Order.  The Receiver Defendants (the
McShane Group and Ebbert) assert that they enjoy absolute immunity from civil liability because
they faithfully carried out quasi-judicial duties pursuant to the Receivership Order.  (Receiver
Mem. at 3-4.)  Alternatively, the Receiver Defendants argue that they are shielded by the
doctrine of qualified immunity because a reasonable officer in their position would not have
thought any of the collateral seizures would violate one of Downeast's clearly established rights.
(Id. at 5-6.)

 In Kermit Construction Corporation v. Banco Credito Y Ahorro Ponceno, the Court of
Appeals for the First Circuit affirmed the dismissal of a civil rights claim against a receiver
where nothing in the complaint suggested "that the receiver was not faithfully and carefully
carrying out the orders of the appointing judge."  547 F.2d at 3.  In doing so, the Court
recognized that receivers who faithfully and carefully perform their court-appointed
discretionary duties are entitled to absolute immunity rather than qualified immunity and that, in
order to meet the objectives of "prevent[ing] vexing suits against public officials" and doing so
"as quickly as possible," the evidentiary burden "falls on the plaintiff."  Id.  Although Downeast
would take the position that the collateral seizures in this case were not performed in good faith
or with sufficient caution, it does not focus its argument on the particulars of each seizure and
resorts, instead, to broad-brushed challenges such as the contention that there should have been
probable cause hearings prior to the seizure of contested property or that it was "clear" from the
loan documents that none of the items at issue had been hypothecated in connection with the Key

loan.  (Downeast Opp'n to Receiver Mem. at 9, 12-13.)  These particular arguments are

insufficient to overcome the Receiver's motion.  The Superior Court delegated authority to the

Receiver to marshal the collateral, which necessarily means that the Receiver was expected to

exercise discretion in connection with the seizure of property, not to pepper the court with

inquiries as to whether each and every contemplated seizure was justified.  That sort of approach

would as readily have been attained by neglecting to appoint a receiver and having the creditors

file serial motions for preliminary injunctions.  That is clearly not what the Superior Court

contemplated when it issued its Receivership Order.  The second point about how clear it is that

the items in question where not hypothecated begs the material question about whether the

grounds offered by the Receiver are sufficient to justify the seizure and retention of the contested

items in view of the expansive security interests given by Guptill Farms and by the Guptills

individually.  In the context of quasi-judicial immunity, it is Downeast's burden to take up that

issue and demonstrate the absence of any plausible basis for one or more of the seizures, as well

as the existence of bad faith.  That kind of focused argumentation is missing from the

memoranda submitted on behalf of Downeast.  Additionally, the summary judgment statements

of material facts do not present any situations in which the Receiver's exercise of discretion

could fairly be regarded as even reckless, let alone faithless.  Some of the seized classic cars

were the objects of a court order specifically calling for their seizure, which would obviously call

for an application of quasi-judicial immunity.  Various other items of seized equipment were

identified on Key loan exhibit B, clearly flagging that they were collateral for the loan.

Numerous other items of equipment were subject to a bill of sale from Bill Guptill to Downeast

that was executed well after the Key loan security agreements.  The language of those security

agreements was clearly expansive enough to justify the seizure and retention of these "Soris bill

of sale" items, particularly where Downeast's claim is based on the theory that Bill Guptill held these items as a constructive trustee for Downeast.  It is not an act of bad faith for a receiver to seize items falling within the scope of a security agreement and to refuse to voluntarily relinquish possession in the face of that kind of claim.  For yet other items not falling into the foregoing categories there are documents (vehicle registrations, bills of sale, IRS documents and, yes, even the 1998 Guptill Farms Equipment List[37]) that suggested use or control by Guptill Farms or one of the Guptills that was consistent with an ownership interest and that was not outweighed by any competing evidence demonstrating ownership on the part of Downeast. Miscellaneous other pieces of equipment, for which no documentation appears to exist for or against Downeast, were seized on the basis that they were being kept with or were associated with other items of collateral.  The record does not reveal any documentary basis tending to establish that ownership of these items is in Downeast as opposed to Guptill Farms or the Guptills and, by extension, that it was an act of bad faith for the Receiver to seize this equipment by virtue of its association with Guptill property.[38]  Based on my review of the record, I find that there is no evidentiary basis in the record to support a factual finding that the Receiver's exercise of discretion in the course of making the collateral seizures at issue in this case proceeded from

---

[37]        There is no evidentiary basis in the record for a fact finder to conclude that it was an act of bad faith for the Receiver to treat the 1998 Guptill Farms Equipment List, which was created by Bill Guptill, as a reliable indicator of an ownership interest in Guptill Farms.

[38]        There are a couple of "loose ends" in the record when it comes to a certain dance floor contained in one of the van trailers and the Ford 555 backhoe that apparently went missing from Guptill Farms's Bought Corners facility.  It is not clear from the record whether there is any ongoing controversy over retention of the dance floor, but its seizure occurred by virtue of its presence in one of the van trailers that was used by Bill Guptill to store Guptill Farms equipment.  As for the Ford 555 backhoe, the Receiver did not make any seizure at the Bought Corners facility and the record fails to establish that this backhoe ever came into the possession of the Receiver.  I cannot understand why either of these loose ends would prevent the Receiver from having immunity because they do not tend to demonstrate the existence of bad faith on the Receiver's part.

faithlessness or carelessness,[39] as opposed to a reasonable exercise of the discretion delegated by the Superior Court.

## B.      The Banks, Wyman and Bailey Were Not State Actors

KeyBank, SN Commercial, Wyman and Harry Bailey, in addition to other arguments, contend that they cannot be liable under section 1983 of the Civil Rights Act because they are not state actors.  ("Key's Mem." at 2-8, Docket No. 214;  "Wyman's Mem." at 5-10, Docket No. 215;  "SN's Mem." at 5-8, Docket No. 221;  "Bailey's Mem." at 3-8, Docket No. 225.)  Section 1983 affords a civil action against every person who acts under color of state law to subject another to a deprivation of any rights, privileges or immunities secured by the federal Constitution and federal law.  42 U.S.C. § 1983.  A basic prerequisite to such a claim is that the defendants must have acted "under color of state law," which means that persons ordinarily are not liable under Section 1983 when they act as private citizens; they are only liable when they engage in conduct that can fairly be attributed to the state, such as when a person acts in his or her capacity as a state officer.  Id.; Estades-Negroni, v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005);  Brown v. Newberger, 291 F.3d 89, 93 (1st Cir. 2002);  Tomaiolo v. Mallinoff, 281 F.3d 1, 8-9 (1st Cir. 2002).

The state actors in this case are the Receiver Defendants and the County Defendants.  I have recommended that the Court grant summary judgment in favor of the Receiver Defendants

---

[39]      I find it somewhat awkward to apply the "faithful and careful" standard of Kermit because the underlying claim concerns a Fourth Amendment standard that has little, if anything, to do with an officer's subjective motivations.  See Whren v. United States, 517 U.S. 806, 813 (1996); Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).  This species of immunity, being "absolute," obviously affords better protection than the doctrine of qualified immunity, which is said to shield all but those officers who "knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1st Cir. 1986).  In effect, the absolute immunity afforded to quasi-judicial officers would appear to require not just a showing that a reasonable officer in the defendant's position would have known that the conduct in question violated a clearly established right (the qualified immunity test), but also that the defendant's conduct was actually motivated by an intention to violate that right (the good faith overlay of the Kermit standard).  Assuming that there were evidence of bad faith in this record, which I cannot find based on my review, I would still find that the record is insufficient to establish that a reasonable court officer in the Receiver's position, having at his disposal the facts then known to Mr. Ebbert, would have known that the seizures at issue violated a clearly establish Fourth Amendment right.

on the Section 1983 claim based on their quasi-judicial immunity to civil damages actions. In the companion Recommended Decision I have similarly recommended that summary judgment enter for the County Defendants on the 1983 claim based both on my assessment that their limited conduct (not being the seizing party) could not fairly be regarded as unreasonable in light of the facts known to them and on the fact that they are entitled to qualified immunity under the circumstances. If the Court adopts these recommendations, then the only remaining window of liability under Section 1983 for the private actors would be in relation to the conduct of the Receiver Defendants because I have not yet addressed the objective reasonableness of every seizure or ongoing retention of property in terms of the core Fourth Amendment question. I have only concluded in this Recommended Decision that the record cannot support a finding that the Receiver Defendants acted in bad faith or, alternatively, that it cannot establish that their conduct reflected a violation of a clearly established constitutional right in light of all the facts known to them. In view of this window of theoretical liability, I consider now whether the record contains the kind of evidence that would support treating the private actors as state actors for purposes of the Section 1983 claim and the related claim for fees under Section 1988.

The Court of Appeals for the First Circuit has sanctioned "the following three tests to determine whether a private party fairly can be characterized as a state actor: the state compulsion test, the nexus/joint action test, and the public function test." Estades-Negroni, 412 F.3d at 5. Downeast asserts the nexus/joint action test because it maintains that there was a conspiracy afoot to wrongfully seize its assets and equipment in order to shut down its operations. (Downeast's Consol. Opp'n to Private Actors' Mems. at 1-5 & 13, Docket No. 255.) Contrary to Downeast's belief, the question is not whether the private creditors "worked with," "used," "utilized," "misled," told falsehoods to, befriended or were "acquaintances of" the state

actors (id. passim).  As a matter of law, these creditors did not become state actors merely by

utilizing the receivership process to achieve their private ends, Estades-Negroni, 412 F.3d at 7,

and merely working with, using or even befriending state actors while pursuing private ends is

not enough in itself to justify superimposing constitutional claims brought under the Civil Rights

Act atop the usual state law tort claims available to redress private misdeeds.  See, e.g., Andresen

v. Diorio, 349 F.3d 8, 13 (1st Cir. 2003) ("[I]t is settled that the fact that private parties give the

police information on which official action is then taken does not by itself convert the private

parties into state actors.");  Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1996)

("Because . . . the officers who requested the warrant independently exercised reasonable

professional judgment in applying for it, . . .  there is no principled basis for attributing state

action to [the private actor whose report of wrongdoing led to an arrest and prosecution].").

Instead, it must be established that the private actors and the state actors jointly engaged in the

activity that is said to have worked a deprivation of the federal right in question, Lugar v.

Edmondson Oil Co., 457 U.S. 922, 937 (1982) (suggesting that state actor status could arise for a

private party who has "acted together with or has obtained significant aid from state officials"),

or that there was an "actual conspiracy" between the state and private actors to have the state

actor perform "a plainly prohibited act."  Casa Marie, Inc. v. Superior Court of P.R., 988 F.2d

252, 259 (1st Cir. 1993) (addressing allegations of "[c]orruption, [c]onspiracy, [u]surpation, or

[c]ollusion").  When a court-appointed receiver seizes property in an effort to preserve the

collateral of a private creditor it is not hard to imagine a situation in which joint activity or a

collaborative decision-making process could lead to a wrongful seizure that would expose the

creditor to civil rights liability.  The Supreme Court has explicitly held that "a private party's

joint participation with state officials in the seizure of disputed property is sufficient to

characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." Lugar, 457
U.S. at 941.[40]  Still, although joint action is a malleable concept, Downeast needs to demonstrate
that the private actors actually participated in the contested seizures, or that the state actors relied
in some material fashion on the assistance of the private actors to effectuate the contested
seizures, or that the state actors agreed to engage in a plainly prohibited act on behalf of the
private actors.  I conclude that this effort is thoroughly undermined by certain admissions in the
record; specifically those reflecting:

> (a)      that KeyBank did not tell the Receiver what items were or were not
> collateral, never instructed the Receiver to take possession of any items of
> property, never took possession of any assets of Downeast and was never present
> when any property was taken by the Receiver (DCS ¶¶ 447-449, 456-457);

> (b)      that SN Commercial did not tell the Receiver what items were or were not
> collateral, never asked the Receiver to seize property that was not collateral, and
> never took possession of any assets of Downeast[41] (id. ¶¶ 462-463, 471);

> (c)      that Wyman was never present for any seizures, did not take possession of
> any contested property, and never asked or instructed the Receiver to recover
> property believed to be owned by Downeast (id. ¶¶ 474-475, 479);  and

> (d)      perhaps most significantly, that when the Receiver and/or Bailey located a
> particular item of property, the Receiver alone made the decision whether to seize
> the item (id. ¶ 481).

In addition to these undisputed facts, the record is void of evidence demonstrating an actual

agreement by the Receiver to engage in a plainly unlawful seizure.  It is also void of evidence

---

[40]      The Court also held that the mere invocation of the aid of a state official sufficed to make a private actor a
state actor for purposes of a due process claim, where a prejudgment attachment was ministerially issued by a state
official (a clerk) on the basis of an ex parte application by the private actor.  Lugar, 457 U.S. at 942.  This case, of
course, does not involve the same kind of abrogation of discretionary oversight on the part of the state.  Nor does it
have a surviving due process claim.  Here, the Superior Court appointed a receiver to exercise independent judgment
with respect to collateral seizures, making this case unlike Lugar.

[41]      The admissions concerning SN Commercial lack a statement to the effect that SN Commercial was never
present during a seizure.  I conclude that this statement is omitted because of SN Commercial's involvement in the
Bought Corners, NY seizure, which occurred following litigation in that state and did not arise by virtue of the
Receiver's exercise of his authority in joint activity with SN Commercial.  The record does not present any factual
scenario in which SN Commercial participated jointly with the Receiver in the seizure of contested property.

demonstrating that the private creditors have participated in any decision to retain disputed property.  On these facts, I do not see how the private actors can be regarded as having jointly participated with the Receiver in the seizure or retention of any contested property.  Because it is undisputed that the private creditors were not present for any of the Receiver's contested seizures and did not usurp or otherwise participate in the Receiver's exercise of discretion with regard to whether or not to seize a particular item of property, and because there is no evidence of an agreement between the private creditors and the Receiver to violate constitutional rights, as a matter of law the private creditors cannot be deemed state actors with respect to those seizures or co-conspirators with any state actor in relation to a plan to purposefully and wrongfully deprive Downeast of its property.

Harry Bailey is in a somewhat different predicament, due to his physical presence at many of the seizures and also due to the fact that he served as something of a dual agent with respect to the search for potential collateral, serving both the Receiver and the private creditors. The facts that Downeast has presented in regard to Mr. Bailey reflect his participation in various alleged "trespasses," his efforts to search out potential collateral, and his social connections with Wyman personnel and the individual county defendants.  The alleged trespasses onto the property of third parties obviously do not support a civil rights claim by Downeast.  Nor do Bailey's efforts to search out potential collateral because the constitutional claim in this case concerns seizures, not searches.  As for the contested seizures, it is still a decisive undisputed fact that the Receiver retained for his sole exercise all of the discretion delegated to him by the Superior Court to seize personal property that he believed was collateral for the Key loan.  In the absence of any evidence that Harry Bailey seized any contested property or influenced the Receiver's decision whether to seize contested property, he is in all material respects in the same

position as the private creditors, despite his physical presence during various seizures.  Finally, the mere fact that Bailey was friendly with the individual county defendants and with some Wyman personnel is insufficient to support an inference that there was an actual conspiracy to wrongfully deprive Downeast of its property.

In summary, to the extent that any theoretical basis for liability remains for the private defendants after the Receiver and the County Defendants are dismissed based on quasi-judicial immunity and qualified immunity, the summary judgment record is not sufficient to support a finding that any of the private actors in this case participated in the discretionary act of seizing contested property or conspired with the state actors to wrongfully deprive Downeast of its property.  Accordingly, summary judgment should enter for the private defendants on the federal civil rights claims because they cannot fairly be deemed state actors for purposes of Section 1983 and the claim for attorney fees under Section 1988 depends on the Section 1983 claim.

**C.     The State Law Claims Against the Receiver, the Creditors and Harry Bailey Should Be Dismissed Without Prejudice**

Downeast's civil rights conspiracy claim and its related plea for attorney fees under 42 U.S.C. § 1998 are the only claims in this litigation over which this Court has subject matter jurisdiction and subject matter jurisdiction is the only basis for jurisdiction asserted by Downeast Ventures in its complaint.[42]  (First Am. Compl. ¶ 11, citing 28 U.S.C. §§ 1331, 1343.)  Because the remaining claims in counts two through ten of the first amended complaint and SN Commercial's fraudulent transfer counterclaim are all state law pendent claims, and because they call for a more searching analysis of the parties' rights in respect to numerous items of equipment presently subject to receivership in the Superior Court, it would be most appropriate for the

---

[42]     Because Downeast has its principal place of business in Maine and several of the defendants are Maine citizens, there is not complete diversity of citizenship and jurisdiction cannot be exercised pursuant to 28 U.S.C. § 1332.

Court to dismiss these claims, without prejudice, so that Downeast may pursue them, or not, in the venue that has already taken the items into its custody.  For that reason, I recommend that the Court deny the pending motions for summary judgment to the extent they seek judgment on Downeast's state law claims against the Receiver and the private defendants;  that the Court also deny the motions for summary judgment that concern the fraudulent transfer counterclaims put forward by SN Commercial and Wyman (Docs. 176 & 223); and that the Court deny as moot the motion to strike the jury demand in relation to their alter ego defense (Docket No. 213).

The only wrinkle in this recommendation is that, if adopted, the Court would be dismissing without prejudice most, but not all, of the state law claims over which it has supplemental jurisdiction, and entering judgment against the rest.  The Court already dismissed the state tort claims against the County Defendants in a prior order on the defendants' motions to dismiss, because Downeast conceded that judgment should enter on those claims.  (Rec. Dec. at 23, Docket No. 77.)  Additionally, in the companion Recommended Decision to this Recommended Decision, I have advised that the Court grant summary judgment to the County Defendants on the Maine civil rights claim because I have found, based on my review of the record, that there is no trial-worthy Fourth Amendment claim against the County Defendants and the parties have agreed that the Maine civil rights claim, which implicates Article I, section 5 of the Maine Constitution, rises or falls with the federal civil rights claim.  In effect, the Court would be granting summary judgment to the County Defendants on all remaining claims, including pendent state claims, but dismissing without prejudice all pendent state law claims against the Receiver, Wyman, KeyBank, SN Commercial and Harry Bailey, pursuant to an exercise of discretionary authority under 28 U.S.C. § 1367(c).  I have been unable to find any authority suggesting that the Court's exercise of discretion under Section 1367 must be identical

as to all of the pendent state law claims or as to all of the defendants subject to those claims.  If the parties are aware of any contrary authority, they should address the issue in their objections to the Recommended Decisions.  At least under the circumstances of this case, where Downeast has already conceded the tort claims against the County Defendants, and now concedes that its state civil rights claim against the County Defendants rises or falls with its federal civil rights claim (as addressed in the companion Recommended Decision), I fail to see how it would be an abuse of discretion for the Court to proceed in this manner, so that the County Defendants are not needlessly embroiled in any subsequent action in state court, and so that this Court is not needlessly entangled in any proceeding involving rights in property subject to the Maine Superior Court's Receivership Order.  This approach, in my view, best balances "considerations of judicial economy, convenience and fairness to litigants" while also serving the interest of comity by avoiding "needless decisions of state law" where "state issues substantially predominate."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

### Conclusion

For the reasons stated herein, I RECOMMEND that the Court GRANT, IN PART the motions for summary judgment filed by KeyBank National Association (Docket No. 214), by Jasper Wyman & Son (Docket No. 215), by McShane Group, Inc., and James C. Ebbert (Docket No. 216), by SN Commercial, LLC (Docket No. 221), and by Harry Bailey (Docket No. 225), and enter judgment in their favor on Count I (§ 1983) and Count IX (§ 1988), and DISMISS, WITHOUT PREJUDICE, all pendent state law claims against these defendants.[43]  I further RECOMMEND that the Court DENY the summary judgment motions targeted at the counterclaims (Docs. 176 & 223) and dismiss the counterclaims, without prejudice.  Finally, I

---

[43]    In the event that this recommendation is adopted, the Clerk is cautioned that this Recommended Decision does not address the motion for summary judgment filed by the County Defendants.

RECOMMEND that the Court DENY AS MOOT the motion to strike Downeast's jury demand

in regard to their alter ego defense (Docket No. 213).


NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


June 13, 2007                                    /s/ Margaret J. Kravchuk
                                                 U.S. Magistrate Judge